**DYNAMIS LLP**

ERIC S. ROSEN (*pro hac vice* forthcoming)
erosen@dynamisllp.com
(617) 802-9157
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

JAMIE H. SOLANO (*pro hac vice* forthcoming)
jsolano@dynamisllp.com
(973) 295-5495
200 Connell Drive
Berkeley Heights, New Jersey 07922

BROOKE WATSON (*pro hac vice* forthcoming)
bwatson@dynamisllp.com
(305) 306-6593
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

YUSEF AL-JARANI (*pro hac vice* forthcoming)
yaljarani@dynamisllp.com
(213) 283-0685
1100 Glendon Avenue, 17ᵗʰ Floor
Los Angeles, California 90024

CAROLINE McHUGH (*pro hac vice* forthcoming)
cmchugh@dynamisllp.com
11 Park Place, 3ʳᵈ Floor
New York, New York 10007

**Parkinson Benson & Potter**
D. LOREN WASHBURN
loren@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

*Attorneys for Plaintiff Marciano Brunette*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARCIANO BRUNETTE, | Civil Case No.: |
| *Plaintiff*, | **COMPLAINT** |
| v. | JURY DEMANDED |
| DEMI ENGEMANN and JEFF JENKINS PRODUCTIONS LLC, | |
| *Defendants*. | |

## **INTRODUCTION**

1.      Certain accusations damage reputations on contact. Calling someone a "sexual predator" and accusing him of "sexual assault" does exactly that.

2.      After flirting with and kissing Plaintiff Marciano Brunette while filming the reality television show *Vanderpump Villa* in August 2024, Defendant Demi Engemann, a self-described "influencer" and star of the Utah-based reality television show *The Secret Lives of Mormon Wives*,

made those exact accusations. She then repeated and escalated them on social media and in interviews, shifting her story over time but never grounding it in specific, consistent facts.

3.    The truth is straightforward. Engemann and Marciano met while filming in Italy. They flirted. They spoke privately. They shared a consensual kiss. They separated. After filming, Engemann stayed in contact with Marciano for months through calls, FaceTime, texts, invitations, and even location sharing. That behavior confirms a continued relationship, not a person reacting to sexual assault.

4.    As Engemann faced public (and private) criticism over her conduct and her storyline developed, she reframed the obviously consensual interaction as one of sexual misconduct and then as sexual assault. She used that accusation to attack Marciano's credibility, suggesting others would "come forward," and portrayed anyone who questioned her account as acting in bad faith.

5.    Jeff Jenkins Productions LLC ("Jeff Jenkins" or "Production"), a producer of the *Mormon Wives* series, amplified the same accusations for profit. It built major storylines around Engemann's claims, republished her "sexual predator" statements, and aired the allegations in a way designed to maximize impact while cutting Marciano out and denying him any meaningful opportunity to respond. Production did so despite obvious reasons to doubt Engemann's account, including inconsistencies, delay, and facts known to Production that undermined the claims.

6.    Unequivocally, the statements of Engemann, amplified by Production, are false. They accuse Marciano of criminal sexual conduct he did not commit. They were published broadly, republished repeatedly, and framed to harden into "truth" in the minds of viewers. The damage has been immediate and severe, including lost professional opportunities, harassment by strangers, and lasting harm to Marciano's reputation.

7.    This lawsuit seeks to hold Engemann and Jeff Jenkins accountable for knowingly or recklessly publishing false accusations of sexual assault and branding Marciano a "sexual predator."[1]

## **PARTIES**

8.    Plaintiff Marciano Brunette ("Plaintiff" or "Marciano") is a resident and citizen of Las Vegas, Nevada. Brunette starred in Seasons 1 and 2 of the hit reality television show *Vanderpump Villa*.

9.    Defendant Demi Engemann is a social media influencer and a citizen and resident of Utah. She has approximately 1.2 million followers on her TikTok social media account and over 725,000 followers on her Instagram social media account. Engemann stars in the hit reality television show *The Secret Lives of Mormon Wives*, which is filmed, in large part, in Utah. Engemann has also appeared as a guest on *Vanderpump Villa*.

10.    Defendant Jeff Jenkins Productions LLC is a Delaware Limited Liability Company with its principal place of business in California. According to its most recent filing with the California Secretary of State, Jeff Jenkins has three members, each of whom resides in California. Jeff Jenkins produces reality television programming, including *The Secret Lives of Mormon Wives,* and it caused statements about Plaintiff to be published and republished to a broad audience through that program and related channels

11.    As alleged below, Engemann and Jeff Jenkins each published, republished, and/or caused the publication of false and defamatory statements and implications concerning Plaintiff, including accusations of sexual assault and the assertion that Plaintiff is a "sexual predator."

---

[1] A list of defamatory statements is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

13.     Plaintiff Brunette is a citizen and resident of Nevada, and no other defendant is a citizen of Nevada. Defendant Engemann is a citizen of Utah and Defendant Jeff Jenkins is a citizen of California because, upon information and belief, all three of its members are citizens of California.

14.     This Court has personal jurisdiction over Engemann because she resides in Utah and, upon information and belief, committed the tortious conduct alleged in this Complaint in Utah, including publishing and republishing defamatory statements from Utah that were directed to and caused harm in Utah and elsewhere.

