David C. Reymann (8495) (dreymann@parrbrown.com)
Sean Sigillito (20101) (ssigillito@parrbrown.com)
Carissa Uresk (18114) (curesk@parrbrown.com)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840

Cameron Stracher (*pro hac vice*) (cam@stracherlaw.com)
Sara Tesoriero (*pro hac vice*) (sara@stracherlaw.com)
**CAMERON STRACHER, PLLC**
1133 Broadway, Suite 516
New York, New York 10010
Telephone: (646) 992-3850

Attorneys for Defendant Jeff Jenkins Productions LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARCIANO BRUNETTE,<br><br>Plaintiff,<br><br>v.<br><br>DEMI ENGEMANN and JEFF JENKINS PRODUCTIONS LLC,<br><br>Defendants. | **DEFENDANT JEFF JENKINS PRODUCTIONS LLC'S MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56, MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(c), AND MOTION FOR FEES UNDER UTAH CODE § 78B-25-102**<br><br>**(Hearing Requested)**<br><br>Case No. 2:25-CV-01102-DAO<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

RELIEF SOUGHT.................................................................................................................. 1

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS AND MATERIALS CONSIDERED................................................ 1

FACTUAL BACKGROUND ................................................................................................ 4

    A. Statement of Undisputed Material Facts....................................................... 4

    B. The Episodes .................................................................................................. 6

    C. Plaintiff's Complaint.................................................................................... 17

ARGUMENT...................................................................................................................... 19

I.   PLAINTIFF'S CLAIMS ARE BARRED BY THE RELEASES HE SIGNED............... 19

II.  PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE

    GRANTED................................................................................................................ 21

    A. The Statements at Issue Do Not Convey a Defamatory Meaning. ............. 22

    B. Plaintiff Fails to Plausibly Plead Defamation by Implication. ................... 26

    C. Plaintiff Fails to Plausibly Plead "Actual Malice." .................................... 29

       i.   Plaintiff Fails to Allege Any Specific Individual Within JJP Who Acted with

         Actual Malice. ....................................................................................... 31

       ii.  Each of Plaintiff's Theories of Actual Malice is Insufficient.......................... 32

    D. Plaintiff's False Light Claim Should Also Be Dismissed........................... 35

III. DEFENDANT IS ENTITLED TO ITS LEGAL FEES UNDER THE ANTI-SLAPP

    STATUTE. ............................................................................................................... 35

    A. The Statements at Issue Fall Within UPEPA's Scope. ............................... 36

    B. UPEPA's Fees Provision Applies in This Diversity Action........................ 37

CONCLUSION................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Amor v. Conover*,
635 F. Supp. 3d 363 (E.D. Pa. 2022) .......................................................................................... 37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................................................... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................................... 2

*Banner Bank v. Smith*,
30 F.4th 1232 (10th Cir. 2022) ................................................................................................. 38

*Berk v. Choy*,
No. 24-440, 2026 WL 135974 (U.S. Jan. 20, 2026) .............................................................. 37

*Bihag v. A&E Television, LLC*,
669 Fed. App'x 17 (2d Cir. 2016) ........................................................................................... 20

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ................................................................................................... 36

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................................................................... 3

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
17 N.Y.3d 269 (N.Y. 2011) ...................................................................................................... 19

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ....................................................................................................................... 38

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ................................................................................................. 28

*Coleman v. Grand*,
523 F. Supp. 3d 244 (E.D.N.Y. 2021) .................................................................................... 37

*Combes v. Montgomery Ward & Co.*,
228 P.2d 272 (Utah 1951) ......................................................................................................... 31

*Compuware Corp. v. Moody's Investors Servs., Inc.*,
499 F.3d 520 (6th Cir. 2007) ................................................................................................... 28

*Cox v. Hatch*,
   761 P.2d 556 (Utah 1988) .............................................................................................. 22

*Dodds v. Am. Broad. Co., Inc.*,
   145 F.3d 1053 (9th Cir. 1998) ........................................................................................ 28

*Dongguk Univ. v. Yale Univ.*,
   873 F. Supp. 2d 460 (D. Conn. 2012) ..................................................................... 31, 32

*Dongguk Univ. v. Yale Univ*,
   734 F.3d 113 (2d Cir. 2013) ........................................................................................... 33

*Dossett v. Ho-Chunk, Inc.*,
   472 F. Supp. 3d 900 (D. Or. 2020) ................................................................................. 36

*Dworkin v. Hustler Mag. Inc.*,
   867 F.2d 1188 (9th Cir. 1989) ........................................................................................ 37

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) .......................................................................................................... 37

*Franchini v. Bangor Publ'g Co., Inc.*,
   109 F.4th 13 (1st Cir. 2024) ........................................................................................... 31

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ........................................................................................ 2

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) .................................................................................................. 33, 34

*Hogan v. Winder*,
   762 F.3d 1096 (10th Cir. 2014) ................................................................................ 21, 25

*Hogan v. Winder*, No. 2:12-CV-123 TS,
   2012 WL 4356326 (D. Utah Sept. 24, 2012) .................................................................. 27

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
   655 F.3d 136 (2d Cir. 2011) ........................................................................................... 19

*Johnson v. Freborg*,
   995 N.W.2d 374 (Minn. 2023) ........................................................................................ 37

*Johnson v. Louisiana*,
   369 F.3d 826 (5th Cir. 20024) ........................................................................................ 36

*Keisel v. Westbrook*,
2023 UT App 163, 542 P.3d 536 ....................................................................................... 27, 35

*Kennedy v. Peele*,
552 F. App'x 787 (10th Cir. 2014)................................................................................................ 2

*Klapper v. Graziano*,
41 Misc. 3d 401 (Kings Cnty. 2013) ......................................................................................... 19

*Lichfield v. Kubler*,
No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468 (D. Utah Sept. 29, 2025)............. 26, 27, 35

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*,
885 F.3d 659 (10th Cir. 2018)................................................................................................... 39

*Lott v. Levitt*,
556 F.3d 564 (7th Cir. 2009)....................................................................................................... 2

*Mackey v. Krause*,
2025 UT 37, 575 P.3d 1162 ...................................................................................................... 36

*Martineau v. Currutt*,
No. 121CV00045JNPDBP, 2022 WL 180735 (D. Utah Jan. 19, 2022) ................................. 2, 22

*Mast v. Overson*,
971 P.2d 928 (Utah Ct. App. 1998)........................................................................................... 22

*Mathews v. McCown*,
2025 UT 34, 575 P.3d 1114 ...................................................................................................... 22

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012)................................................................................................ 30, 31

*McFarlane v. Esquire Mag.*,
74 F.3d 1296 (D.C. Cir. 1996) .................................................................................................. 35

*Miami Herald Publ'g Co, v. Tornillo*,
418 U.S, 241 (1974) .................................................................................................................. 34

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016).............................................................................................. 30, 34

*Mile High Contracting, Inc. v. Deseret News Publ'g Co.*,
No. 170906024, 2018 WL 7374786 (Utah 3d Dist. Ct. March 16, 2018) ................................. 28

*Moore v. Cohen*,
  548 F. Supp. 3d 330 (S.D.N.Y. 2021) ........................................................................ 20

*Nelson v. State Farm Mut. Auto Ins. Co.*,
  419 F.3d 1117 (10th Cir. 2005) ................................................................................... 2

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................................ 29, 32, 34

*Nunes v. WP Co. LLC*,
  513 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................... 31

*O'Connor v. Burningham*,
  2007 UT 58, 165 P.3d 1214 ............................................................................. 2, 21, 22

*Pace v. Baker-White*,
  432 F. Supp. 3d 495 (E.D. Pa. 2020) ........................................................................ 30

*Pipkin v. Acumen*,
  2020 UT App 111, 472 P.3d 315 ............................................................................... 22

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) ..................................................................................... 30

*Psenicska v. Twentieth Century Fox Film Corp.*,
  2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008) ............................................................ 20

*Reuber v. Food Chem. News, Inc.*,
  925 F.2d 703 (4th Cir. 1991) ..................................................................................... 34

*Revell v. Hoffman*,
  309 F.3d 1228 (10th Cir. 2002) ................................................................................. 29

*Scott v. Harris*,
  550 U.S. 372 (2007) ..................................................................................................... 3

*Scottsdale Ins. Co. v. Tolliver*,
  636 F.3d 1273 (10th Cir. 2011) ........................................................................... 38, 39

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ................................................................................................... 38

*Shapiro v. NFGTV, Inc.*,
  No. 16 CIV. 9152 (PGG), 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018) .................... 20

*Sheehan v. Anderson*,
No. 98–5516, 2000 WL 288116 (E.D. Pa. Mar. 17, 2000) ........................................................ 31

*Shrader v. Biddinger*,
633 F.3d 1235 (10th Cir. 2011) ................................................................. 33

*Silvester v. Am. Broad. Cos.*,
839 F.2d 1491 (11th Cir. 1988) ................................................................. 34

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................. 36

*Spacecon Specialty Contractors, LLC v. Bensinger*,
713 F.3d 1028 (10th Cir. 2013) ................................................................. 34

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ................................................................. 29

*Talley v. Time, Inc.*,
923 F.3d 878 (10th Cir. 2019) ................................................................. 33, 34, 35

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962) ................................................................. 3

*Weil v. Johnson*,
No. 119431/02, 2002 WL 31972157 (N.Y. Sup. Ct. Sept. 27, 2002) ...................................... 20

*West v. Thomson Newspapers*,
872 P.2d 999 (Utah 1994) ................................................................. 21, 22, 26