15.     This Court has personal jurisdiction over Jeff Jenkins because it intentionally produced, edited, and caused the publication and republication of the defamatory statements at issue through a television series centered on Utah-based cast members, filmed in substantial part in Utah, and distributed the defamation to Utah audiences. Jeff Jenkins also purposefully directed its conduct at Utah by creating and distributing content into this District and by republishing Engemann's accusations as part of the program's storylines and promotion.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Engemann resides in this District.

17.     Venue is proper in this District under 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Upon information and belief, at least some of Engemann's and Jeff Jenkins' defamatory comments were made and published

from this District, the defamatory statements were disseminated into this District, and were republished in a television series that centers around several women who live and work in this District.

## **FACTUAL ALLEGATIONS**

### A.    **Relevant Background**

18.    *The Secret Lives of Mormon Wives* is a reality television series that follows a group of Utah-based social media influencers dubbed "MomTok" and various dramatic storylines about the influencers' personal and professional lives.

19.    Jeff Jenkins produces *The Secret Lives of Mormon Wives.*

20.    Engemann, who has been on the show for all three seasons, is one of the stars of *The Secret Lives of Mormon Wives.*

21.    Season 1 of *The Secret Lives of Mormon Wives* was released on Hulu on or about September 6, 2024, and became Hulu's most-watched unscripted season premiere of 2024. Season 2 was released on or about May 15, 2025. Season 3 was released on or about November 13, 2025. On or about November 25, 2025, it was announced that, given the show's popularity, it had been renewed for a fourth season.

22.    *Vanderpump Villa* is a reality television series starring Lisa Vanderpump, a British businesswoman. The show focuses on the personal lives of Vanderpump's staff who work in a lavish European chateau that hosts various guests. Season 2 of *Vanderpump Villa* was filmed and set in Italy.

23.    Marciano was a staff member on *Vanderpump Villa*. It was there that he met Engemann, who was a guest, along with other castmates from the *Mormon Wives* show. The

interactions between Marciano and other cast members were filmed and broadcast publicly as part of *Vanderpump Villa*.

**B.**    **Plaintiff's Public Profile and Professional Interests**

24.    Plaintiff is a public-facing individual who has appeared in television and streamed reality programming and related media.

25.    Plaintiff's professional opportunities and earning potential depend in substantial part on his reputation, public perception, and his ability to participate in entertainment projects, brand partnerships, appearances, and other commercial opportunities that require trust, credibility, and marketability.

26.    Plaintiff has pursued opportunities in reality television and similar programming, including participation in projects that rely on audience engagement and commentary about cast members' personal lives.

27.    Before Defendants' publications described in this Complaint, Plaintiff maintained a positive public image and did not have a reputation for sexual misconduct or predatory behavior.

28.    Accusations of sexual assault, sexual misconduct, and being a "sexual predator" are uniquely damaging in Plaintiff's line of work because networks, production companies, sponsors, and partners routinely avoid association with individuals who face such accusations, regardless of their truth.

**C.**    **Engemann and Plaintiff Met During Filming in Italy and Engage in Flirting and Friendship**

29.    In August 2024, Engemann arrived as a guest at the *Vanderpump Villa* chateau. There, she met Marciano, who was acting as a server.

30.    Upon information and belief, video and audio recorders capture audio and video recordings of the entire chateau and surrounding grounds, with the sole exceptions being the bathrooms.

31.    Engemann and Marciano interacted extensively during her time on *Vanderpump Villa*.

32.    For example, as depicted in Season 2 of *Vanderpump Villa*, the two removed themselves from the larger group, flirted, and talked extensively about their personal lives. During their time together, in an encounter that was not aired, Engemann and Marciano exchanged a kiss on the lips. Engemann then told Marciano: "I love you."  Marciano responded back: "I love you too."

33.    The kiss and related contact were consensual. Engemann did not express non-consent, did not resist, and did not treat her interactions with Marciano as an assault because they were not.

34.    The interaction ended without incident. Plaintiff did not touch Engemann in any manner she communicated was unwanted. Some of Marciano's and Engemann's interactions were aired during the *Vanderpump Villa* Season that was released publicly on April 24, 2025. Most were not.

35.    Marciano left the encounter under the impression that Engemann was a friend who likely intended to leave her then-husband in the future, possibly to pursue a relationship with Marciano.

36.    Engemann's later public story about her interaction with Marciano changed over time. Months after filming, she began to describe the Italy interaction in increasingly negative and sensational terms.

37.     Engemann ultimately characterized the consensual encounter as sexual misconduct and then as sexual assault, including by describing specific physical contact in ways that were inconsistent with her earlier accounts and inconsistent with her contemporaneous conduct toward Plaintiff.

38.     These later descriptions were false. They falsely accused Plaintiff of non-consensual sexual contact and conveyed to audiences that Plaintiff committed a heinous sexual assault.

39.     Engemann's later statements also created a broader insinuation that Plaintiff had a pattern of predatory behavior, including by branding him a "sexual predator" and suggesting more women would come forward, even though she lacked any factual basis for that implication.

40.     Engemann's false narrative served to justify and normalize her later public attacks on Plaintiff and to provide a storyline that could be amplified through social media, interviews, and television publication.

**D.    Engemann's and Marciano's Continued Contact After Filming**

41.     Following Engemann's consensual interactions with Marciano on the set of *Vanderpump Villa*, Engemann remained in close contact with Marciano and the two discussed their lives and their work.