*Wilson v. UT Health Ctr.*,
973 F.2d 1263 (5th Cir. 1992) ................................................................. 36

*World Wide Ass'n of Specialty Programs v. Pure, Inc.*,
450 F.3d 1132 (10th Cir. 2006) ................................................................. 29, 30

*Xlear, Inc. v. Focus Nutrition, LLC*,
893 F.3d 1227 (10th Cir. 2018) ................................................................. 38

*XPO Logistics, Inc. v. Peterson*,
No. 2:15-CV-703-CW, 2025 WL 1114392 (D. Utah Apr. 15, 2025) ...................................... 31

**Statutes**

N.M. Stat. § 38-2-9.2 ........................................................................................................ 39

Utah Code § 13-11a-4 ........................................................................................................ 38

Utah Code § 78B-25-102 ................................................................................................ 1, 36

Utah Code § 78B-25-101 ................................................................................................ 1, 38

Utah Code § 78B-25-104 .................................................................................................... 37

**Rules**

Fed. R. Civ. P. 7............................................................................................................... 1

Fed. R. Civ. P. 12......................................................................................................... 1, 21

Fed. R. Civ. P. 56...................................................................................................... 1, 3, 21

**RELIEF SOUGHT**

Defendant Jeff Jenkins Productions LLC (Defendant or JJP) moves for summary judgment under Fed. R. Civ. P. 56 because Plaintiff Marciano Brunette's (Plaintiff or Brunette) claims are barred by the releases he signed. Defendant also moves, in the alternative, for judgment on the pleadings under Fed. R. Civ. P. 12(c) because Plaintiff has failed to state a claim upon which relief can be granted. Finally, Defendant seeks its attorneys' fees under the Uniform Public Expression Protection Act, Utah Code § 78B-25-101, *et seq.* (UPEPA). Defendant respectfully requests a hearing on this motion. DUCivR 7-1(g).

**INTRODUCTION**

This lawsuit arises out of Plaintiff's participation in the unscripted television series *The Secret Lives of Mormon Wives* (the Series). Despite agreeing to appear in the Series, and signing a lengthy "Performer Agreement" on February 27, 2025, and then a "Participant Release" on January 23, 2026—after this lawsuit was filed—both of which included a broad assumption of risk and release provision, Plaintiff brings this lawsuit claiming he has been defamed and depicted in a false light based on comments made about him by Defendant Demi Engemann (Engemann), another participant in the Series. Plaintiff's claims should be dismissed, however, because not only did Plaintiff "sign up" for exactly the type of verbal sparring he now alleges is defamatory, his claims fail as a matter of law.

**LEGAL STANDARDS AND MATERIALS CONSIDERED**

A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is reviewed under the same standard as a motion to dismiss and should be granted if, as a matter of law, the non-moving party could not recover under the facts alleged. *Nelson v.*

1

*State Farm Mut. Auto Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005).  In ruling on Defendant's motion on the pleadings, the Court considers the well-pleaded facts to decide "whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Conclusory allegations must be disregarded, *id.* at 678–679, and the Court need not "take the plaintiff's *interpretation* of the allegedly defamatory words at face value," *Lott v. Levitt*, 556 F.3d 564, 569 (7th Cir. 2009) (emphasis in original).  Instead, "[b]ecause the existence of defamatory content is a matter of law, a reviewing court can, and must, conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation."  *Martineau v. Currutt*, No. 121CV00045JNPDBP, 2022 WL 180735, at *4 (D. Utah Jan. 19, 2022) (quoting *O'Connor v. Burningham*, 2007 UT 58, ¶ 26, 165 P.3d 1214, 1222).  "Moreover, when a district court determines whether a statement is susceptible to a defamatory meaning, it does not construe all factual inferences in favor of the nonmoving party, as it would in other cases." *Id.*

The court will "ordinarily examine . . . documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." *Kennedy v. Peele*, 552 F. App'x 787, 792 (10th Cir. 2014) (citations omitted).  Thus, the Court should consider the Series episodes incorporated into Plaintiff's Complaint.  Compl. ¶¶ 65–66, 73, 85–100.  Any allegations that contradict such materials need not be taken as true.  *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("[F]actual allegations that contradict such a properly considered document are not well-pleaded facts . . . .").

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted if "the movant shows that there is no genuine issue as to any material fact and the

2

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In opposing summary judgment, a plaintiff is required "to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal marks omitted). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Put differently, the relevant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

In this regard, it is well-settled that the Court must favor the non-movant with the benefit of all reasonable *factual* inferences that may be drawn from the evidence. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."). There is, however, no similar requirement that the Court favor the non-movant with regard to unresolved issues of law. *See Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007) (noting that once the relevant factual inferences are drawn in favor of the nonmoving party what remains is a "pure question of law").

Here, in connection with Defendant's summary judgment motion, the court should consider the Performer Agreement signed by Plaintiff on February 27, 2025, which is attached as Exhibit 1 to the Declaration of Julie Hunt, dated February 16, 2026 (Hunt Decl.), as well as the Participant Release signed by Plaintiff on January 23, 2026, which is attached as Exhibit 2 to the Hunt Decl.

3

## FACTUAL BACKGROUND

### A.      Statement of Undisputed Material Facts

1.      *The Secret Lives of Mormon Wives* is a reality television series produced by Defendant JJP through its wholly owned subsidiary, Ludwig Productions, LLC (Ludwig Productions).  Compl. ¶¶ 18–19; Hunt Decl. ¶¶ 3, 5.

2.      Plaintiff is a participant in the Series and also appeared in the reality television series *Vanderpump Villa* (which is not produced by JJP).  Compl. ¶ 8; *see also* Season 3, Reunion Ep., 00:24:08–00:30:14 (reviewing various clips of Plaintiff's interactions with other Series participants throughout Season 3 of the Series).

3.      In connection with his appearance and participation in the Series, Plaintiff signed a Performer Agreement with Ludwig Productions dated February 27, 2025 (the Agreement), as well as a Participant Release dated January 23, 2026, after this lawsuit was filed (the Participant Release).  Hunt Decl. Exs. 1 & 2.

4.      In the Agreement, Plaintiff (Artist) assumed the risks of participating in the Series, and acknowledged that:

> Artist may reveal and/or relate, and other parties (including, without limitation, other participants, Artist's friends, Artist's family, Artist's co-workers, Producer, and/or Hulu), may reveal and/or relate information about Artist of a personal, private, surprising, embarrassing and/or unfavorable nature. Artist further understands that Artist's appearance, depiction and/or portrayal in the Series, and Artist's actions and the actions of others displayed in the Series, may be embarrassing or of an otherwise unfavorable nature and may expose Artist, Artist's friends, co-workers and/or family to public ridicule, humiliation, or condemnation. Artist acknowledges that Artist is voluntarily participating in the Series and related activities with full knowledge, appreciation and understanding of the personal risks involved, and hereby agrees to accept any and all risks of participating in the Series.

Hunt Decl. Ex 1, ex. A ¶ 7.

4

5.      Plaintiff agreed to a similar broad assumption of risk provision in the Participant Release. *See id.* Ex. 2.

6.      The Agreement also contained an extensive release provision, which read, in relevant part, that:

> TO THE MAXIMUM EXTENT PERMITTED BY LAW . . . ARTIST HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES (AS DEFINED BELOW) FROM ANY AND ALL CLAIMS, ACTIONS, COMPLAINTS, DAMAGES, DEMANDS, ALLEGATIONS, SUITS, LIABILITIES, LOSSES, LIENS, COSTS, EXPENSES, INJURIES AND CAUSES OF ACTION, OF ANY KIND WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) INCLUDING WITHOUT LIMITATION THOSE DIRECTLY OR INDIRECTLY CAUSED BY, ARISING OUT OF, RESULTING FROM, OR RELATING TO, IN ANY WAY, THE SERIES (INCLUDING, WITHOUT LIMITATION, ARTIST'S PARTICIPATION THEREIN AND THE DEVELOPMENT, PRODUCTION, DISTRIBUTION OR EXPLOITATION THEREOF), ARTIST'S SERVICES, THE ACTIVITIES AND LOCATIONS, THE RESULTS AND PROCEEDS, THE FOOTAGE SHOT IN CONNECTION WITH THE SERIES (INCLUDING, BUT NOT LIMITED TO, ANY RECORDINGS USING HIDDEN AND/OR CONCEALED CAMERAS, MICROPHONES OR OTHER DEVICES), OR THE EXERCISE OF ANY RIGHTS GRANTED HEREIN, ON ANY LEGAL OR EQUITABLE THEORY WHATSOEVER (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, RIGHTS OF PRIVACY AND PUBLICITY, DEFAMATION, FALSE LIGHT, INFLICTION OF EMOTIONAL DISTRESS, COPYRIGHT AND OTHER INTELLECTUAL PROPERTY INFRINGEMENT, CLAIMS BASED UPON ANY ALLEGED PERSONAL INJURY, DEATH, AND/OR PROPERTY DAMAGE) (COLLECTIVELY, THE "RELEASED CLAIMS"). TO THE MAXIMUM EXTENT PERMITTED BY LAW, ARTIST SHALL NOT SUE, INSTITUTE ANY OTHER PROCEEDINGS, OR MAKE ANY CLAIM AGAINST ANY OF THE RELEASED PARTIES OR ANYONE ELSE FOR ANY CAUSE OF ACTION BASED ON ANY OF THE RELEASED CLAIMS.

*Id.* Ex. 1, ex. A ¶ 8 (emphasis in original).