42.     The two spoke on the phone for extended periods of time, including the following approximate dates and times:

      a.    In September 2024, the two exchanged calls several times, including three conversations on September 7, 2024, lasting approximately 11, 21, and 31 minutes, and a call on the morning of September 27 lasting approximately 44 minutes.

      b.    In January 2025, the two spoke on the phone for approximately 12 minutes.

c.  In February 2025, the two exchanged calls on February 19, 27, and twice on February 28, with the calls lasting approximately 29, 10, 13, and 8 minutes.

d.  In March 2025, the two exchange numerous phone calls, some several times a day, including a call on March 7 that lasted approximately 27 minutes, 6 calls on March 10, the longest of which was approximately 37 minutes, and 3 calls the next day on March 11, the last of which lasted approximately 40 minutes starting at 10:15 at night.

43.  In addition to these phone calls, during this same time period Engemann participated in video calls with Marciano on FaceTime on several occasions. Engemann's daughter participated in at least one FaceTime call with Marciano.

44.  Marciano and Engemann also repeatedly texted and messaged each other after filming in Italy in August 2024. The parties exchanged over a hundred pages of text messages, which indicated that Engemann considered Marciano to be a close friend and confidant. None of the messages suggested that they had engaged in any type of non-consensual encounter, sexual or otherwise.

45.  For example, on August 20, 2024, Engemann sent Marciano a text message trying to cheer him up and encouraged him to "come out [to Utah] and do ketamine":



46.    The following evening, on August 21, 2024, Engemann checked in on Marciano, sending him an emoji of two hands depicting a heart:

> Wellness check 🫶 are you doing okay?

> Good!! That's so good to hear! Proud of you! ❤️ nothing but up from here. Stay the course

47.    The two confided in each other about the stress involved with their respective appearances on reality television.  Engemann told Marciano that she was nervous. In response to Marciano asking why she was worried and whether she had anything to worry about, Engemann responded:

> Nothing specifically, but just seeing how dumb people are like I'm just scared I said or did something that's going to ruin my life somehow! 😅 you just never know these days…People are so sensitive

48.     In August 2024, Engemann told Marciano he should come to Los Angeles for the premiere of her show:

> Thank you!! It'll be fun! Omg you should come to our premiere event for sure!! Would be so fun! 😍

> Lmk if you want an invite I'll message the producers and tell them to send you the details 🫶

49.     In early September 2024, Engemann texted Marciano and suggested that he come to Utah to watch the premiere of her show. When Marciano was unable to come, Engemann said that they should plan another time for Marciano to come and hang out.  The night of the premiere party, Engemann messaged Marciano:

> Thank you!!!! 🫶 missed you! I'll fill you in on it all!

50.     In the course of their messaging, Engemann jealously confronted Marciano about a rumor of him kissing another woman. Marciano told Engemann the rumor was not true, but even if it was, he would not have shared that information with Engemann because it was private. When she questioned why not, Marciano explained:

> Because that would be like me telling someone our personal things together… I wouldn't betray your trust why would I betray someone else's

Engemann responded:

> True

> Fair

51.     Engemann and Marciano even shared their phones' locations with each other as late as March 2025.

**E.      For Months After the Italy Trip, Engemann Did Not Publicly Accuse Plaintiff of Sexual Assault**

52.     Following her filming on *Vanderpump Villa* in August 2024, Engemann began filming Season 2 of *The Secret Lives of Mormon Wives*.  Upon information and belief, this filming took place from approximately October to December 2024.

53.     During the filming of Season 2, it became apparent that Engemann was prone to level false accusations about others' conduct.

54.     As an example, during the filming of a Halloween party (the "Halloween Incident") hosted by Jessi Ngatikaura, another *Mormon Wives* castmate, Engemann told her husband that her co-star's ex-husband had "put his hands on her."  Engemann intimated, and later claimed, that the subtle touch was a "shove." The video footage of the interaction showed that no aggressive action or shove occurred.

55.     Nonetheless, Engemann's accusations led to a significant argument and Engemann's husband confronted the man.  This confrontation nearly resulted in a physical altercation, and the police were called to the home.

56.     Because of this, and other incidents as described below, Jeff Jenkins knew, or recklessly disregarded, many facts that created doubt concerning the veracity of Engemann's later sexual assault and sexual predator accusations.

F.     **In April 2025, Months After the August 2024 Filming for _Vanderpump Villa_, Engemann First Suggested that Marciano Engaged in Sexual Misconduct**

57.     In April 2025, Hulu hosted an event where several reality stars were invited, including cast members from _Vanderpump Villa_ and _The Secret Lives of Mormon Wives_.  The event provided those in attendance valuable networking opportunities with others in the industry.  Marciano's invitation to the event was rescinded, upon information and belief, because of Engemann.

58.     On April 21, 2025, Marciano posted a video on TikTok saying "uninvited to the function cus a 30yo mormon wife's scared I'll tell her husband the truth."  At this point, the _Vanderpump Villa_ episodes featuring both Marciano and Engemann had not yet been released (even though they were filmed in August 2024).

59.     That same day, and in response to Marciano's post (three days before Season 2 of _Vanderpump Villa_ was set to be released that depicted Engemann's interactions with Marciano, and eight months after she had kissed Marciano and told Marciano she loved him), Engemann commented about the video on social media with the false accusation that Marciano was a sexual predator:

> Also he got uninvited by @hulu because he's a s3ual pr3dator that can't keep his hands to himself, not because I'm hiding anything from my husband. He's a lying clout chaser. [Marciano's screen name] hope your 15 min of fame is worth it, you're pathetic.

60.     Engemann's statement that Marciano was a "sexual predator" who could not keep his hands to himself was false and defamatory.