7.      The "Released Parties" were defined to mean the Producer, as well as "all participants, all other persons and entities rendering services in connection with the Series or

otherwise connected to the Series or Artist's services, [and] all parent[s] . . . of each of the foregoing." *Id.*

8.    The Participant Release also contained similar broad release language. *See id.* Ex. 2.

9.    Finally, both the Agreement and the Participant Release provided that they "shall be governed by and construed and enforced in accordance with the laws of the State of New York." *Id.* Ex. 1, ex. A ¶ 20; *see also id.* Ex. 2.

**B.    The Episodes[1]**

The Series follows a group of Utah-based social media influencers known as "MomTok." Compl. ¶ 18.  Defendant Engemann is a former member of "MomTok" who appears on the Series.  *Id.* ¶¶ 18, 20.  Seasons 2 and 3 of the Series occasionally featured discussions among the MomTok members about interactions between Plaintiff and Engemann and claims Engemann had made about Plaintiff.  *Id.* ¶¶ 73, 85–100.

***Season 2***

In Episode 2 of Season 2, Engemann recalls, "Some of the girls and I took a trip to Italy to go to *Vanderpump Villa*, and one of the guys, specifically [Brunette], was like super flirtatious. And I felt like I handled it the best that I could.  Truly did nothing wrong."  Season 2, Ep. 2, 00:40:45.[2]

---

[1] As materials referenced in and central to Plaintiff's Complaint, the Court may review the Episodes in ruling on Defendant's Rule 12(c) motion. *See Pingree v. Univ. of Utah,* No. 2:20-CV-00724-JNP-CMR, 2022 WL 1307902, at *1 n. 2 (D. Utah May 2, 2022) (emails containing the allegedly defamatory communications were properly considered on a motion to dismiss).

[2] The relevant Episodes of the Series referenced in the Complaint can be viewed at the following link: https://app.mediasilo.com/review/69681efdc4162741172b2bc0.

Season 2 also included a final "Reunion Episode," which featured host Nick Viall discussing highlights from Season 2 with several of the Series participants.[3]  Compl. ¶ 65; *see also gen.* Season 2 Reunion Episode.  During the Reunion Episode, Viall prompts, "There seems to be some confusion about who did what with [Brunette] on *Vanderpump Villa*."  Season 2, Reunion Ep., 00:05:12.  One of the participants, Jessi Ngtikaura, responds, "I don't know what I'm legally allowed to say, but there are some accusations out there right now and there were just more things that happened and she [Engemann] was very flirty."  *Id.* at 00:06:13.  Other participants agree that there was "[l]ots of flirting" between Engemann and Plaintiff, *id.* at 00:05:27–00:05:29, and Ngtikaura then adds that she has images of text messages between Engemann and Plaintiff.  *Id.* at 00:06:23.  The texts are shown on screen and include jokes and sexual innuendos.  *Id.* at 00:06:41–00:06:59.  Viall and the Series participants then discuss whether Engemann has been honest with the MomTok members about what she has shared with her husband regarding Brunette.  *Id.* at 00:07:20–00:07:30.  Notably, Viall asks MomTok member Whitney Leavitt, "Do you think [Engemann] is an honest person?"  *Id.* at 00:10:15.  Leavitt ultimately responds, "[R]eading that [text], no, I wouldn't trust her."  *Id.* at 00:10:32.  Later in the episode, the participants continue to discuss Engemann and various claims she made throughout Season 2, and one participant comments, "I feel like [Engemann's] head, sometimes, she thinks like the more people I can get that align with this narrative I'm trying to push, it makes it more valid in her brain."  *Id.* at 01:23:20.

---

[3] Engemann did not film the Reunion with the other participants and only appears via a pre-recorded interview. *See, gen.* Season 2, Reunion Ep.

***Season 3, Episode 6***

In Season 3, the discussion of Engemann and Brunette continues in Episode 6 when some of the MomTok members are preparing to attend an event hosted by Hulu, which broadcasts the Series.  Compl. ¶ 21; Season 3, Ep. 6, 00:04:33.  One of the MomTok members sees a social media post on TikTok by Brunette, which reads, "Uninvited to the [Hulu] function cus [*sic*] a 30yo [M]ormon wife's [*sic*] scared I'll tell her husband the truth." *Id.* at 00:04:19.  MomTok member Mikayla Matthews then opines, "I feel like [Engemann's] behind it because she is giving a little bit guilty. And I feel like if [Brunette] is not there at the Hulu event, she can kind of plant her story before [Brunette] can." *Id.* at 00:04:41.  Another MomTok member, Layla Taylor, adds, "[Engemann's] comments on it [Brunette's post] are disgusting." *Id.* at 00:06:08.  Engemann's comments are then shown on screen, including one that reads, "Also [Brunette] got uninvited by @hulu because he's a s3xual pr3dator [*sic*] that can't keep his hands to himself, not because I'm hiding anything from my husband . . ." *Id.* at 00:06:26.  Taylor and Ngatikaura then discuss the comment:

Ngatikaura:   Is she for real?

Taylor:   I can't.

Ngatikaura:   When people see how flirty she was?  We all witnessed it with our own eyes.

[. . .]

That's not him being a predator.

[. . .]

That is him acting on what you told him was okay.

Taylor:   Leaning into your flirting. Yes.

8

[. . .]

Ngatikaura:   The day after we left, [Engemann] came into our hotel room crying and basically said that she confessed to [her husband] that she feels bad because she's not a victim and that she played into it too much.

Taylor:   When [Engemann] initially told us about this, we were like, "Oh my gosh, who do we need to call?" . . . And then the narrative switched a little bit after, and then she was saying she wasn't the victim and she was flirting with him the whole entire time and admitted that.

*Id.* at 06:39–07:19.

Later in Episode 6, Engemann comments that Brunette's social media post implies she and Brunette had an affair, and says Brunette is "not gonna get away with that." *Id.* at 00:10:29. She also accuses Ngatikaura of "form[ing] an alliance" with Brunette to "spin things" to make them look better for Brunette. *Id.* at 00:10:40. Engemann says that she has seen "comments from the other women in favor of [Brunette] and against me, basically calling me a liar." *Id.* at 00:11:51. Several social media comments questioning Engemann's claim that Brunette is a "sexual predator" are then shown. *Id.* at 00:11:55–00:12:14.

Engemann then discusses the perceived lack of support with MomTok member Mayci Neeley, referencing Neeley's personal experience with sexual abuse. *Id.* at 00:12:19. Neeley comments that it "feels a little inappropriate to me because our situations are so vastly different . . . I was abused . . . I was raped. And this situation is so different than what she went through . . ." *Id.* at 00:12:56.

Also in Episode 6, Brunette's ex-girlfriend is shown confronting Engemann at the Hulu event. *Id.* at 00:18:34–00:18:40. The ex-girlfriend tells Engemann that she "do[esn't] have [Brunette's] back on a lot . . . but this . . . He's not a sexual assaulter. He's not a predator." *Id.* Ngatikaura is then heard agreeing, "He's not. Yep." *Id.* at 00:18:38. Another MomTok member

9

adds, "We all know that [Engemann] is very calculated.  She knows she's been caught . . . What better way to kind of squash this conversation than to call yourself a victim?"  *Id.* at 00:19:03–00:19:15.  Brunette's ex-girlfriend is also heard telling Engemann, "let's retract the sexual predator thing," to which Engemann responds, "No. Hell no."  *Id.* at 00:25:30–00:25:35.

Episode 6 also included a meeting between Engemann and Ngatikaura to discuss Brunette that outlined Ngatikaura's confusion over Engemann's allegations.  *Id.* at 00:34:32.  During the conversation, Ngatikaura confronts Engemann about her decision to keep in contact with Brunette and allow him to speak with Engemann's daughter:

| Ngatikaura: | [I]t was just very confusing 'cause it's like, "Okay, if you guys did kiss, then that isn't assault 'cause you kissed him the next day," you know?  But— |
|---|---|
| Engemann: | Well, that still could be assault even if I did kiss him the next day, which I didn't.  There was not a kiss on the mouth.  There was [*sic*] two ass grabs. |
| Ngatikaura: | I genuinely feel there was, like, some flirtiness.  And even if you didn't do anything wrong, like, I feel like maybe he got the wrong idea, and then you continued to talk to him for months.  If he actually assaulted you, why did you continue to talk to him?  And why did you send him pictures of [your daughter]?  And why was [your daughter] talking to him? |
| | [. . . ] |
| | I'm just saying if he assaulted you, why are you sending photos of your daughter to him? |

*Id.* at 00:36:27–00:37:48.  Ngatikaura also references texts she describes as "flirty" between Brunette and Engemann, which are shown on the screen, and Ngatikaura says, "For me, the behavior does not add up. Why did you continue to have a relationship?"  *Id.* at 00:37:01–00:38:30.  At the end of their meeting, Ngatikaura concludes, "At this point, I feel like I'm

backed into a corner because [Engemann] is saying there's no perfect way to handle assault, and that is completely valid and so true . . . And even though we may never know the truth, I just need to let this go." *Id.* at 00:39:55–00:40:07.

### *Season 3, Episode 7*

In Episode 7, the MomTok members discuss another social media post made by Engemann, which reads:

> It seems pretty clear, but I guess some people are still confused. Unwanted physical touch equals assault. Period, the end. To the people that were made aware of these events and watched me cry and then proceed to use their platforms to victim shame, publicly call me a liar, and judge the way I handled it, from the bottom of my heart, shame on every last one of you.

Season 2, Ep. 7, 00:05:04. The MomTok members take issue with the post, and three comment that Engemann "never cried." *Id.* at 00:05:22–00:05:28.