61.     The label "sexual predator" implied that Marciano committed criminal sexual acts, which is completely false.

62.     On approximately April 22, 2025, Engemann lied and suggested that Marciano had sexually assaulted others, commenting on Instagram that she was "[a]nxious to see how many other women come forward, I know without a doubt I'm not the first."

63.     On approximately that same day, Engemann posted a story on Instagram accusing the other castmates of not believing her allegations:  "It seems pretty clear but I guess some people are still confused – unwanted physical touch = assault. PERIOD the end.  To the people that were made aware of these events and watched me cry. and then proceed to use their platforms to victim shame, publicly called me a liar, and judge the way I handled it,  from the bottom of my heart, shame on every last one of you."

64.     On approximately April 24, 2025, Season 2 of *Vanderpump Villa* was released, including episodes that depicted some of Marciano and Engemann's interactions with each other, including Engemann telling Marciano that she had thought about divorcing her husband approximately 27 times.

65.     Around this time, Season 2 of *The Secret Lives of Mormon Wives* also included a "Reunion" episode that was filmed in or around April 2025.  Neither Engemann nor Marciano were filmed in the Reunion Episode.

66.     During the filming of the Season 2 Reunion Episode, several castmates suggested that Engemann had not truthfully characterized the nature of her interactions with Marciano during their time together on *Vanderpump Villa* and thereafter.

67.    The Reunion Episode did not air publicly until July 1, 2025. However, in anticipation of being perceived negatively in the public eye, Engemann tried to distance herself from her friendship with Marciano and lied about her interactions with him.

68.    In May 2025, with the footage from *Vanderpump Villa* public, Engemann told a reporter that "nothing happened with Marciano" while she was in Italy. She stated: "At the expense of sounding rude, there wasn't even a remote attraction to him. It sucks that women can't be kind and friendly and even playful with men in this world without it being taken as, like, you're open."

69.    On approximately May 15, 2025, Engemann appeared on a podcast called "The Viall Files." On that podcast, Engemann lied again about being assaulted, stating:

> ***I had opened up to all of the girls after Vanderpump Villa that I had been groped, sexually assaulted*** . . . I told [] the girls and I asked them not to tell anyone. A couple of the girls were like you need to like file against this guy. Like [] if this were me, this is what I would do. And I was just like Guys, like I need you to allow me to handle this the way that I want to handle it. And umm I just said I need you to respect that I don't want to talk about this and I don't want to make it legal. I don't want all of the everything that comes with making this legal on my plate right now with everything else going on. Like I do not want this to become a thing. Please promise me you won't tell your husbands. Do not tell a soul.

70.    That Viall Files episode has been viewed approximately 279,000 times.

71.    Engemann's statement that she was groped and sexually assaulted was false and defamatory. Within the context of her statement referencing *Vanderpump Villa*, where she had extensively spent time and been filmed with Marciano, the statement implied that Marciano had groped and sexually assaulted her on the set of *Vanderpump Villa*. To bolster her credibility, it implied that she had told her fellow *Mormon Wives* cast members about the "assault" contemporaneously with its occurrence.

15

72.     But, during a Season 3 episode of *The Secret Lives of Mormon Wives*, several of Engemann's castmates stated that Engemann had told them that she was *not* a victim.

73.     On approximately May 15, 2025, Season 2 of *The Secret Lives of Mormon Wives* was released. In a "confessional" interview (effectively, a one-on-one camera interview), Engemann said that Marciano had been flirtatious with her and she handled it the best way she could.

74.     As part of this confessional, Production aired a clip from the *Vanderpump Villa* which depicted Marciano hugging Engemann and kissing her on her forehead.

### G.      During Season Three, Jeff Jenkins Repeatedly Published and Republished Engemann's False Sexual Assault Allegations

75.     Upon information and belief, Season 3 of *The Secret Lives of Mormon Wives* was filmed in and around Salt Lake City, Utah, between approximately February and May 2025. Filming locations included coffee shops, restaurants and private homes located in Utah.

76.     Upon information and belief, Engemann knew that Jeff Jenkins would be interested in her story that she was a victim of sexual assault because it would be an explosive storyline for ratings.

77.     In fact, Jeff Jenkins took Engemann's false accusations about sexual assault and exploited them as one of the primary storylines for Season 3 of *The Secret Lives of Mormon Wives.*

78.     As Engemann later acknowledged, Jeff Jenkins was looking for ways to make the show more interesting by falsely depicting content to make it appear more salacious.  Engemann herself posted on Instagram a message explaining that *The Secret Wives of Morman Wives* was very "produced" and admitted that she had suggested to Production previously that they could obtain footage making it appear as if Engemann was having an affair with one of her castmates.

79.    Engemann explained that following Season 1 (*i.e.*, before Engemann falsely accused Marciano of sexual assault), Production considered staging an affair between Engemann and another castmate because the show was "boring":

> Awkward that I now have to clarify this and reveal just how produced this show is… ***Production sat us down after filming season 1 asking us for ideas for a "big cliffhanger" because the show was "boring".*** We all threw out a bunch of ideas and ***one of mine was me saying that Dakota could meet up with me to get advice about him and taylor and someone could "get footage" of us talking in the car making it seem like "something might be going on between us".*** Then at the top of season 2 it's cleared up that he was just there to get my advice about Taylor the same way he did with Mayci. It really was not that deep or serious. This is a perfect example of the "pile on" tactic these women use when someone is already down in the public eye. They ALL gave ideas for a cliffhanger, but the way that they relayed this story was as though I just "wanted to stage an affair" out of the blue for fun! No. Not at all what happened, nor would I ever stage anything on my own, unlike some 👀

(Emphasis supplied).