### *Season 3, Episode 8*

In Episode 8, Leavitt, the "only one in the [MomTok] group that's been supportive of Engemann," wrestles with whether she believes Engemann's claims about Brunette. Season 3, Ep. 8, 00:06:10. Leavitt says there are "two different sides," one where "[Engemann] is saying she was touched inappropriately," and "another side who's saying 'Well, you've been talking to him so why would you be talking to him if this thing happened?'" *Id.* at 00:06:35. Leavitt and her husband discuss the situation and reference a recorded phone call between Engemann and MomTok member Jen Affleck regarding Brunette. *Id.* at 00:07:09–00:07:32. The couple agree that the recording appears to show Engemann telling Affleck "exactly what to say" about Engemann's allegations. *Id.* at 00:07:20. Leavitt's husband adds, "Maybe it is shame, maybe she is scared, maybe there's something she just like doesn't want to share with other people

11

outside of her relationship with [her husband]." *Id.* at 00:07:35. Speaking to the camera, Leavitt concludes that "hearing [my husband] say, 'I don't believe [Engemann],' it sucks." *Id.* at 00:08:07.

Later in the Episode, Leavitt confronts Engemann about her "flirtatious" texts with Brunette and her daughter's communications with him. *Id.* at 00:24:01–00:25:27. Engemann explains "[t]hat's how [she] talks to all of [her] friends," and that her daughter's communication with Brunette was an accident and "for five seconds" when the daughter interrupted a call between Engemann and Brunette. *Id.* at 00:24:32–00:25:27. The Episode then cuts to an interview with Leavitt, where a producer asks for her feelings on Engemann's explanations. *Id.* at 00:25:27–00:25:34. Leavitt says "[I]t's not adding up for me because I would never do that. I would never stay in contact with someone like that . . . I don't understand this." *Id.* at 00:25:44–00:25:51.

Leavitt also questions Engemann about the phone recording where "it's like you're coaching [Affleck] of what to say." *Id.* at 00:25:55. Engemann responds, "I'll admit that because I didn't want the sexual assault to come out . . . I was never covering anything up . . . ." *Id.* at 00:26:15–00:26:25. The episode then cuts back to the interview between Leavitt and the producer, and the producer asks if Engemann's response makes sense to Leavitt. *Id.* at 00:26:26–00:26:35. Leavitt says, "It's making me uncomfy [*sic*]. I'm not [Engemann], so maybe I'll never understand." *Id.* at 00:26:42.

Engemann then tries to explain her position further:

I was either sexually assaulted, or I wasn't, and the answer is that I was, and so the fact that people are trying to diminish that and be like, "Oh, well why'd you still talk to him?" I don't know, why'd someone who got beat 75 times by their husband stay married to them and says that they're completely in love with them? You do

12

weird things when you're in those situations.  Would I change things?  Sure.  Did I do it perfectly?  No.  But I navigated it the best way that I felt like I could.

*Id.* at 00:26:48.  She also adds:

There were times where [my husband] was like, "I feel bad."  Like one of the nights, [Brunette] was like, "Oh, I didn't have time to go get food," and [my husband] was like, "Should we send him DoorDash?"  Like, feeling bad for him.  I was completely upfront and honest with [my husband] the entire time and that should be the only person that matters in this situation.

*Id.* at 00:28:25.

Later, Leavitt discusses Engemann's explanations with her husband.  *Id.* at 00:35:15–00:38:51.  Leavitt's husband is skeptical about Engemann's claim that her husband offered Brunette food and her explanation about why her daughter was speaking with Brunette.  *Id.* at 00:36:41.  He notes, "I just know that if someone had done anything to harm another human being or to make them uncomfortable in that kind of way, I would keep my children as far away as possible . . . I wanna take her claims seriously . . . however, I'm just like I gotta . . . know the whole story here . . . What [Engemann] is telling you doesn't add up to what everyone else has shared."  *Id.* at 00:38:01.  Leavitt similarly concludes, "I don't wanna have doubts about her story, but my gut is just saying something's not right, something's missing in this story."  *Id.* at 00:37:32.

### Season 3, Episode 9

Episode 9 continues with Leavitt trying to advocate for Engemann with MomTok member Miranda McWhorter, who raises her concerns with Leavitt reposting Engemann's social media post about Brunette.  Season 3, Episode 9, 00:04:03.  Leavitt then informs McWhorter that Leavitt's husband has urged Leavitt to "see how that [version of events put forth by Engemann] doesn't make sense?"  *Id.* at 00:05:01.  Leavitt eventually admits to McWhorter that Leavitt "just

13

[doesn't] know how to support [Engemann] when [she doesn't] feel like she's being 100% honest with herself and me." *Id.* at 00:05:09. McWhorter finally ends the scene by saying:

| McWhorter: | It's like it makes us look like we are turning a blind eye to assault. |
|---|---|
| Leavitt: | Yeah. |
| McWhorter: | Regardless of like how icky and sleazy I think [Brunette] is, that kind of an accusation when it's not accurate can also ruin someone's life. |
| Leavitt: | Yeah. |
| McWhorter: | So it's like, it needs to be taken seriously on both ends. And that's what puts everybody in such an uncomfortable position, is that it's like, "Okay, well we don't have all the facts," but also like, "You're lying, and it's—it's obvious that you're lying. Maybe you're not lying about everything, but there is a lot that you're lying about." Because it's not even about anything that did or didn't happen. At this point, it's the way that it's being handled. People are distancing themselves. Unfortunate as it may be, that's kind of just like the way it goes. |

*Id.* at 00:05:49–00:06:33.

Later, Leavitt and Engemann discuss how Engemann feels responsible for how McWhorter's ex-husband and Brunette "have treated multiple people." *Id.* at 00:16:23. Speaking about the events with McWhorter's husband, Engemann states that she is proud of herself because "[t]he majority of my life I've felt like I have to placate and walk on eggshells with men. Men that make me feel like their emotions are my responsibility. I think what's making me so emotional is that I'm finally feeling fed up and I'm done putting up with it. But why am I having to defend myself against men's behavior to a group of women?" *Id.* at 00:17:12.

14

*Season 3, Episode 10*

Early in Episode 10, Engemann confesses that she "became this liar and villain" because of her comments surrounding Plaintiff. Season 3, Ep. 10, 00:04:36. In order to put the situation to rest, Leavitt arranges a meeting for all the MomTok members. *Id.* at 00:14:31–00:14:54. Engemann begins by saying that "[Brunette] came onto me very strong. He was like expressing that like, it was love at for sight and never once in a text message, in a phone call, never did I feel it for him. We've never kissed in our life. I've never even told him he was cute, period, the end. But Marciano did sexually assault me. In my mind, I'm just thinking, 'Walk on eggshells, placate.'" *Id.* at 00:36:16

Taylor quickly jumps in to press Engemann on her version of events by saying that "what's hard [for Taylor to believe] in that situation, [was that Engemann] continued to talk to him, and I think that's—no one's saying that we don't believe you with what happened. We are, I think we're all just confused." *Id.* at 00:36:42. To reinforce that many—if not all—of the MomTok members doubt Engemann's account, the Series pairs the statement with on-screen messages from Brunette stating, "DEMI HAS MADE SOME CRAZY ALLEGATIONS ABOUT ME . . . ." *Id.* at 00:36:51.

Still unsatisfied with Engemann's explanation, Affleck interjects that she is "[j]ust being totally transparent, [and that she] obviously [wanted to] walk out here and be like, 'Oh, I understand [Engemann]. Like, I can see her, I wanna move forward,' but to be honest, I-I'm even more confused now." *Id.* at 00:37:45. Affleck, Taylor, and other MomTok members continue to question Engemann's seemingly contradictory statements and behavior. *Id.* at 00:38:05–00:42:51. Finally, Ngatikaura concludes that she "still [doesn't] have clarity on the whole

15

situation with [Engemann] and [Brunette] behind the scenes" but chooses to move on with her relationship with Engemann nonetheless.  *Id.* at 00:41:08.  Taylor comes to a similar resolution. *See id.* at 00:42:51 ("The only people that are ever gonna know the truth of that is [Engemann] and [Bruentte]. So I'd like to just kind of move on.").

### Season 3, Reunion Episode

In the Season 3 Reunion episode, the Series participants discuss learning about Matthews's history of abuse.  Season 3, Reunion Ep., 00:19:21.  In response to the conversation about the sexual abuse experienced by Matthews and Ngatikaura, Engemann and the majority of the cast began crying.  *Id.* at 00:21:49.  When asked if she was okay by Reunion host Stassi Schroeder, Engemann responds that she felt "deep, deep wounds and things for [her] that [she hasn't] fully uncovered and things [she knows she has] been through that [she] blocked out as well."  *Id.* at 00:21:50–00:22:10.  Engemann then took care to distinguish her experience with Plaintiff from Matthews's abuse by wondering aloud, "[H]ow many people in this room have experienced something like this to a degree?  And then with everything that [she] went through the past year, not to compare, because what [she] went through was not even close to what most everyone has gone through, but it triggered a lot of really horrible things that have happened in [her] life."  *Id.* at 00:22:18–00:22:29.

Later in the Reunion Episode, Engemann poses a hypothetical to Neeley, and asks Neeley how she would feel if people questioned Neeley saying "I love you" to her abuser.  *Id.* at 00:37:10.  The other MomTok members immediately interject to say Neeley's situation was "so different," and Engemann then agrees.  *Id.* at 00:37:24–00:37:31.