80.    Because of her past experience with Production, Engemann knew Production was interested in salacious stories to avoid their program being perceived as "boring," and that if she lied about Marciano sexually assaulting her, that would be a more interesting story for Jeff Jenkins to portray than the public fallout and marital discord from her flirting and kissing Marciano on *Vanderpump Villa.*

81.    Engemann was right about Jeff Jenkins.

82.    In September 2025, Jeff Jenkins posted the trailer for Season 3 of *The Secret Lives of Mormon Wives* on the Internet, highlighting Marciano in the trailer.

83.    On approximately November 13, 2025, Season 3 of *The Secret Lives of Mormon Wives*, produced by Jeff Jenkins, was publicly released.

84.    Jeff Jenkins chose to publish and feature prominently Engemann's false defamatory lies that Marciano had sexually assaulted her.

i. *Episode 6—"The Book of Confrontation"*

85.    In Episode 6—"The Book of Confrontation"—Production published footage of Engemann falsely telling another cast member that she did not kiss Marciano. She also falsely alleged that there were "two ass grabs," with the implication that Marciano had grabbed her buttocks without her consent on two occasions.  This was defamatory and never happened.

86.    Jeff Jenkins also highlighted and republished Engemann's false and defamatory comment on Instagram labeling Marciano a sexual predator who could not keep his hands to himself. Jeff Jenkins also published footage of Engemann accusing Marciano and another castmate of forming an alliance to accuse Engemann of having an affair and promising that Marciano "is not going to get away with it."

87.    Engemann's Season 3 castmates were, correctly, dubious about her sexual assault claims.

88.    Engemann compared Marciano's actions with the violent abuse that Mayci Neeley and Mikalya Matthews have publicly shared that they suffered at the hands of other men. Immediately after making the accusation, Jeff Jenkins cut to a clip of Neeley recounting that Engemann's comparison "feels a little inappropriate to me, because our situations are so vastly different.  I was in an abusive relationship. I was abused, choked, hit, pushed, all these things. I was raped.  And this situation is so different than what she went through, so, to me, it almost feels insensitive that she's trying to compare the two[.]"

89.    Jeff Jenkins further publicized Engemann shaming Neeley and Matthews for being skeptical of her accusations concerning Marciano, stating that they, as survivors of domestic violence and sexual abuse, should believe women.

ii.    *Episode 7— "The Book of Broken Hearts"*

90.    In Episode 7—"The Book of Broken Hearts"—Production aired footage of the women discussing Engemann's post suggesting that she was victimized to the same extent as Matthews and Neeley. While Engemann's social media post claimed that she cried while her castmates watched, a cast member stated, in front of Production, that she had "never seen her cry about it . . . not once [had she] seen her shed a tear."

iii.    *Episode 8—"The Book of Awakening"*

91.    In Episode 8—"The Book of Awakening"— Production aired footage of Engemann discussing her interactions with Marciano during which she falsely claimed:  "I either was sexually assaulted or I wasn't and the answer is that I was." Again, Engemann's false accusation was defamatory and understood to convey the false accusation that Marciano had sexually assaulted her.

92.    When a castmate expressed skepticism of Engemann having been sexually assaulted, Engemann equated her situation to that of a battered spouse who stayed in a relationship despite having been punched in the face by her partner.

93.    Engemann said:  "the fact that people are trying to diminish [the assault] and be like 'oh well why'd you still talk to him?' I don't know. Why'd someone who got beat 75 times by their husband stay married to them and says that they're completely in love with them? You do weird things when you're in those situations."

94.    Engemann's comparison of her interactions with Marciano as that of a battered spouse who had been beaten numerous times but remained in a marriage gave the false implication that she had been sexually assaulted and then manipulated by Marciano.  This was false and defamatory.

iv.    *Episode 9—"The Book of Judgment" and Episode 10—"The Book of Enlightenment"*

95.    In Episode 9—"The Book of Judgment"—Production depicted Engemann crying in a car with a castmate, lamenting "why am I having to defend myself against men's behavior to a group of women?"

96.    And in Episode 10—"The Book of Enlightenment"—Engemann falsely claimed, once again, that "Marciano did sexually assault me." This statement was published by Jeff Jenkins and was false and defamatory.

v.    *The Season 3 Reunion Episode*

97.    Upon information and belief, the Reunion Episode for Season Three was filmed sometime in the fall of 2025. The episode was published on December 4, 2025. Jeff Jenkins republished many of Engemann's false statements from Season Three, including Engemann's statement made in Episode 6 that "[t]here was two ass grabs."

98.    In the Reunion Episode, Engemann repeated the false allegation that Marciano sexually assaulted her—"[Y]ou can be sexually assaulted and then also continue a relationship. . . I think [it] honestly just boils down to a trauma response and having a lack of [b]oundaries."

99.    Engemann also continued to equate her interactions with Marciano to the actual sexual assault experiences of Matthews and Neeley. In response to a conversation about the sexual abuse experienced by Matthews, Engemann began crying and said that it reminded her of "everything she has been through." Engemann's comparison of her interactions with Marciano as akin to Matthews' abuse was defamatory.