16

During the Reunion, the Series participants also discuss Engemann's claims against Brunette.  The Episode 6 clip of Engemann claiming there were "two ass grabs" is shown as the husbands of the MomTok members discuss why no one believed Engemann's claims.  *Id.* at 00:03:36–00:04:29.  Engemann is again pressed about her decision to continue communicating with Brunette, which she defends as a "trauma response" and maintains her claim that she was assaulted.  *Id.* at 00:32:03.  However, the other reunion participants continue to express skepticism over Engemann's claim.  *See id.* at 00:31:46 ("[Brunette] did seem like he was a nice guy there . . . Like I felt like he was respectful . . . So it—it was confusing."); 00:37:54 ("'Cause I'm still confused. I want answers."); 00:37:56 ("It's all these things we're like, 'This doesn't add up.'").  Ultimately, Schroeder advises that they need to "move on with the reunion."  *Id.* at 00:38:41.

### C.    Plaintiff's Complaint

Plaintiff brings the instant lawsuit against JJP and Engemann (collectively, Defendants) for defamation, defamation per se, defamation by implication, and false light.[4]  Compl. ¶¶ 133–62.  According to Plaintiff, he and Engemann first met in August 2024 while Engemann was a guest on *Vanderpump Villa*.  *Id.* ¶ 29.  While at the villa, Plaintiff and Engemann "removed themselves from the larger group, flirted, and talked extensively about their personal lives" and had a consensual kiss.  *Id.* ¶¶ 32–33.  Plaintiff believed Engemann intended to leave her husband, and "possibly pursue a relationship" with Plaintiff.  *Id.* ¶ 35.  After leaving the villa, Engemann

---

[4] Plaintiff also brings claims for tortious interference with economic relations and business disparagement against Engemann.  Compl. ¶¶ 163–70.

allegedly continued communicating with Plaintiff via phone, text, and FaceTime, and Plaintiff also interacted with Engemann's daughter via FaceTime. *Id.* ¶¶ 42–44.

Plaintiff alleges that Engeman's "public story about her interaction with [Plaintiff] changed over time," and that her claim that their encounter constituted sexual misconduct or sexual assault is false. *Id.* ¶¶ 36–38. According to Plaintiff, Engemann's response to his TikTok video about being uninvited to the Hulu event in which she accused him of being a sexual predator was the first time she suggested Plaintiff had engaged in sexual misconduct. *Id.* § F. He claims Engemann continued to make false claims about her interactions with Plaintiff in social media posts and in interviews. *Id.* ¶¶ 58–63, 68, 69.

Plaintiff asserts that the Series "repeated and amplified" Engemann's accusations that Brunette committed sexual misconduct and sexual assault and that JJP "had access to information" that made Engemann's accusations "inherently unreliable and defamatory." *Id.* ¶¶ 101–02. Specifically, Plaintiff appears to claim that the following statements included in the Series are defamatory:

- Season 3, Episode 6—Engemann's claim to Ngatikaura that she did not kiss Brunette but there were "two ass grabs," Compl. ¶ 85;

- Season 3, Episode 6—Engemann's social media post calling Brunette a "sexual predator" who could not keep his hands to himself, *id.* ¶ 86;

- Season 3, Episode 6—Engemann's assertion that Brunette was forming an alliance with other MomTok members to make things look better for Brunette but that he "is not going to get away with it," *id.*;

- Season 3, Episode 8—Engemann's statement while discussing her interactions with Brunette that "I was either sexually assaulted or I wasn't and the answer is that I was," *id.* ¶ 91;

- Season 3, Episode 10—Engemann's statement that, "[Brunette] did sexually assault me," *id.* ¶ 96;

18

- Season 3, Reunion Episode—The clip from Episode 6 where Engemann refers to "two ass grabs," *id.* ¶ 97; and

- Season 3, Reunion Episode—Engeman's statement that, "[Y]ou can be sexually assaulted and then also continue a relationship . . . I think [it] honestly just boils down to a trauma response and having a lack of [b]oundaries." *Id.* ¶ 98.

Plaintiff also claims that by broadcasting Engemann's claims alongside the details of other Series participants' sexual assault and abuse experiences, the Series implies that Plaintiff had "violently sexually assaulted" Engemann and manipulated her. *Id.* ¶¶ 153–55.

Because Plaintiff's claims against JJP are barred by the releases he signed, and because Plaintiff fails to state a claim for defamation or false light based on the Series, JJP now files this Motion for Summary Judgment or, in the alternative, Motion on the Pleadings.

## ARGUMENT

## I.    PLAINTIFF'S CLAIMS ARE BARRED BY THE RELEASES HE SIGNED.

Under New York law, which applies by the plain terms of the Agreement Plaintiff signed, "'a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (N.Y. 2011)). Indeed, it is a matter of black letter law that:

> [A] release may not be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice.

*Klapper v. Graziano*, 41 Misc. 3d 401, 408 (Kings Cnty. 2013), *aff'd*, 129 A.D.3d 674 (2d Dep't 2015) (internal citations omitted).

19

Here, Plaintiff clearly assumed the risk that other participants in the Series "may reveal and/or relate information about [Plaintiff] of a personal, private, surprising, embarrassing and/or unfavorable nature." Hunt Decl. Ex 1, ex. A ¶ 7. Despite that risk, Plaintiff agreed that he was "voluntarily participating in the Series and related activities with full knowledge, appreciation and understanding of the personal risks involved, and [agreed] to accept any and all risks of participating in the Series." *Id.* Plaintiff agreed to the broad language of the release provision in the Agreement he signed, and agreed that he "IRREVOCABLY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES (AS DEFINED BELOW) FROM ANY AND ALL CLAIMS, ACTIONS, COMPLAINTS, DAMAGES, DEMANDS, ALLEGATIONS, SUITS, LIABILITIES, LOSSES, LIENS, COSTS, EXPENSES, INJURIES AND CAUSES OF ACTION, OF ANY KIND WHATSOEVER . . . INCLUDING, WITHOUT LIMITATION . . . DEFAMATION, [AND] FALSE LIGHT." *Id.* ¶ 8 (emphasis in original). Under these circumstances, Plaintiff is barred from bringing any of the claims he asserts here. *See Bihag v. A&E Television*, *LLC* 669 Fed. App'x 17 (2d Cir. 2016) (release barred fraud and other claims brought by participant in unscripted television program); *Moore v. Cohen*, 548 F. Supp. 3d 330 (S.D.N.Y. 2021) (release barred defamation and other claims brought by participant in faux television talk show); *Shapiro v. NFGTV, Inc.*, No. 16 CIV. 9152 (PGG), 2018 WL 2127806, at *1 (S.D.N.Y. Feb. 9, 2018) (release barred participant's defamation, fraudulent inducement, and other claims in unscripted television program); *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07 CIV. 10972(LAP), 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009) (release's broad waiver barred action for fraudulent inducement); *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157, at *1

20

(N.Y. Sup. Ct. Sept. 27, 2002) (holding that a "plaintiff may not avoid his obligations under a clearly worded release on the ground that the defendant falsely misrepresented the true significance of the document").  For the same reasons, the Participant Release, which contains similar language covering all "known and unknown" claims for "defamation [and] invasion of privacy" that Plaintiff "ever had, now has, or in the future may have" against JJP, and was signed by Plaintiff *while his claims in this case were pending*, likewise releases JJP from liability.  Hunt Decl. Ex. 2.

For these reasons, Plaintiff's Complaint should be dismissed with prejudice under Rule 56 of the Federal Rules of Civil Procedure.

## II.   PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Even if Plaintiff's claims were not barred by the Release—which they are—Plaintiff's Complaint should be dismissed under Rule 12(c) of the Federal Rules of Civil Procedure because he fails to state a claim against JJP.  "To state a claim for defamation, [a plaintiff] must show that defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).  Here, Plaintiff's defamation and defamation-by-implication claims fail because the statements about Plaintiff in the Series are not defamatory, nor do they convey a defamatory implication, and Plaintiff has not adequately pleaded actual malice, which he must do as a limited purpose public figure.  Furthermore, Plaintiff's false light claim against JJP cannot survive because it is duplicative of his defamation claims and fails for the same reasons.

### A.      The Statements at Issue Do Not Convey a Defamatory Meaning.

To be actionable as defamation, a statement must be capable of conveying a defamatory meaning.  *West*, 872 P.2d at 1008.  This determination is a threshold question of law for the court and must be made before any defamation claim is allowed to proceed.  *Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014); *see also, supra, O'Connor*, 2007 UT 58, ¶ 26.

To be defamatory, the statement must expose the plaintiff to "public hatred, contempt, or ridicule." *West*, 872 P.2d at 1008. In that examination, "[t]he guiding principle in determining whether a statement is defamatory is the statement's tendency to injure a reputation in the eyes of its audience" when viewed in the context it was made.  *Martineau*, 2022 WL 180735, at *4 (internal citation omitted). "If no defamatory meaning can reasonably be inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim."  *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988).

To determine whether a statement can sustain a defamatory meaning, a court "must carefully examine the context in which a statement was made."  *West*, 872 P.2d at 1009; *see also, supra, O'Connor*, 2007 UT 58, ¶ 26.  If the statements occur, for instance, in the context of a "heated public debate," a reasonable reader is "less likely to take the statements at face value." *Pipkin v. Acumen*, 2020 UT App 111, ¶¶ 19–20 472 P.3d 315, *abrogated on other grounds by Mathews v. McCown*, 2025 UT 34, ¶ 20, 575 P.3d 1114; *see also Mast v. Overson*, 971 P.2d 928, 932–33 (Utah Ct. App. 1998) (recognizing same).  This is the case even if this Court assumes that the statements are false and derogatory:

> A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff. Thus, an embarrassing, even though false, statement that does not damage one's reputation is not actionable as libel or slander. If no defamatory meaning can reasonably be

22

inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim.