100.    Engemann also confronted Neeley, stating "how uncomfortable would it be if you got [] raped by your abuser or you got slapped or [w]hatever, and then afterwards you're like, 'I love you.' And then later they're like, [] 'it's really weird that you said I love you." Engemenn's

comparison of her interactions with Marciano as similar to Neeley's violent and sexual abuse was defamatory and gave the false implication that she had been violently sexually assaulted by Marciano.

### H.    Jeff Jenkins Knew or Recklessly Disregarded the Fact that Engemann Had Not Been Sexually Assaulted, But Aired Engemann's Defamatory Statements Concerning the "Assault" Anyway

101.    Jeff Jenkins did not act as a passive distributor of Engemann's defamatory statements.  Rather, Jeff Jenkins developed, produced, edited and published a serialized program and related promotional content that repeated and amplified accusations that Plaintiff committed sexual misconduct and sexual assault and, that he is a "sexual predator."

102.    Before Jeff Jenkins republished those accusations, such as in Season 3, it had access to information that made the accusations inherently unreliable and defamatory on their face, including information in Jeff Jenkins' own possession and information readily available to it through basic, standard production practices.

103.    *First*, during filming for Season 3 of *Mormon Wives* (February to May 2025), Marciano's ex-girlfriend confronted Engemann, in view of Production, and told Engemann to retract the "sexual predator" accusation because he was not a "sexual predator."  Engemann refused to do so.

104.    *Second*, other *Mormon Wives'* castmates made clear to Jeff Jenkins that Engemann was lying about the assault. One cast member, as aired in Episode 9 of Season Three, stated, in front of Production, that Engemann's story about Marciano was false, telling Engemann:  "You're lying and it's obvious that you're lying."

105.    Another cast member pointed out in front of Production that it was strange that Engemann was sending Plaintiff photographs of her children and FaceTiming Marciano with her children after he purportedly sexually assaulted her.

106. *Third*, while filming Season 3 of *The Secret Lives of Mormon Wives*, Engemann and other cast members did an interview with Entertainment Tonight during which the Halloween Incident depicted in Season 2 was discussed. During the discussion, Engemann repeated her obviously false accusation and exaggerated further, claiming that she had actually been *shoved*, even though Production observed what had actually happened at the party. Several castmates said, in front of Production, that Engemann had not been shoved. This demonstrated, at least to Production, Engemann's willingness to repeat easily refutable lies.

107. *Fourth*, upon information and belief, Jeff Jenkins had access to on-camera footage, audio recordings, and production materials from *Vanderpump Villa* and related filming. During *The Secret Lives of Mormon Wives*, Jeff Jenkins was able to air footage depicting Marciano and Engemann that was filmed by a separate production team during their time on *Vanderpump Villa*. This footage, accessible to Jeff Jenkins, would not only refute Engemann's narrative, but would depict behavior inconsistent with the allegation that Plaintiff committed a sexual assault. Although Jeff Jenkins was undoubtedly aware that the chateau of *Vanderpump Villa* was extensively wired to capture video and audio of everything that took place on the premises, upon information and belief, Jeff Jenkins purposely chose not to take appropriate steps to investigate whether Engemann's serious accusation about Marciano, which Jeff Jenkins knew would have adverse consequences for Marciano professionally and personally, was actually true.

108. *Fifth*, Jeff Jenkins knew that Engemann's public story was delayed and shifted over time. In private and on camera, Engemann did not present a consistent account of non-consensual sexual acts. Her public statements, over time, escalated the severity of the accusation—a classic indicator of falsity.

109.    *Sixth*, Jeff Jenkins knew or should have known, and could have known with minimal diligence, that Engemann continued voluntary contact with Plaintiff for months after the Italy trip through calls, FaceTime, texts, invitations, and other engagement. That post-filming conduct was inconsistent with the portrayal of Plaintiff as a "sexual predator" who just committed a violent sexual act.

110.    *Seventh*, minimal due diligence would have revealed obvious reasons to doubt the accusations, including the absence of contemporaneous complaints consistent with the severity of Engemann's later claims. Jeff Jenkins did not address the accusations with Marciano because it made for such good television. Jeff Jenkins would have obviously understood that Engemann's accusations are among the most reputation-destroying factual accusations a publisher can broadcast.

111.    Despite all these red flags, Jeff Jenkins chose to construct and broadcast storylines that treated Engemann's accusations as credible and that repeated them in substantially the same form, including through promotional content designed to maximize audience attention and emotional reaction.

112.    Jeff Jenkins' publications heightened their defamatory harm. It presented them as part of a broader narrative of predatory sexual behavior while, simultaneously, withholding context and facts that undermined the truth of the accusations.

113.    Jeff Jenkins then exacerbated the harm by limiting, curating or excluding Plaintiff's response and by failing to provide a meaningful opportunity for Plaintiff's denial and contextual facts to be presented alongside the accusations.

114.    Finally, Jeff Jenkins' conduct was commercially motivated, as the accusations provided sensational content, drove engagement and increased viewership.  Jeff Jenkins prioritized money over truth.

115.    As described, the chateau where *Vanderpump Villa* was filmed is covered with cameras and recorders that are continually monitoring guests' interactions. Any sexual assault would have been captured on film.

116.    In an interview with Access Hollywood that was published on or about November 23, 2025, Lisa Vanderpump, the executive producer of *Vanderpump Villa*, publicly declared her support of Marciano, making clear that "I categorically know what happened because we have cameras everywhere and I have seen every ounce of the footage," and that the women who doubted Engemann "had very good reason."