*Cox*, 761 P.2d at 561; *see also West*, 872 P.2d at 1009 (recognizing same).

When properly viewed in the context of the Series, none of the statements Plaintiff raises can sustain a defamation claim. As Plaintiff admits, the Series conveys that the MomTok members were "dubious about [Engemann's] sexual assault claims." Compl. ¶ 87. Indeed, the Series consistently frames Engemann's allegations as questionable and highlights the other MomTok members' belief that Engemann is unreliable. *See* Season 2, Reunion Ep., 00:10:32 ("[R]eading that [text to Brunette], no, I wouldn't trust [Engemann]."); *id.* at 01:23:20 ("I feel like [Engeman's] head, sometimes, she thinks like the more people I can get that align with this narrative I'm trying to push, it makes it more valid in her brain."); Season 3, Ep. 7, 00:05:04–00:05:28 (MomTok members stating that Engemann's claim that they "watched [her] cry" over her interaction with Brunette is a lie); Season 3, Ep. 9, 00:06:04 ("[I]t's like, 'Okay, well we don't have all the facts,' but also like, 'You're lying, and it's—it's obvious that you're lying. Maybe you're not lying about everything, but there is a lot that you're lying about.'").

When Engemann's social media post suggesting that Plaintiff was uninvited from the Hulu event "because he's a s3xual pr3dator" appears in Season 3, Episode 6, it is immediately followed by other MomTok members expressing their skepticism about the allegations. Season 3, Ep. 6, 00:06:26–00:07:10. Ngatikaura asserts that the behavior they witnessed from Brunette was "not him being a predator" and claims Engemann had told her "she feels bad because she's not a victim and that she played into it too much." *Id.* at 00:06:44–00:07:19. Similarly, Engemann's comment later in Episode 6 that there were "two ass grabs" from Plaintiff is part of her conversation with Ngatikaura, which ends with Ngatikaura expressing that she does not

23

believe Engemann's claim that Brunette touched her without her consent. *See id.* at 00:36:27–00:37:48 ("I genuinely feel there was, like, some flirtiness. And even if you didn't do anything wrong, like, I feel like maybe he got the wrong idea, and then you continued to talk to him for months. If he actually assaulted you, why did you continue to talk to him?"). The episode also shows Brunette's ex-girlfriend confronting Engemann and insisting "[h]e's not a sexual assaulter. He's not a predator." *Id.* at 00:18:34–00:18:40. And although Engemann claims that Ngatikaura was "forming an alliance" with Brunette to "spin" thing to make Brunette look better, comments by MomTok members portray Engemann as the one who was attempting to frame the narrative in her favor. *See id.* at 00:04:41 ("I feel like [Engemann's] behind it because she is giving a little bit guilty. And I feel like if [Brunette] is not there at the Hulu event, she can kind of plant her story before [Brunette] can."), 00:19:03–00:19:15 ("We all know that [Engemann] is very calculated. She knows she's been caught . . . What better way to kind of squash this conversation than to call yourself a victim?").

Season 3, Episode 8 focuses on Leavitt as the "only one in the [MomTok] group" supportive of Engemann while she struggles to believe Engemann's claims about Brunette. Season 3, Ep. 8, 00:06:10. The statement by Engemann that she was sexually assaulted is part of her conversation with Leavitt, during which Leavitt confronts her about the "flirtatious" texts with Brunette, the communications between Brunette and Engemann's daughter, and Engemann's apparent attempt to coach Affleck on what to say about Engemann's contact with Brunette. *Id.* at 00:24:01–00:25:55. Despite Engemann's response, Leavitt concludes that Engemann's claims are "not adding up," and the episode ends with Leavitt and her husband agreeing that they have trouble believing Engemann's story. *Id.* at 00:35:15–00:38:51.

24

Similarly, Engemann repeats her assertion in Season 3, Episode 10 that she was sexually assaulted during a meeting with all the MomTok members, during which the MomTok members again questioned her seemingly contradictory statement and behavior.  *Id.* at 00:14:44, 00:38:05–00:42:51.  Their questioning is paired with on-screen messages from Brunette that assert Engemann's allegations are "crazy."  *Id.* at 00:36:51. The meeting concludes with the MomTok members still "confused" about what happened between Brunette and Engemann, and deciding to "just kind of move on."  *Id.* at 37:45, 42:51.

Lastly, in the Season 3 Reunion Episode, the Episode 6 clip of Engemann claiming there were "two ass grabs" is shown as part of a discussion among the husbands of the MomTok members about how no one believed Engemann's claims.  Season 3, Reunion Ep., 00:03:36. During the Reunion, Engemann is again pressed about her decision to continue communicating with Brunette, which she defends as a "trauma response" and maintains her claim that she was assaulted.  *Id.* at 00:32:03.  However, the other reunion participants continue to express skepticism over Engemann's claim.  *See id.* at 00:31:46 ("[Brunette] did seem like he was a nice guy there . . . Like I felt like he was respectful . . . So it-- it was confusing."); 00:37:54 ("'Cause I'm still confused. I want answers."); 00:37:56 ("It's all these things we're like, 'This doesn't add up.'").  As in other episodes, the discussion of Engemann's allegations against Brunette does not end with any resolution, with the host instead advising that they need to "move on with the reunion."  *Id.* at 00:38:41.

Overall, the Series conveys that none of the other MomTok members believe Engemann's allegations against Brunette and, if anything, leaves viewers with the impression that Engemann's claims should not be believed.  In this context, Plaintiff cannot show that the

25

statements he identifies are defamatory, and therefore his defamation and defamation per se claims should be dismissed. *See Hogan*, 762 F.3d at 1107 (dismissing defamation claim because statements in a "back-and-forth of a contentious dispute that no reasonable reader would take at face value" did not convey a defamatory meaning as a matter of law).

### B.    Plaintiff Fails to Plausibly Plead Defamation by Implication.

Plaintiff's claim that the Series created the defamatory implication that he had "seriously assaulted Engemann" and that he manipulated her also fails. Compl. ¶¶ 154–55. "When a plaintiff asserts a claim for defamation by implication, the court must first determine whether a reasonable factfinder could conclude that the underlying statement . . . 'conveys the allegedly defamatory implication.'" *Lichfield v. Kubler*, No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468, at *6 (D. Utah Sept. 29, 2025) (citing *West*, 872 P.2d at 1019). To make this determination, a court "must examine the context in which the underlying statement is made." *Id.*

Here, the context in which Engemann's allegations and the references to other participants' sexual assault and abuse experiences are made would not lead a reasonable viewer to believe that the Series implies that Brunette "seriously assaulted Engemann." When Engemann first references Neeley's experience with sexual abuse, Neeley comments that it feels "inappropriate" because their "situations are so vastly different." Season 3, Ep. 6, 00:12:56. During the Season 3 Reunion Episode, when Engemann has an emotional response to the conversation about Matthews's experience with sexual abuse, she clarifies that her reaction was "[n]ot to compare 'cause what I went through was not even close to what most everyone has gone through." Season 3, Reunion Ep., 00:22:21. Similarly, when Engemann asks Neeley how

26

she would feel if people questioned Neeley saying "I love you" to her abuser, the other MomTok members immediately interject to say Neeley's situation was "so different," and Engemann then agrees. *Id.* at 00:37:10–00:37:31. Thus, the reasonable implication from these discussions is that Engemann's alleged experience with Brunette was *not* like the sexual abuse experienced by Neeley and Matthews.

Nor does the Series imply that Brunette "manipulated" Engemann. Compl. ¶ 94. Engemann's explanation about why she continued speaking with Brunette is met with skepticism throughout the Series. *See, e.g.*, Season 3, Ep. 8, 00:35:15–00:38:51 (showing Leavitt and her husband continuing to doubt Engemann after Engemann defends her decision to continue communicating with Brunette). Despite Engemann's justification, the other Series participants continue to point to Engemann's "flirtatious" texts with Brunette as a basis for their continued doubt of her claims. *See* Season 3, Ep. 10, 00:36:42 ("[W]hat's hard [for Taylor to believe] in that situation, [was that Engemann] continued to talk to him, and I think that's—no one's saying that we don't believe you with what happened. We are, I think we're all just confused."). Thus, because no reasonable viewer would find that the Series creates the implications Plaintiff alleges, Plaintiff's defamation by implication claim should be dismissed. *See Lichfield*, 2025 WL 2772468, at *7 (dismissing defamation claim where no reasonable viewer could find that defendant's work conveyed the defamatory implication alleged); *Keisel v. Westbrook*, 2023 UT App 163, ¶ 50, 542 P.3d 536, 552 (dismissing defamation by implication claim where court found no basis for concluding that defendant's statements created the implication plaintiff alleged).