I.    **Even Though Engemann's Lies Were Exposed, She Continues To Defame Marciano**

117.    Engemann and her public relations firm have attempted to assuage skeptics of her accusations by accusing them of not believing women victims. As an example, on November 18, 2025, Eda Kalkay, Engemann's publicist, stated that: "By definition, sexual assault is any nonconsensual sexual act or contact. As a woman, it distresses me that what happened to Demi is being minimized. You cannot believe the lies from a known liar."

118.    On approximately November 24, 2025, Heather McDonald, a podcast hostess, and Marciano, jointly published a post on Instagram to promote Marciano talking on Ms. McDonald's podcast. Engemann commented on the post and accused Marciano, for the first time, of having "grabbed" her "privates" without permission.  She also used an emoji to ask if Marciano's dead father was as much as a "pussy" as Marciano allegedly was.  She also opined that Marciano's dead father was disappointed and embarrassed of Marciano.

24

119.    Engemann's new accusation that Marciano "grabbed" her "privates," **_first made 15 months after interacting with Marciano_**, was false and defamatory.

120.    On or about November 25, 2025, Engemann posted a video on Instagram about how reality television was fake. In response to a comment that "this is how Marciano" felt, Engemann responded: "the recorded phone call I have say quite the opposite. [] the truth is coming . . . I like to play with my food a little before I eat it." Engemann has yet to release a private conversation between herself and Marciano, let alone one where he confesses to sexual assault.

121.    On approximately the same day, November 25, 2025, Engemann posted on Instagram a response to a rumor that that Engemann and her husband engaged in sexual activity involving urination, referred to as "fruity pebbles." She wrote: "I won't let a private act between my husband and I be a distraction from a serious act that I did not consent to." This statement was defamatory and in context gave the false implication that Marciano had sexually assaulted her.

122.    On approximately December 4, 2025, Entertainment Tonight released an interview with Engemann. In that interview, Engemann stated "unequivocally" she "was sexually assaulted and inappropriately touched without [her] consent." She also stated that Marciano "is not truthful. . . . He is lying. Not only lying about what actually happened at Vanderpump Villa, but lying about the relationship that we had."

**J.    Marciano Has Suffered Serious Injuries to His Life and Career as a Result of the Defamation**

123.    Unfortunately for Marciano, Engemann's lies and Jeff Jenkins' repeated publication of those lies have continued and he has suffered significant damages as a result.

124.    Marciano has lost multiple business opportunities due to the false allegations against him. These opportunities could have resulted in compensation. Engemann's accusations have interfered with Marciano's future business prospects.

125.     As an example, prior to Season 3 of *The Secret Lives of Mormon Wives* airing, Marciano received a lucrative contract to appear on a popular reality dating competition show. Following Season 3, the production company for the show informed Marciano that they now believed he was not the right fit.

126.     As another example, Marciano lost a lucrative opportunity to guest DJ at renowned nightclub in Las Vegas because of the accusations. This show was meant to launch Marciano's DJ career, but because his ability to DJ at respected venues has been curtailed, his DJ career has been put on hold.

127.     As a final example, he was denied an ability to attend the Season Three Reunion of the *Secret Lives of Mormon Wives*. Marciano was told that he could not attend because if he did attend, Engemann would refuse to participate.

128.     Marciano has suffered considerable mental health distress and anguish by way of Engemann initially engaging in a romantic fling with him and then accusing him of being a liar and a sexual predator who assaulted her without her consent.

129.     Marciano has suffered extreme damage to his personal and business reputation. Due to Engemann's campaign that has been bolstered by Production's publication of her lies, strangers believe that Marciano is a sexual predator who sexually assaulted Engemann.

130.     For example, on approximately November 22, 2025, Marciano attended an event where a stranger recognized him.  She immediately started screaming at him, saying that "I know what you did, get away from me!"

131.     As another example, a TikTok post stated: "Marciano is the worst man on reality tv ever (not including DVers James and & Jax)," referring to James Kennedy, a reality television personality who was arrested for domestic violence in December 2024, and Jax Taylor, who was

26

credibly accused of domestic violence by his estranged wife.  In one comment to this post, an individual wrote "[t]hey're the top 3," lumping Marciano in with *actually* violent men.

132.    In response to a different fan's post on TikTok stating "I cannot STAND Marciano from Vanderpump Villa," multiple users made negative comments like "[h]e's such a creep" and "[h[e's a creep," and continued to draw connections between Marciano and Jax Taylor.

## CAUSES OF ACTION

### COUNT ONE
### (Defamation)
*Against All Defendants*

133.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

134.    Defendants repeatedly and publicly falsely accused Plaintiff of criminal conduct, sexual misconduct, and spreading lies.

135.    Defendants' statements were about Plaintiff.

136.    Defendants' statements were false, defamatory, and not subject to any privilege.

137.    Defendants' statements were published with the requisite degree of malice, that is, Defendants made the statements with reckless disregard and/or willful knowledge of their falsity.

138.    It was both objectively and subjectively unreasonable for Defendants to believe the truth of Engemann's statements about Marciano.

139.    Defendants' statements were the types of statements that impeached Plaintiff's honesty, integrity, virtue, and reputation, exposed Plaintiff to public hatred, contempt, and ridicule, and had the tendency to injure his reputation in the eyes of at least a substantial and respectable minority of its audience.

140.    Plaintiff has been damaged by the false and defamatory statements because the statements have subjected Plaintiff to hatred, ridicule, contempt, disgrace and expressions of disgust.