In addition, courts have recognized that to maintain a claim for defamation by implication, a plaintiff must also establish that the defendant intended or endorsed the defamatory inference. *See Hogan v. Winder*, No. 2:12-CV-123 TS, 2012 WL 4356326, at *9 (D. Utah Sept. 24, 2012), *aff'd*, 762 F.3d 1096 (10th Cir. 2014) ("In light of the magnitude of the First Amendment liberties at stake . . . the Court is inclined to require that Plaintiff allege facts sufficient to show that Defendants intended the implication."); *see also Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528 (6th Cir. 2007) ("[W]here the plaintiff is claiming defamation by innuendo, he . . . must show with clear and convincing evidence that the defendant . . . intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material.") (internal quotations omitted); *Dodds v. Am. Broad. Co., Inc.*, 145 F.3d 1053, 1064 (9th Cir. 1998) ("[A]ll the courts of appeal that have considered cases involving defamation by implication have imposed a similar actual intent requirement."); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference."); *Mile High Contracting, Inc. v. Deseret News Publ'g Co.*, No. 170906024, 2018 WL 7374786, at *9 (Utah 3d Dist. Ct. March 16, 2018) (Scott, J.) (dismissing defamation-by-implication claim for failing to plead facts that the defendant subjectively intended the defamatory implication).

Here, Plaintiff has not pleaded, and cannot plead, that JJP intended to imply that Engemann had violently assaulted and manipulated Engemann. In fact, as outlined above, the framing of Engemann's claims as questionable throughout the Series shows that JJP took steps to

avoid the implications Plaintiff alleges. For this additional reason, Plaintiff's defamation by implication claim should be dismissed.

### C.   Plaintiff Fails to Plausibly Plead "Actual Malice."

Plaintiff's claims also fail for another independent and dispositive reason—the First Amendment prohibits a public figure like Plaintiff[5] from prevailing in a defamation action unless he can plausibly plead and prove, by clear and convincing evidence, that the statements at issue were "made with 'actual malice'—that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964); *see also World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1136 (10th Cir. 2006) (*WWASP*) ("[I]f the plaintiff is a public figure, he must demonstrate by a standard of clear and convincing evidence that the defamatory statement was made with 'actual malice.'").

"Actual malice is a *subjective* inquiry; it is not based on whether a 'reasonably prudent' person would have conducted further investigation prior to publishing." *Revell v. Hoffman*, 309 F.3d 1228, 1233 (10th Cir. 2002). For that reason, knowledge of falsity must be "actual." *Id.* And "reckless disregard" is likewise subjective—the question is whether "the defendant actually had a high degree of awareness of probable falsity." *Id.* (cleaned up); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.").

---

[5] Plaintiff concedes he is a public figure. Compl. ¶ 24 ("Plaintiff is a public-facing individual who has appeared in television and streamed reality programming and related media."); *id.* ¶ 137 (asserting the "requisite degree of malice" includes "reckless disregard and/or willful knowledge").

29

"In the wake of *Iqbal* and *Twombly*, adequately pleading actual malice is an onerous task. And it is one that regularly results in early dismissal of an action." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 513 (E.D. Pa. 2020) (cleaned up). That is because "the plausibility pleading standard applies to the actual malice standard in defamation proceedings." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (holding that actual malice must be "alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("States of mind may be alleged generally, but a plaintiff must still point to details sufficient to render a claim plausible."). "[E]very circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Michel*, 816 F.3d at 702. Strict application of this "rigorous standard," *WWASP*, 450 F.3d at 1136, "makes particular sense when examining public figure defamation suits," *Michel*, 816 F.3d at 702. "In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation," undermining "the 'breathing space' needed to ensure robust reporting on public figures and events." *Id.*

This standard cannot be satisfied by conclusory assertions. "For a pleading of actual malice to survive a motion to dismiss, the plaintiff must plead non-conclusory, non-speculative *facts* from which malice might be reasonably inferred." *Franchini v. Bangor Publ'g Co., Inc.*, 109 F.4th 13, 35 (1st Cir. 2024) (cleaned up) (emphasis added). "Actual-malice buzzwords . . . are merely legal conclusions, which must be backed by well-pled facts to be sufficient." *Id.*

30

(cleaned up).  "[U]nless plaintiff pleads and proves facts which indicate actual malice . . . there is no issue to be submitted to the jury."  *Combes v. Montgomery Ward & Co.*, 228 P.2d 272, 277 (Utah 1951).[6]

Here, Plaintiff has failed to plausibly plead actual malice for two independent reasons: (i) he alleges actual malice only in the aggregate for JJP as a corporate entity, rather than identifying any specific individual at JJP who acted with the requisite state of mind, and (ii) even if he had identified particular individuals with responsibility for publishing the allegedly defamatory statements, Plaintiff's purported theories of actual malice fail as a matter of law.

> i.   Plaintiff Fails to Allege Any Specific Individual Within JJP Who Acted with Actual Malice.

When a defamation "defendant is an organization," as JJP is here, "a plaintiff must prove that a particular agent or employee of the defendant acted with actual malice at the time that agent or employee participated in the publication of the statement in question."  *Dongguk Univ. v. Yale Univ.*, 873 F. Supp. 2d 460, 465 (D. Conn. 2012), *aff'd*, 734 F.3d 113 (2d Cir. 2013). "[A]n organizational defendant is not charged with the collective knowledge of all its agents and employees for purposes of the actual malice inquiry."  *Id.*; *see also XPO Logistics, Inc. v. Peterson*, No. 2:15-CV-703-CW, 2025 WL 1114392, at *13 (D. Utah Apr. 15, 2025) ("Particularly where it concerns defamation and where, as here, [the publisher] is a corporate

---

[6] *See also Mayfield*, 674 F.3d at 378 (conclusory assertions of actual knowledge and reckless disregard are "entirely insufficient"—"a mere recitation of the legal standard . . . is precisely the sort of allegations that *Twombly* and *Iqbal* rejected"); *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 8 (D.D.C. 2020) (for actual malice, "labels and conclusions and a reference to the relevant legal standard" do "not satisfy Rule 8" (cleaned up)); *Sheehan v. Anderson*, No. 98–5516, 2000 WL 288116, at *3 (E.D. Pa. Mar. 17, 2000) ("Simply asserting that publication is made with malice is not sufficient.").

entity rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind.") (citing *Sullivan*, 376 U.S. at 287). This requirement derives directly from the constitutional basis for actual malice. *See Sullivan*, 376 U.S. at 287 (the "state of mind required for actual malice [must] be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statements]").

Plaintiff's Complaint here fails this requirement. It does not identify *any* individual within JJP, let alone an individual responsible for publishing the statements at issue who possessed actual knowledge of falsity or harbored actual doubts about truth. Rather, throughout the Complaint, Plaintiff simply refers to JJP and "Production" as an entity and tries to ascribe a state of mind to the company writ large. For this reason alone, Plaintiff's complaint fails the pleading requirements for plausibly alleging actual malice by a corporate defendant, and it accordingly should be dismissed.

        ii.      Each of Plaintiff's Theories of Actual Malice is Insufficient.

Even if Plaintiff had adequately identified a specific person at JJP, his allegations would still be insufficient because Plaintiff alleges no facts to support his naked conclusion that JJP "[k]new . . . that Engemann had not been sexually assaulted." Compl. § H. Instead, he alleges seven "red flags" and provides other extraneous commentary in an attempt to establish JJP's reckless disregard. Those allegations fit within three flawed theories: (1) Engemann is unreliable and, therefore, JJP should have investigated more, *id.* ¶¶ 103–107, 108–110; (2) JJP produced the Series to make a profit, *id.* ¶ 114; and (3) JJP should have given Plaintiff a better platform to

refute the allegedly defamatory statements, *id.* ¶¶ 112, 113.  These theories, even considered collectively, are inadequate to plead actual malice.

*First*, "failure to investigate . . . is not sufficient to establish reckless disregard." *Talley v. Time, Inc.*, 923 F.3d 878, 906 (10th Cir. 2019) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).  "Even the failure to review one's own files is inadequate to demonstrate malice by the party responsible for publishing a statement."[7] *Dongguk*, 734 F.3d at 126.  And "[c]ourts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice." *Talley*, 923 F.3d at 903.  Rather, Plaintiff must plausibly allege that JJP published Engemann's statements in "purposeful avoidance of the truth." *Harte-Hanks*, 491 U.S. at 692.  But by Plaintiff's own allegations, JJP did not purposefully avoid the truth.

Plaintiff alleges that JJP published at least two statements critical of Engemann's claims.[8] Had JJP been purposefully avoiding the alleged truth, it would not have published these statements.  And because Plaintiff did not allege JJP purposefully avoided the truth (instead alleging the opposite), Plaintiff's failure-to-investigate argument fails.  *See Michel*, 816 F.3d at

---

[7] Plaintiff's allegation that JJP had access to all "on-camera footage, audio recordings, and production materials" from *Vanderpump Villa* is wholly speculative and should be disregarded.  Compl. ¶ 107; *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (the Court need only accept as true "plausible, non-conclusory, and non-speculative" facts).  In addition to being speculative, this allegation does not allege which individuals at JJP had access to the alleged footage, and, as explained above, Plaintiff must plead that an individual acted with actual malice.

[8] *See* Compl. ¶ 104 ("One cast member, as aired in Episode 9 of Season Three, stated . . . 'you're lying and it's obvious that you're lying.'"); *id.* ¶ 105 ("Another cast member pointed out in front of Production that it was strange that Engemann was sending Plaintiff photographs of her children and FaceTiming with [Plaintiff] with her children after he purportedly sexually assaulted her.").

705 ("Far from intentionally avoiding the truth, the defendants included information contrary to their conclusions in the text of the article itself. In doing so, they undermined [plaintiff's] claim that they acted with actual malice."); *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (rejecting actual malice argument because the publisher "included adequate footage in the broadcast to inform the viewing audience that [a source] was not an unimpeachable source of information."); *cf. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043 (10th Cir. 2013) ("[Defendant] was not required to accept . . . denials of the film's allegations as conclusive, or prefer them over apparently creditable accusations.").