141.    Plaintiff's profession requires him to interact with women—the false and fraudulent statements about Plaintiff sexually assaulting a woman and the false and defamatory characterization of Plaintiff as a sexual predator has severely tarnished his professional reputation, making it nearly impossible to find meaningful employment.

142.    As a result of Defendants' statements, Plaintiff has suffered damages, including reputational damage, mental anguish, and lost opportunities to work on other projects, including at least one reality dating show.

## COUNT TWO
### (Defamation Per Se)
*Against All Defendants*

143.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

144.    Defendants published statements concerning Plaintiff.

145.    The statements were false, defamatory, and not subject to any privilege.

146.    Defendants' statements were the types of statements that impeached Plaintiff's honesty, integrity, virtue, and reputation, exposed Plaintiff to public hatred, contempt, and ridicule, and had the tendency to injure his reputation in the eyes of at least a substantial and respectable minority of its audience.

147.    The defamatory statements were, on their face, and without the aid of intrinsic proof, unmistakably recognized as injurious. Many of the false statements accused Plaintiff of sexual misconduct and criminal conduct and were statements that harmed Plaintiff in his trade, business, and profession.

148.    Defendants' statements were published with the requisite degree of intent, that is, Defendants made the statements with reckless disregard and/or willful knowledge of their falsity.

149.    It was both objectively and subjectively unreasonable for Defendants to believe the truth of Engemann's statements about Marciano.

150.    Because the statements constitute defamation *per se*, injury and damages are presumed as a matter of law.

**COUNT THREE**
**(Defamation by Implication)**
*Against All Defendants*

151.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

152.    Defendants published statements concerning Plaintiff.

153.    The underlying statements, alongside the details about the other castmates' actual horrific sexual assault and Engemann's hypothetical scenarios about a wife being beaten repeatedly, conveyed the defamatory implication that Marciano had violently sexually assaulted Plaintiff.

154.    The implications arising from the Defendants' statements and the context in which those statements were made falsely suggested that Marciano had seriously assaulted Engemann similarly to conduct akin to child rape and violent physical assault and rape.

155.    The implication arising from Defendants' statements and the context in which those statements were made also falsely suggested that Marciano had manipulated Engemann.

156.    Defendants' statements were published with the requisite degree of intent, that is, Defendants made the statements with reckless disregard and/or willful knowledge of their falsity.

157.    As a result of Defendants' statements and defamatory implications from those statements, Plaintiff has suffered damages to his reputation, career, mental health, and interpersonal relationships.

**COUNT FOUR**
**(False Light)**
*Against All Defendants*

158.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

159.    By their actions, Defendants gave excessive publicity to a matter concerning Plaintiff that placed Plaintiff before the public in a false light.

160.    The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

161.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed.

162.    As a result of Defendants' actions, Plaintiff has suffered damage to his reputation, credibility, and dignity.

## COUNT FIVE
### (Tortious Interference with Economic Relations)
*Against Defendant Engemann*

163.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

164.    Defendant Engemann intentionally interfered with Plaintiff's existing and potential business relationships and knew that her actions were substantially certain to occur due to Defendant Engemann's interference.

165.    Defendant Engemann's interference was accomplished by improper means, including by repeatedly falsely accusing Plaintiff of sexual assault, of groping her, of grabbing her "privates," and/or her buttocks, and being a sexual predator.

166.    Plaintiff has suffered and continues to suffer injury due to Defendant Engemann's tortious interference.

## COUNT SIX
### (Business Disparagement)
*Against Defendant Engemann*

167.    The allegations set forth in Paragraphs 1-132 are realleged and incorporated herein.

168.    Engemann's statements that Plaintiff sexually assaulted her, that he grabbed her "privates," or her buttocks, and that he was a sexual predator are all false.

169.     In making these statements, Engemann acted intentionally and with malice to interfere with Marciano's business.

170.     As a result of Engemann's false statements, Plaintiff has suffered damages, including harm to his economic interests. Namely, Plaintiff's brand was reduced in value and he lost the opportunity to participate in a lucrative reality dating television show.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor, and against Defendants, awarding the following relief:

A.     General damages, including actual and presumed damages, in an amount to be determined at trial;

B.     Special damages, including actual and consequential damages, in an amount to be determined at trial;

C.     Punitive and/or exemplary damages in an amount to be determined at trial;

D.     Reasonable expenses, including but not limited to reasonable costs and attorneys' fees, incurred to mitigate the harm caused by Defendants' defamatory and tortious conduct, including without limitation the fees incurred in defending against Defendants' false and defamatory statements and money spent on efforts to counteract the negative impact of Defendants' defamatory statements on Plaintiff's reputation;

E.     Reasonable costs and attorneys' fees incurred in bringing this action to restore Plaintiff's reputation;

F.    A narrowly tailored injunction that prohibits Defendants from repeating and republishing all of the statements that are adjudicated by this Court to be defamatory;

G.    All costs, disbursements, fees, and pre- and post-judgment interest as permitted by law; and,

H.    Any other and further relief this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands that this case be tried to a jury.


Dated: December 5, 2025

**Parkinson | Benson | Potter**


/s/ D. Loren Washburn
D. Loren Washburn
loren@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

**DYNAMIS LLP**

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice* forthcoming)
Jamie H. Solano (*pro hac vice* forthcoming)
Brooke Watson (*pro hac vice* forthcoming)
Yusef Al-Jarani (*pro hac vice* forthcoming)
Caroline McHugh (*pro hac vice* forthcoming)


*Attorneys for Plaintiff Marciano Brunette*