*Second*, that JJP published the allegedly defamatory statements as part of its business cannot establish actual malice. *See Harte-Hanks*, 491 U.S. at 667 ("Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice."). "The cases from *New York Times v. Sullivan* onward teach that evidence of a defendant printing material to increase its profits does not suffice to prove actual malice." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991). Plaintiff's conclusory assertions as to JJP's motives are thus irrelevant.

*Finally*, Plaintiff's theory that JJP was required to present his preferred narrative, *see* Compl. ¶¶ 112, 113, flies in the face of settled First Amendment principles. "It is the 'function of editors' to decide 'the choice of material to go into [a publication].'" *Talley*, 923 F.3d at 904 (quoting *Miami Herald Publ'g Co, v. Tornillo*, 418 U.S, 241, 255 (1974)). Moreover, even when commentary is "one sided," it "has no tendency to prove that the publisher believed it to be false." *Talley*, 923 F.3d at 904–05 (quoting *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1307 (D.C. Cir. 1996)). And here, JJP did not even present a one-sided narrative—it aired other

34

participant's skepticism of Engemann's claims, and it published Plaintiff's statement that Engemann's allegations were "crazy."  Season 3, Ep. 10, 00:36:51.

For all these reasons, Plaintiff has failed to satisfy the exacting standards for plausibly pleading actual malice. Because he is a public figure, that failure is fatal to his claims

### D.   Plaintiff's False Light Claim Should Also Be Dismissed.

Plaintiff's remaining claim against JJP for false light is duplicative of his defamation claims and fails for the same reasons.  "[A] plaintiff may not attempt an end-run around First Amendment strictures protecting speech by instead suing for defamation-type damages under non-reputational tort claims."  *Lichfield*, 2025 WL 2772468 at *8 (citing *Keisel*, 2023 UT App 163, ¶ 70).  Thus, "[t]he same principles that limit liability under defamation law also apply to false light claims."  *Id.*  Here, Plaintiff's false light claim is based on the same facts as his defamation claim.  Compl. ¶¶ 133, 143, 151, 158.  Therefore, Plaintiff's false light claim also fails as a matter of law.  *See Lichfield*, 2025 WL 2772468, at *8 (dismissing false light claim "for the same reasons that [the court] dismisses the defamation claims); *Keisel*, 2023 UT App 163, ¶ 70 (finding false light claim "necessarily fail[ed]" because it was based on same statements at issue in defamation claim).

### III.   DEFENDANT IS ENTITLED TO ITS LEGAL FEES UNDER THE ANTI-SLAPP STATUTE.

Finally, should JJP prevail on this motion, it is entitled to an award of costs, reasonable attorney fees, and reasonable litigation expenses under UPEPA because (1) the statements on which the claim are based fall within UPEPA's scope, and (2) UPEPA's fees provision is a substantive provision that is not displaced by federal law, and thus applies in this diversity case.

35

A.      The Statements at Issue Fall Within UPEPA's Scope.

As a threshold matter, Plaintiff's claims against JJP fall within the scope of UPEPA. UPEPA applies, among other things, to claims based on the "exercise of the right of freedom of speech or of the press . . . , guaranteed by the United States Constitution or Utah Constitution, on a matter of public concern." Utah Code § 78B-25-102(2)(c). "Public concern" is a term of art in First Amendment law that is, by design, quite broad. Speech "deals with matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Mackey v. Krause*, 2025 UT 37, ¶ 49, 575 P.3d 1162 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Whether speech is related to a matter of public concern is determined from "the content, form, and context of that speech, as revealed by the whole record." *Id.* (quoting *Snyder*, 562 U.S. at 453).

Here, there is no real question that the speech at issue—debating allegations of sexual assault and misconduct—was on matters of public concern. Allegations of sexual harassment and assault are generally considered matters of public concern, *see Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) ("[I]t is well-settled that allegations of sexual harassment, like allegations of racial harassment, are matters of public concern."),[9] including in the entertainment industry, *see*

---

[9] *See also Johnson v. Louisiana*, 369 F.3d 826, 830 n.6 (5th Cir. 20024) ("More importantly, allegations of sexual harassment . . . are always matters of public concern . . . .."); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir. 1992) ("The content of Wilson's speech—reports of sexual harassment perpetrated on her and other women at [the University of Texas Health Center]—is of great public concern." (footnote omitted)); *Dossett v. Ho-Chunk, Inc.*, 472 F. Supp. 3d 900, 909 (D. Or. 2020) ("However, allegations of sexual harassment in the workplace are in the public interest even if the allegations are disputed (and of course, they usually are).").

36

*Johnson v. Freborg*, 995 N.W.2d 374, 386 (Minn. 2023).[10]  And it is especially true where, as here, the statements are also about a public figure.  *See Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1197 (9th Cir. 1989) ("[W]e doubt that it is possible to have speech about a public figure but not of public concern.").  Consequently, UPEPA applies to Plaintiffs' claims.

### B.      UPEPA's Fees Provision Applies in This Diversity Action.

When the subject matter of a plaintiff's claims falls within UPEPA's scope, as it does here, "the court shall award court costs, reasonable attorney fees, and reasonable litigation expenses" to a moving party that prevails on its motion.  Utah Code § 8B-25-110.  Although UPEPA is a state statute, a provision of state law applies in a diversity action so long as it is not displaced by a Federal Rule and is substantive.  *Berk v. Choy*, No. 24-440, 2026 WL 135974, at *3 (U.S. Jan. 20, 2026); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  UPEPA's fee provision meets both requirements.[11]

*First*, the Federal Rules do not displace UPEPA's fee provision. A Federal Rule displaces state law if "the Federal Rule 'answers the question in dispute.'"  *Berk*, 2026 WL 135974, at *3 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).  The question here is whether the moving party is entitled to fees and costs if it prevails on the

---

[10] *See also Amor v. Conover*, 635 F. Supp. 3d 363, 369 (E.D. Pa. 2022) (concluding that "allegations of sexual misconduct against minors perpetrated by a renaissance festival employee(s) is a matter of legitimate public concern" because renaissance fair employees "work in a public facing event and performance."); *Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D.N.Y. 2021) (finding that "sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest").

[11] JJP does not assert here that certain other provisions of UPEPA apply, and the Court need not reach that question. *See, e.g.*, Utah Code § 78B-25-104(1) (discovery stay); *id.* § 78B-25-107(1)(c)(i) (plaintiff's proof burdens); *id.* § 78B-25-108 (expedited hearing); *cf. id.* § 78B-25-115 (provisions of UPEPA are severable).

motion.  The Federal Rules do not answer that question, so there is no rule that displaces UPEPA's fee provision.

*Second*, UPEPA's fee provision is substantive. Fee provisions are substantive when they are "tied to the outcome of the litigation" but procedural when they "are generally based on a litigant's 'bad faith conduct in litigation.'"  *Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1279 (10th Cir. 2011) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 52–53 (1991)).  So, for example, the Utah Truth in Advertising Act (UTIAA) provision awarding fees to the prevailing party is substantive because it "embodie[s] a substantive judgment about a particular class of claim, specifically UTIAA claims."  *Banner Bank v. Smith*, 30 F.4th 1232, 1240 (10th Cir. 2022) (discussing *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227 (10th Cir. 2018), and Utah Code § 13-11a-4).

UPEPA's fee provision is tied to the outcome of the litigation because fees are awarded "if the moving party prevails on the motion."  Utah Code § 78B-25-110(1).  And by mandating that a successful movant—but not necessarily a successful respondent—is entitled to fees, the Utah legislature made a "substantive judgment about a particular class of claim," thus demonstrating the fees are substantive.  *Banner Bank*, 30 F.4th at 1240; *see also* Utah Code § 78B-25-110 (mandating fees and costs for successful movant but allowing fees for respondent only if "the court finds that the motion was frivolous or filed solely with intent to delay the proceeding"). Moreover, UPEPA does not state that a moving party is entitled to fees and costs for the purpose of preventing bad faith litigation, further indicating the fee provision is substantive.  *See Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, (10th Cir. 2018) (concluding the fee provision in New Mexico's anti-SLAPP law is procedural because

38

it has a stated purpose of preventing "abuse of the legal process" and "baseless lawsuits" (quoting N.M. Stat. § 38-2-9.2)).

In addition, when deciding if fee provisions are substantive, courts consider the twin aims of *Erie*—preventing forum shopping and horizontal inequity. *Scottsdale*, 636 F.3d at 1280. In *Scottsdale*, for example, after concluding that the text of a fee provision was "inconclusive" on its substantive or procedural nature, the Tenth Circuit concluded the provision was substantive because not applying it in federal court would lead to forum shopping. *Id.* So too here. If UPEPA's fee provision did not apply in federal court, plaintiffs would be incentivized to file speech-based tort lawsuits in federal court to avoid the remedial purpose of the statute. Such an outcome would be contrary to *Erie*.

As a result, because Plaintiff's claims are within the scope of UPEPA, and because UPEPA's fee provision applies in this diversity action, upon prevailing on this motion, JJP is entitled to such an award.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed in its entirety with prejudice, and Defendant should be awarded its attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 17th day of February 2026.

/s/ David C. Reymann

**PARR BROWN GEE & LOVELESS, P.C.**
David C. Reymann
Sean M. Sigillito
Carissa A. Uresk

**CAMERON STRACHER, PLLC**
Cameron Stracher
Sara C. Tesoriero

Attorneys for Defendant Jeff Jenkins Productions LLC