## **PERFORMER AGREEMENT**

THIS PERFORMER AGREEMENT ("**Agreement**") is dated as of February 27, 2025 (the "**Effective Date**") by and between Ludwig Productions, LLC ("**Producer**") and Marciano Brunette ("**Artist**") with respect to Artist's engagement by Producer to render on-camera services for an unscripted television series tentatively entitled "*Secret Lives of Mormon Wives*" (the "**Series**) and currently intended for initial exhibition by Hulu ("**Hulu**"). Artist and Producer may each be referred to herein individually as "**Party**" and, collectively, as the "**Parties**". For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  **CONDITIONS**

    (a)    Conditions Precedent. All of Producer's obligations under this Agreement are expressly conditioned upon satisfaction of the following conditions precedent: (i) Producer's receipt of a fully-executed copy of this Agreement (including all exhibits hereto as applicable); (ii) Producer's receipt of any and all identification, payroll, and other documentation required for statutory record keeping requested by Producer; (iii) full execution of Producer's production services agreement with Hulu (which Producer acknowledges has been satisfied) and Hulu's approval of the budget and schedule for the Second Season (as defined below); and (iv) Artist's completion of any required background checks and such other checks and evaluations as required by Producer and/or Hulu, the results of which are satisfactory to Producer and Hulu, in their sole discretion, and the results of which must be secured prior to commencement of principal photography (collectively, the "**Conditions Precedent**").

    (b)    Conditions Subsequent. All of Producer's obligations under this Agreement (e.g., any obligations related to payments of any amounts due Artist, indemnification, credits) are subject to, and conditioned upon, Artist not being in Default of this Agreement, and Producer's rights in the event of a Default, Incapacity, or Force Majeure (as those terms are defined in the Standard Terms and Conditions attached hereto as Exhibit A) (collectively the "**Conditions Subsequent**").

2.  **ENGAGEMENT/OPTIONS**

    (a)    Second Season. Subject to satisfaction of the Conditions Precedent, Producer hereby engages Artist, and Artist agrees, to render on-camera services in connection with the second season ("**Second Season**") of the Series.

    (b)    Subsequent Seasons. Producer shall have five (5) successive, dependent, exclusive, irrevocable options (each, an "**Option**") to engage Artist to render on-camera services for subsequent seasons of the Series (each, a "**Subsequent Season**"). Each Option will be exercisable by Producer, if at all, no later than thirty (30) days after Hulu exercises its option to order Producer's production company services in connection with each Subsequent Season

    (c)    The Second Season and any Subsequent Season may be individually referred to herein as a "**Season**" and collectively "**Seasons**". The number of episodes in each Season and for which Artist will be engaged will be determined by Producer in its sole discretion. Producer will have the right, in its sole discretion, to increase or decrease the number of episodes ordered for any Season and to split, market, and/or distribute a Season order into multiple seasons. For the avoidance of doubt, in the event Producer, in its sole discretion, splits, markets, and/or distributes a Season order as multiple seasons, Artist acknowledges and agrees that such actions shall not constitute the exercise of an additional Season Option as set forth herein.

3.  **COMPENSATION**

Subject to the Conditions Precedent and Conditions Subsequent, and Producer's rights in the event of Default, Incapacity and/or Force Majeure, if Artist is engaged to render, and actually renders and completes all required services hereunder, the following fees shall be payable to Artist for Artist's services hereunder:

    (b) Second Season: Either: (i) Three Thousand Five Hundred Dollars ($3,500) per original episode in which Artist is predominantly featured in a storyline focusing on Artist's life (as determined by Producer in its sole discretion), with a storyline consisting of approximately three (3) or more scenes, with at least one (1) scene including a sit-down interview with Artist (the "**Featured Fee**"); or (ii) One Thousand Fifty Dollars ($1,050), if Artist is required to render services for, and meaningfully appears (i.e., other than incidentally or in the background, and other than in the show open, main titles, end credits, cold opens, super-tease, flashback, next-on, previously-on, this season on or last season on) in an original episode but is NOT predominately featured in a storyline focusing on Artist's life ("**Appearance Fee**").

    (c) Subsequent Seasons: Provided Producer exercises its applicable Option pursuant to subparagraph 2(b), the episodic fee set forth in subparagraph 3(b) hereinabove will increase 5%, on a cumulative, season-over-season basis for each Season Artist is engaged beyond the Second Season.

In the event, Producer or the Hulu elects to split such Season order into multiple Seasons (and no additional material services are required of Artist in connection thereof), no bump shall be accorded to Artist. For the avoidance of doubt, Artist shall not receive the foregoing fee in connection with the production of newly-created clip, compilation, "making of" casting, "best of," "countdown," and/or similar types of episodes that are substantially comprised of either footage that has already been exhibited and/or footage from Seasons other than the then-current Season, provided that no new services of Artist are required in connection with such episodes. For any reunion episodes in which Artist appears (other than in the open, main titles, end credits, cold opens, super-tease, flashback, next-on, previously-on, this season on or last season on), Artist shall receive Fifty Percent (50%) of the Featured Fee for the applicable Season. The Fee, to the extent payable, shall be payable in accordance with the payment schedule provided to Artist by Producer.

(d) <u>Bonus</u>:  Provided Artist: (i) is on time and available to fully render all services (including, but not limited to, showing up at call times and staying and filming for as long as production requires; (ii) not publicly criticizing Producer or Hulu or the Series; (iii) not talking publicly, confirming, leaking, providing or posting confidential information about the Series, Producer or Hulu; and (iv) participating in all press and promotional requirements as set forth in Paragraph 6 below, Artist shall receive a bonus at the end of each Season in the amount of <u>One Thousand Five Hundred Dollars ($1,500)</u> for each original episode in which Artist appears ("**Episodic Bonus**"). No Episodic Bonus is guaranteed, and receipt of any Episodic Bonus is contingent upon Artist's full compliance with the requirements set forth above as determined by Producer and Hulu, in their sole discretion. Episodic Bonuses, to the extent payable, shall be payable no later than thirty (30) days following the initial exhibition of the last Episode of the then-current Cycle.

## 4.  **SERVICES**

Artist shall render services customarily rendered by first-class, on-camera talent of high-quality television unscripted programs in a professional manner. Without limiting anything in this Agreement, at the direction of Producer and Hulu, Artist agrees to render all pre-production, production, post production, promotional, press, publicity, digital, social media and/or other related services in and in connection with the Series, including, without limitation, participating in standard openings, closings, bridges, lead-ins, lead-outs, re-shoots, voice-over work, teasers, vignettes, promos, bumpers and trailers, performing interview segments on-air, attending meetings, attending and participating in rehearsals, and participating in publicity interviews, satellite media tours, stills sessions, v-logs, video diaries, blogs, and promotional appearances. Artist further acknowledges and agrees that the applicable fee set forth in Paragraph 3 above includes payment for all the foregoing services and any other services or rights rendered and granted hereunder.

## 5.  **EXCLUSIVITY**

(a)    From the Effective Date and for so long as Producer has an Option to engage Artist hereunder, and if Producer has exercised its last Season Option hereunder, until the date that is twelve (12) months from the initial exhibition of the last episode of the then-current Season of the Series produced hereunder ("**Exclusivity Period**"), Artist's on-camera services shall be exclusive to Hulu in all forms of unscripted in all media now known or hereafter devised. The foregoing exclusivity obligation does not restrict Artist from posting and engaging in Artist's personal social networking activity (e.g., TikTok, Instagram, Facebook, personal website, YouTube channel) on new media platforms ("**New Media Platforms**") provided, however, that (i) Artist shall not engage in any activity that would put Artist in breach or default hereunder; (ii) Artist's services to Producer shall remain in first position at all times throughout the Exclusivity Period; and will not materially interfere with Artist's services for the Series; (iii) such material is not produced for or distributed by a Hulu's competitor; (ii) such material is consistent with Artist's existing posts in length, frequency and subject matter; (iii) such material does not include events, outcomes and/or material to the extent that any of the foregoing is created for and/or included in the Series; (iv) such material is non-serialized, non-professional, and a different format from the Series; (v) and in the course of engaging in New Media Platform activities, Artist shall not use, upload or otherwise make publicly available Hulu's or Producer's names (other than on an incidental basis as permitted herein), logos, marks, and/or any other materials owned and/or controlled by Producer or Hulu (e.g., stills, videos, behind-the-scenes materials, etc.). Artist agrees that Artist shall not disclose any confidential information or share any additional, non-incidental Series information on any New Media Platform (e.g., Series outlines or story arcs, "behind the scenes" information, details of the production process, the state of production cycle, details of other cast members, etc.) unless (a) Artist has obtained Producer's and Hulu's prior written approval; and (b) Artist's publication of such information is made in conjunction with the strategy and/or express direction of Producer and Hulu.

(b)    During the Exclusivity Period, Artist may not appear in or authorize the use of their name or likeness in commercials or pursuant to endorsement arrangements in any media without the prior written approval of Hulu Business Affairs in each instance. In no event shall any such Hulu-approved commercial contain any mention of or explicit or implicit connection or reference (whether audio, visual or otherwise) to the Series. Hulu shall have the right within its sole discretion to determine that any such commercial shall not be exhibit within the time period the Series is exhibit. Artist will not enter into any agreement that restricts the use of Artist's likeness or name in any media as permitted hereunder by Hulu or any agreement that interferes with or prohibits Artist's participation in any product integration, commercial tie-in or other similar advertising in connection with the Series. Notwithstanding anything to the contrary herein, during each Broadcast Season for which Producer exercises its annual option to require the services of Artist, neither Artist's name nor Artist's likeness will be used in any medium in the Broadcast Territory or Windsor, Canada or Tijuana, Mexico on behalf of any product or service competitive with (i) Hulu or The Walt Disney Company, or any of their respective entities or business ventures (including amusement parks, location based entertainment venues, Internet services or cruise lines; (ii) a product or service of

a sponsor of the Series, Hulu or The Walt Disney Company; or (iii) a sponsor of the Series, Hulu or The Walt Disney Company, or any of their respective entities or business ventures (including amusement parks, location based entertainment venues, Internet services or cruise lines).

(c)      During the Exclusivity Period, Artist's services hereunder shall be in first priority to Artist's other obligations and permitted services, which obligations and permitted services shall not interfere with Artist's obligations under this Agreement. To the extent Artist is permitted to render on-camera services for any third party, Artist shall not disparage or parody Hulu, Producer, or the Series in connection with such permitted activities or otherwise.

## 6.  PUBLICITY & PROMOTION

In connection with each Season for which Artist is engaged to render services hereunder and without additional compensation except as may be required pursuant to any applicable collective bargaining agreement, in which event such compensation shall be at guild minimum, Artist's services hereunder shall include the following:

(a)      Promotional Services:  As requested by Hulu, Artist shall participate in publicity, promotional, marketing and advertising activities and events in connection with the Series (collectively, "**Promotional Services**"), including: (i) one (1) full day press junket; (ii) one (1) full day shoot for marketing/PR (EPK, promo videos, interviews); (iii) one (1) full day cast photo shoot; (iv) two (2) full days media tours; (v) phone, television, radio and social media interviews; (vi) at least two (2) media and marketing events, to be selected by Hulu in its sole discretion, which may include upfronts, TCA events, Comic-Con, award season events, and/or other tentpole media, marketing, and promotional events; (vii) promotion of each season's availability on Hulu on the individual's own social-media services (e.g., Artist's official Facebook page and Twitter feed) before, during, and after the launch of such season on Hulu.  Hulu will provide Hulu-approved hashtags and social media links that may be included, as applicable, in tweets and/or posts and will provide other materials for such tweets and/or posts upon request; (viii) making promotional appearances for the Series at press and publicity events, and on news shows, talk shows, and other programs, including other unscripted programs also exhibited by Hulu and its affiliates, subject to Artist's pre-existing professional obligations, which Artist shall keep Producer/Hulu apprised of in order to schedule promotional appearances so as to minimize conflicts with Artist's professional and family obligations to the extent reasonably possible (for the avoidance of doubt, Artist acknowledges and agrees to reasonably cooperate with Hulu and shall execute, in good faith, any appearance releases or other agreements as may be required in connection with such other programs).

(b)      It is of the essence of this Agreement that Artist shall promote the Series and render Promotional Services and Additional Services. The Promotional Services and Additional Services shall be in first position at all times.

## 7. CREDIT

All billing/credits (if any) shall be subject to the policy and discretion of Hulu.

## 8. TRAVEL

If Producer or Hulu requires Artist to render services in connection with the Series more than one hundred (100) miles from Artist's permanent residence (or then current-residence), Producer or Hulu shall provide Artist with the following on an if-available, if-used basis: one (1) coach round-trip air transportation, reasonable hotel accommodations (standard room and room tax only), ground transportation (to and from airports and hotels), and a per diem in accordance with Producer's/Hulu's policies. All travel arrangements will be made by, and shall be subject to the guidelines of, Producer, Hulu, or a designee of the foregoing.

## 9.  CONFIDENTIALITY

Artist agrees to keep strictly confidential and not disclose or caused to be disclosed, to any third party any information related to the Series, including, without limitation, the identity of the Series participants and any information regarding the experiences, conversations, behind- the-scenes activities, taping locations (if/as applicable), the events contained in the Series, storylines, the outcome of the Series, trade secrets, operational methods, business affairs of Producer or Hulu, and any other information that Artist may read, hear, or learn at any time from any source concerning or relating to the Series, Producer and/or Hulu that has not been intentionally disclosed by Producer and the terms and conditions this Agreement (except only as required to fulfill Artist's obligations hereunder), as expressly permitted in writing by Producer (collectively, "**Confidential Information**") until after the Confidential Information is exhibited on television (if ever) or publicly announced (unless announced by Artist, in which case Artist shall be deemed in material breach of this Agreement) and is no longer confidential. Artist agrees that Artist shall not discuss any of the Confidential Information with any third parties unless Artist has first obtained written permission from Producer to do so. Notwithstanding the foregoing, Artist may disclose Confidential Information (a) as necessary to carry out the intent and purposes of this Agreement as expressly permitted by Producer in writing ; (b) as necessary to professional representatives (i.e., accountants, attorneys, and business mangers) provided such representatives agree to be bound by these terms of confidentiality; (c) as necessary and as required by law or legal proceeding; (d) **in disclosing information about unlawful acts, such as harassment or discrimination, or other conduct that I have reason to believe**

3

**is unlawful;** and (e) which is otherwise already in the public domain. Artist shall not discuss the Series or Artist's involvement with Hulu or the Series in any manner or media (including social media and/or social networking platforms) at any time or use Producer or Hulu's trademarks, logos, or tradenames without Producer's or Hulu's prior written consent in each instance. Artist's obligations with respect to confidentiality as set forth in this paragraph shall continue in perpetuity. Artist understands and agrees that any disclosure or misappropriation of any of the Confidential Information at any time in violation of this Agreement will constitute a material breach of this Agreement and will cause Producer and Hulu irreparable harm, including, but not limited to: affecting the Series experience for the participants; eliminating the surprise, tension and outcome of the Series for the viewing public, adversely affecting television ratings for the Series; and/or potentially placing Producer and/or Hulu in breach of its agreements with third parties. Artist further acknowledges and agrees that Artist shall be responsible for the damages caused by such breach. Additionally, Artist shall not i) prepare or assist in the preparation of any written work (including, but not limited to, websites, books and magazine articles), any audio work or visual work, or any audio-visual work that depicts, concerns, or relates in any way to Artist's appearance, if any, or the Series, unless expressly authorized by Producer in writing. Artist shall not be critical of nor make derogatory comments about or toward the Series or any element thereof, Producer, Hulu, any of their respective related and affiliated entities, producers, crew and any other personnel affiliated with the show, Series sponsors, or The Walt Disney Company's products or services.

These deal terms (the "**Deal Terms**") together with the Standard Terms and Conditions attached hereto as Exhibit A, the Emergency Medical Release attached hereto as Exhibit B, and Company Policies attached hereto as Exhibit C shall collectively constitute the Agreement. In the event of any conflict between the Deal Terms and the Standard Terms and Conditions, the provision(s) of the Deal Terms will govern to resolve such conflict. This Agreement supersedes any and all prior and contemporaneous agreements, negotiations and communications with respect hereto and may not be modified, amended, or otherwise changed except by an instrument in writing signed by the parties hereto.

ACCEPTED AND AGREED:

**LUDWIG PRODUCTIONS, LLC**

By: _____

Its: _____

Date: _____

**ARTIST**

Marciano Brunette (Mar 6, 2025 17:14 PST)

Signature

Date: 03/06/2025

**EXHIBIT A**

STANDARD TERMS AND CONDITIONS

1. SERVICES

Artist hereby accepts the engagement under the Agreement and agrees to provide services as set forth therein. Artist shall render services in accordance with the requirements of Producer and shall comply with all of Producer's instructions, directions, and requests and all the instructions, directions, and requests of any other person(s) designated by Producer. Artist further agrees that Producer's decisions shall be final and controlling with respect to all matters relating to the rendition of Artist's services, including, without limitation, any and all business, production and creative matters. Artist's services shall be rendered for and as directed by Producer at such places and on such locations as Producer may from time to time designate.

2. RIGHTS

Producer is and shall be the sole and exclusive owner, throughout the universe, in perpetuity, of the Series and all of the results and proceeds of Artist's services (including, without limitation, all material, suggestions and ideas furnished by Artist in connection with Artist's services hereunder, as well as any other material created by Artist for the Series, whether or not the creation of such material is part of Artist's services hereunder) heretofore or hereafter rendered in connection with the Series (the "**Results and Proceeds**"), which Results and Proceeds shall constitute a "work-made-for-hire" for Producer within the meaning of U.S. copyright law or any similar or analogous law or statute of any other jurisdiction, with Producer being considered the author for copyright purposes and the owner of the copyright and all other rights now known or hereafter devised in any and all media throughout the universe in perpetuity. If for any reason the Results and Proceeds (or any portion thereof) are deemed not to be a "work-made-for-hire" for Producer or to not be capable of copyright protection, then Artist hereby irrevocably assigns, grants, licenses and transfers to Producer, exclusively, all of Artist's rights of every kind and nature, including all rights of copyright, in and to the Results and Proceeds for use in all manner and media now known or hereafter devised, throughout the universe, in perpetuity. The Results and Proceeds shall include, without limitation, any and all material that Artist may create (or participate in the creation of) in connection with the Series, including, without limitation, any and all ideas, plots, material (written or otherwise), musical compositions, photographs, moving pictures and/or recordings made by Artist in connection with the Series. Producer shall have the right, but not the duty, to exploit, distribute and exhibit the Results and Proceeds by any means now known or hereafter devised, throughout the universe, in perpetuity, and/or to sell, assign or otherwise dispose of the Results and Proceeds to any person, firm or corporation and/or to exploit the Series and the allied and ancillary rights therein in any and all media and by any and all means now known or hereafter devised and in any manner, in segments or otherwise, at Producer's sole discretion. Furthermore, Producer shall have the right to edit, cut, rearrange, adapt, dub, revise, modify, or otherwise alter the Results and Proceeds or any part thereof in its sole discretion. Artist waives the exercise of any "moral rights" and "droit moral" and any analogous rights however denominated in any jurisdiction of the universe. Artist agrees not to institute, support, maintain or authorize any claim, action, litigation, or arbitration on the ground that any exploitation of the Results and Proceeds by Producer in any way constitutes an infringement of any of Artist's "moral rights" or a defamation or mutilation of any part thereof or contains unauthorized variations, alterations, modifications, changes or translations of the Results and Proceeds.

3. NAME AND LIKENESS

Producer shall have the irrevocable right in perpetuity, throughout the universe, to use, and to grant to third parties the right to use, Artist's name, actual or simulated voice, likeness, and biographical material (collectively, "**Name and Likeness**"), in any media now known or hereafter devised, in connection with the development, production, exhibition, distribution, merchandising, commercial tie-ins, advertising, marketing and promotion (including "institutional" or trade advertising) and other exploitation of the Series and the businesses, services, programs and/or products of Hulu, Producer and their licensees, sublicensees and assigns (including all advertising, publicity and promotion and materials associated therewith). Notwithstanding the foregoing, Producer agrees that it will not use Artist's name, voice or likeness as a direct endorsement by Artist of any product or service (other than the Series) unless Producer first obtains Artist's prior written consent for such endorsement, provided that any advertising that occurs in conjunction with the publicizing, promotion, production or distribution of the Hulu service or the Series, or elements thereof, does not constitute a direct endorsement of such product or service. In addition, Artist agrees to participate in product integrations and/or other similar sponsor-related content in connection with the Series for no additional compensation. Subject to any applicable collective bargaining agreement, Producer and Hulu shall have the right to use the services of third parties to dub or double Artist's acts, poses, appearances, voice, or sound effects in any language and for any purpose including the distribution of the Series in other countries. Notwithstanding any of the foregoing, Producer shall also have the right to use any materials (which shall include, but not be limited to, Artist's personal journals, photographs, webisodes, vlogs, blogs, video diaries, social media posts or other content from Artist's social media accounts, emails text/picture messages, etc.) that Artist provides or is otherwise obtained by Producer, in and in connection with the Series and any advertising and promotion thereof.

4. NO OBLIGATION TO USE

Producer shall be under no obligation to actually use Artist's services, to use any of the Results and Proceeds, to produce or exploit the

5

Series, to continue any of the foregoing if commenced or to otherwise exercise any of the rights granted to Producer hereunder. Notwithstanding the foregoing, provided Artist fully performs all services required hereunder to the extent required by Producer, and provided Artist is not in uncured material breach of this Agreement, Producer shall have fully discharged its obligations hereunder by the payment to Artist of the applicable compensation set forth in the herein for any services actually rendered.

5.   REPRESENTATIONS AND WARRANTIES AND INDEMNITIES

(a)   Artist represents and warrants that: (i) Artist has the right, power, and authority to enter into this Agreement, fully perform all of Artist's obligations under this Agreement and grant and assign all rights granted by Artist hereunder (and the consent of no other person or entity is required in connection therewith); (ii) Artist has not made nor will make any contract or other arrangement that would conflict with or impair the complete enjoyment of the rights and privileges granted to Producer under this Agreement; (iii) the Results and Proceeds are wholly original to Artist (except to the extent in the public domain and Producer is notified or it is provided by Producer or Hulu for Artist's inclusion); (iv) the Results and Proceeds will not infringe or violate the rights of any third party, including without limitation, rights of privacy or intellectual property rights, constitute libel or slander, or breach any obligation of confidentiality Artist may have to a third party; (v) the Results and Proceeds are free and clear of any lien, encumbrance, claim, or third party interest of any kind; and (vi) Artist shall comply with all applicable federal, state and local laws, rules and regulations.

(b)   Artist further represents, warrants and agrees that: (i) Artist is in good health and has no medical, physical, or emotional condition that might interfere with Artist rendering services for the Series; (ii) Artist will not be under the influence of any medication or drug that might impair Artist's mental or physical ability to participate in the Series; and (iii) to the extent that Artist's physical, emotional, psychological, and/or mental health changes or Artist discovers additional information about Artist health at any time after signing this Agreement, Artist shall immediately notify Producer.

(c)   Artist hereby agrees to indemnify and hold harmless Producer, Hulu, and each of their respective parents, subsidiaries, affiliates and related entities, and their respective directors, officers, employees, agents, attorneys, successors, licensees and assigns of each of the foregoing entities (collectively, "**Related Entities**") from and against any and all third party claims, liabilities, losses, judgments, damages, costs and expenses (including, without limitation, reasonable, outside attorney's fees and court cases whether or not in connection with litigation) (each a "**Claim**" and collectively "**Claims**") arising out of or resulting from (i) any breach by Artist of any representation, warranty or agreement made by Artist in this Agreement; (ii) any negligent or reckless act or omission, willful misconduct, intentional tortious act or omission of Artist (or any agent, employee, guest, or invitee of Artist); and/or (iii) any acts by Artist outside of the scope of Artist's services hereunder or contrary to Producer's instructions in connection with the occurrence giving rise to such Claim.

(d)   Producer represents, warrants, and agrees that Producer has the right, power, and authority to enter into this Agreement and the consent of no other person or entity is required for Producer to fulfill its obligations herein.

(e)   Producer shall indemnify, defend, and hold Artist harmless from all Claims arising out of or resulting from (i) breach of any agreement, covenant, representations, or warranty made by Producer in this Agreement; (ii) Producer's development, production, distribution, exhibition, and/or exploitation of the Series and any element thereof except with respect to Claims for which Artist is obligated to indemnify the Related Parties pursuant to this Agreement; and (iii) Producer's negligent or reckless act or omission, willful conduct, intentional tortious act or omission of Producer.

(f)   The indemnitor's obligations to indemnify the indemnitee are conditioned upon (i) the indemnitee advising the indemnitor of the Claim in a timely manner, and (ii) the indemnitee's full cooperation in the defense of the Claim. The Parties acknowledge and agree that Producer shall control the defense of any Claim brought against Producer and/or for which Producer is the indemnitor.

6.   DEFAULT, DISABILITY AND FORCE MAJEURE

(a)   An event of "**Incapacity**" shall be deemed to exist under this Agreement if Artist becomes incapacitated or prevented from fully performing any of Artist's obligations under this Agreement by reason of Artist's illness, Artist's mental, physical or other disability or physical disfigurement. For the avoidance of doubt, any occurrence that would otherwise be deemed an event of Incapacity hereunder will not be so deemed and will instead by deemed an event of Default if such occurrence is the result of Artist's use of alcohol or any drug or controlled substance. If at any time Artist alleges that Artist is, or if Artist shall actually be, incapacitated by illness or other incapacity or by a default of the kind described in the preceding sentence, and thereby prevented from performing Artist's obligations hereunder, then Producer may, at Producer's expense, require Artist to submit to medical examination(s) to be conducted by such physician(s) as may be designated by Producer. Artist shall have the right to have Artist's own physician present at any medical examination at Artist's sole cost and expense.

(b)   An event of "**Default**" shall be deemed to exist under this Agreement if at any time: (i) Artist breaches any representation, warranty, obligation, covenant, or provision in this Agreement; (ii) Artist fails, refuses or neglects, or at any time Producer is notified by or on behalf of Artist that Artist intends to fail, refuse, or neglect, to comply fully with any of Artist's obligations

6

required under this Agreement as, when, and where required by Producer. A "Default" shall include any event of Incapacity caused as a result of Artist's use of alcohol or of any drug or controlled substance.

(c)    An event of "**Force Majeure**" shall be deemed to exist under this Agreement if Producer's or Hulu's general business operations and/or Producer's or Hulu's production or distribution operations and/or the exhibition operations of any licensee of the Series and/or any normal transmission of the Series are impaired, hampered, interrupted, prevented, suspended, postponed or discontinued by reason of any war, riot, terrorist act, fire, earthquake, casualty, accident, labor controversy (including without limitation any lockout, walkout, strike, or threat thereof), governmental order or regulation, judicial order (whether imposed on an industry-wide basis or affecting only Producer, Hulu, the Series and/or the licensee(s) of the Series), pandemic, epidemic, infectious disease outbreak, act of God, failure of the producer, director, any other essential production personnel (as determined by Producer in its sole discretion) or any other continuing, primary participant of the Series to perform for any reason (including without limitation, death, illness, incapacity, disfigurement, failure, refusal or neglect), failure of technical facilities or substantial impairment (including, without limitation, substantial increase in the cost thereof) in obtaining facilities, materials, and/or personnel which makes production in accordance with customary or established schedules and practices impracticable, and/or all other events customarily included as events of force majeure in the U.S. television industry and/or any other similar or dissimilar occurrence beyond Producer's control.

(d)    <u>Suspension</u>. If any event of Incapacity, Default or Force Majeure occurs at any time during the term of this Agreement, then notwithstanding anything to the contrary contained in this Agreement, Producer shall have the right to suspend the term of Artist's employment under this Agreement and all dates herein shall automatically be extended for a period of time equal to the duration of such suspension. No compensation shall accrue or be payable to Artist under this Agreement during any such period of suspension. Producer's payment of compensation to Artist during any period of suspension shall not be deemed a waiver by Producer of any of its rights under this Agreement, and Producer may apply such payment(s) against any compensation accruing or coming due to Artist pursuant to this Agreement. Any suspension under this Agreement shall continue until Producer's notice to Artist ending the suspension or until the cause of such suspension shall have ceased to exist, whichever first occurs, and, with respect to a suspension for Incapacity or Default, until Artist has reported to Producer that Artist is ready, willing, and able to perform all of Artist's obligations hereunder. Notwithstanding the foregoing, any period of suspension may, at Producer's election, be extended to include such period of time as may be required by Producer to make preparation for the utilization or resumption of Artist's services. Producer may at its election lift any suspension at any time prior to the cessation of the cause therefor (including any extended time for preparation for the utilization or resumption of Artist's services), except for any suspension caused by Artist's Incapacity, and with respect to any suspension caused by an event of Force Majeure, Producer may at its election thereafter reinstate such suspension at any time during the continuation of such event of Force Majeure. Artist shall resume rendering services upon such date following the lifting of any suspension as Producer may designate. If the period of any suspension under this Agreement shall include a starting date previously designated by Producer, then Producer may, at Producer's election, cancel and/or postpone such starting date. During any period of suspension for Incapacity or Default, Artist will not render services for any other person or entity or on Artist's own behalf. During any suspension for Force Majeure, Artist may (if Artist is not in Default under the terms of this Agreement) render services for any other person or entity or on Artist's own behalf, subject to Artist's exclusivity obligations hereunder and Producer's right to require Artist to immediately resume rendering Artist's services hereunder at any time. During any period of suspension, the terms of the exclusivity provision of the Agreement shall remain in full force and effect.

(e)    <u>Termination</u>. If Artist is in Default under this Agreement, Producer shall have the right at Producer's election to terminate this Agreement either during the continuance of such Default or within a reasonable time thereafter (whether or not Producer has first suspended Artist). In the event of Artist's Incapacity, Producer shall have the right, at Producer's election, subject to applicable law, to terminate this Agreement at any time after the continuance of such Incapacity for three (3) consecutive business days or for an aggregate of five (5) business days during any production period, or immediately in the event of death. If any event of Force Majeure occurs hereunder, Producer shall have the right, at its election, to terminate Artist's engagement under this Agreement at any time after the earlier of: (i) cancellation of production of all applicable series episodes that have not yet been produced for which Artist is engaged hereunder; or (ii) after continuance of such event of Force Majeure for a period or aggregate of periods of more than two (2) weeks.

(f)    Producer shall have the right to reduce the number of episodes of the Series for which it is required to compensate Artist hereunder during the applicable season of the Series by one (1) for each episode the production of which is canceled, discontinued, postponed or suspended by reason of an event of Force Majeure, Incapacity, or Default.

(g)    In the event of any termination of this Agreement, Producer shall be relieved of any and all further obligations to Artist under this Agreement, except that termination for any reason other than for Default by Artist shall not relieve Producer of its obligation to pay all accrued compensation with respect to periods for which Artist completed all services prior to such termination. In addition, Paragraph 9 (Confidentiality) of the Deal Terms as well as the following provisions in the Standard Terms: Paragraph 2 (Rights), Paragraph 3 (Name & Likeness), Paragraph 5 (Representations and Warranties/Indemnities), Paragraph 7 (Assumption of Risks), Paragraph 8 (Release of All Claims), Paragraph 9 (Release of unknown Claims), Paragraph 10 (Remedies), Paragraph 11 (Plugola, Payola and Logos), Paragraph 13 (Insurance), Paragraph 19 (Use of Data) and Paragraph 20 (Controlling Law & Dispute Resolution) shall survive any termination or expiration of the Agreement. Producer's rights under this Agreement (including, without limitation, its termination and suspension rights) are in addition to any other rights or remedies available to Producer, whether at law, in equity or otherwise. In the event of termination, Producer's ownership of the Series and the Results and Proceeds, or any other grant of

7

rights to Producer hereunder by Artist shall not be affected, limited, or terminated in any way by termination of cancellation of this Agreement for any reason.

7.  ASSUMPTION OF RISKS

(a)    Artist's participation in the Series may lead to emotional strains and pressures before, during and after Artist's participation in the Series. Accordingly, Artist may reveal and/or relate, and other parties (including, without limitation, other participants, Artist's friends, Artist's family, Artist's co-workers, Producer, and/or Hulu), may reveal and/or relate information about Artist of a personal, private, surprising, embarrassing and/or unfavorable nature. Artist further understands that Artist's appearance, depiction and/or portrayal in the Series, and Artist's actions and the actions of others displayed in the Series, may be embarrassing or of an otherwise unfavorable nature and may expose Artist, Artist's friends, co-workers and/or family to public ridicule, humiliation, or condemnation. Artist acknowledges that Artist is voluntarily participating in the Series and related activities with full knowledge, appreciation and understanding of the personal risks involved, and hereby agrees to accept any and all risks of participating in the Series. The foregoing is not an exhaustive list of the risks, hazards and dangers to which Artist may be exposed as a result of Artist's participation in the Series. Artist accepts and assumes any and all risks, hazards and dangers regardless of whether they are detailed in this Agreement, and Artist acknowledges that the waivers, releases and indemnities in this Agreement and any other agreement that Artist has executed or may execute in connection with the Series, apply to all such risks, hazards and dangers.

(b)    ARTIST UNDERSTANDS AND AGREES THAT ANY RECORDINGS MADE IN CONNECTION WITH THE SERIES MAY BE MADE BY ANY MEANS, INCLUDING, WITHOUT LIMITATION, USING CONCEALED OR HIDDEN CAMERAS, MICROPHONES, AND OTHER DEVICES, THE PRESENCE AND USE OF WHICH ARTIST AND OTHER PARTICIPANTS MAY NOT BE AWARE AND PRODUCER MAY MAKE SUCH RECORDINGS AT TIMES AND IN LOCATIONS AS DETERMINED BY PRODUCER, INCLUDING, WITHOUT LIMITATION, AT TIMES, IN LOCATIONS, AND IN CIRCUMSTANCES WHERE ARTIST AND SUCH OTHER PARTICIPANTS MIGHT OTHERWISE HAVE A REASONABLE EXPECTATION OF PRIVACY. ARTIST CONSENTS TO ANY SUCH RECORDINGS MADE USING HIDDEN/CONCEALED CAMERAS, MICROPHONES, OR ANY OTHER DEVICES. ARTIST DOES NOT NEED TO BE GIVEN ANY FURTHER NOTICE THAT SUCH RECORDINGS ARE TAKING PLACE. NOTWITHSTANDING THE FOREGOING, PRODUCER SHALL NOT FILM ARTIST DURING ANY OF THE FOLLOWING ACTIVITIES OR IN ANY OF THE FOLLOWING LOCATIONS AND/OR CIRCUMSTANCES WITHOUT ARTIST'S CONSENT: (i) WHILE ARTIST IS SHOWERING OR BATHING; (ii) WHILE ARTIST IS URINATING OR DEFECATING; (iii) WHILE ARTIST IS ENGAGING IN ACTUAL SEXUALLY EXPLICIT CONDUCT; OR (iv) WHILE ARTIST IS NUDE. NOTWITHSTANDING THE FOREGOING ARTIST SHALL BE DEEMED TO HAVE CONSENTED TO BEING FILMED DURING SUCH ACTIVITIES AND/OR CIRCUMSTANCES IF ARTIST ALLOWS CAMERAS TO FILM ARTIST DURING SUCH ACTIVITIES AND/OR IN SUCH LOCATIONSAND/OR CIRCUMSTANCES, OR ARTIST WEARS OR OTHERWISW CARRIES A RECORDING DEVICE WHILE ARTIST IS PRESENT IN SUCH LOCATIONS, IN SUCH CIRCUMSTANCES OR WHILE ARTIST IS UNDERTAKING SUCH ACTIVITIES. ALL OF ARTIST'S CONTRIBUTIONS TO SUCH RECORDINGS FORM PART OF THE RESULTS AND PROCEEDS, AND THE RECORDINGS MAY BE USED AND EXPLOITED AS SET FORTH HEREIN. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, PRODUCER SHALL NOT, WITHOUT ARTIST'S CONSENT, INTENTIONALLY HIDE OR CONCEAL ANY CAMERAS OR RECORDING DEVICES FOR THE SPECIFIC PURPOSES OF FILMING OR RECORDING ARTIST AT TIMES AT WHICH ARTIST IS NOT AWARE THAT ARTIST IS RENDERING SERVICES HEREUNDER. HOWEVER, NOTWITHSTANDING THE FOREGOING, RECORDINGS OF ARTIST'S ACTIONS AND STATEMENTS WHILE ARTIST IS TALKING ON THE TELEPHONE TO OTHER PARTICIPANTS IN THE SERIES MAY BE USED USING HIDDEN AUDIO AND VIDEO RECORDING DEVICES, INCLUDING IN AREAS IN WHICH A PERSON UNDER OTHER CIRCUMSTANCES MIGHT HAVE A REASONABLE EXPECTATION OF PRIVACY. ARTIST CONSENTS AND AGREES TO, AND ASSUMES ALL RISKS OF, THE RECORDINGS AND THE CONDUCT DESCRIBED IN THIS PARAGRAPH REGARDLESS OF WHETHER IT MAY INFRINGE ARTIST'S RIGHTS OR GIVE RISE TO ANY CLAIM IN THE ABSENCE OF ARTIST'S EXPRESS CONSENT AND AGREEMENT.

(e)    In case of an emergency, Artist authorizes Producer to arrange for or otherwise provide medical assistance to Artist as Producer may determine to be necessary. Artist also authorizes any licensed physician, health care personnel or medical facility to provide any medical or surgical care (including, without limitation, the use of anesthetics) and to hospitalize Artist, as such licensed physician, health care personnel or medical facility determines necessary or advisable, pending receipt of a specific consent from Artist. Artist also authorizes any reasonably necessary care by paramedics, emergency medical technicians, or other first responders. In connection with the foregoing, Artist also agrees to execute a copy of the Emergency Medical Release attached hereto as Exhibit B, which is incorporated herein by this reference. Artist understands that any injury Artist may suffer, and any treatment Artist may receive is part of the Results and Proceeds, and may be filmed and broadcast, exhibited, and otherwise exploited by Producer as with all other Results and Proceeds.

8.  RELEASE AND AGREEMENT NOT TO SUE

TO THE MAXIMUM EXTENT PERMITTED BY LAW, ON BEHALF OF ARTIST'S SELF AND ARTIST'S HEIRS, NEXT OF KIN, SPOUSES, GUARDIANS, EMPLOYEES, AGENTS, CONTRACTORS, REPRESENTATIVES, EXECUTORS, ADMINISTRATORS, SUCCESSORS, LICENSEES AND ASSIGNS (COLLECTIVELY, THE "**RELEASING PARTIES**"),

ARTIST HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES (AS DEFINED BELOW) FROM ANY AND ALL CLAIMS, ACTIONS, COMPLAINTS, DAMAGES, DEMANDS, ALLEGATIONS, SUITS, LIABILITIES, LOSSES, LIENS, COSTS, EXPENSES, INJURIES AND CAUSES OF ACTION, OF ANY KIND WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) INCLUDING WITHOUT LIMITATION THOSE DIRECTLY OR INDIRECTLY CAUSED BY, ARISING OUT OF, RESULTING FROM, OR RELATING TO, IN ANY WAY, THE SERIES (INCLUDING, WITHOUT LIMITATION, ARTIST'S PARTICIPATION THEREIN AND THE DEVELOPMENT, PRODUCTION, DISTRIBUTION OR EXPLOITATION THEREOF), ARTIST'S SERVICES, THE ACTIVITIES AND LOCATIONS, THE RESULTS AND PROCEEDS, THE FOOTAGE SHOT IN CONNECTION WITH THE SERIES (INCLUDING, BUT NOT LIMITED TO, ANY RECORDINGS USING HIDDEN AND/OR CONCEAL CAMERAS, MICROPHONES OR OTHER DEVICES), OR THE EXERCISE OF ANY RIGHTS GRANTED HEREIN, ON ANY LEGAL OR EQUITABLE THEORY WHATSOEVER (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, RIGHTS OF PRIVACY AND PUBLICITY, DEFAMATION, FALSE LIGHT, INFLICTION OF EMOTIONAL DISTRESS, COPYRIGHT AND OTHER INTELLECTUAL PROPERTY INFRINGEMENT, CLAIMS BASED UPON ANY ALLEGED PERSONAL INJURY, DEATH, AND/OR PROPERTY DAMAGE) (COLLECTIVELY, THE "**RELEASED CLAIMS**"). TO THE MAXIMUM EXTENT PERMITTED BY LAW, ARTIST SHALL NOT SUE, INSTITUTE ANY OTHER PROCEEDINGS, OR MAKE ANY CLAIM AGAINST ANY OF THE RELEASED PARTIES OR ANYONE ELSE FOR ANY CAUSE OF ACTION BASED ON ANY OF THE RELEASED CLAIMS. As used herein, the term "**Released Parties**" shall mean and refer to Producer, Hulu, all entities and platforms of Hulu, any other licensees or assignees of the Series or the Results and Proceeds, all participants, all other persons and entities rendering services in connection with the Series or otherwise connected to the Series or Artist's services, all parent, subsidiary, related and affiliated entities, licensees, successors, assigns, sponsors and advertisers of each of the foregoing, all of the respective directors, officers, employees, principals, executives, on-air talent, agents, contractors, partners, shareholders, representatives and members of each of the foregoing, and the respective heirs, next of kin, spouses, guardians, representatives, executors, administrators, successors, licensees and assigns of each of the foregoing.

9. RELEASE OF UNKNOWN CLAIMS

Artist understands that there is a possibility that, after the execution of this Agreement, the Releasing Parties may discover facts or incur or suffer Claims that were unknown to or unsuspected by the Releasing Parties at the time Artist executed this Agreement, and which, if known to or suspected by the Releasing Parties prior to such execution, may have materially affected Artist's decision to do so. Irrespective of the foregoing, on behalf of the Releasing Parties, Artist has assumed any risk of such unknown and unsuspected facts and Claims. NOTWITHSTANDING ANY APPLICABLE LAW OF ANY JURISDICTION LIMITING OR PREVENTING ARTIST FROM RELEASING UNKNOWN OR UNSUSPECTED CLAIMS, THE RELEASES CONTAINED HEREIN SHALL CONSTITUTE A FULL, FINAL, AND COMPLETE RELEASE AND DISCHARGE OF THE RELEASED CLAIMS THAT THE RELEASING PARTIES HAVE OR MAY HAVE, AT ANY TIME, AGAINST ANY OF THE RELEASED PARTIES, IRRESPECTIVE OF WHETHER THEY ARE KNOWN TO OR SUSPECTED BY THE RELEASING PARTIES. TO THE MAXIMUM EXTENT PERMITTED BY LAW, ON BEHALF OF THE RELEASING PARTIES, ARTIST WAIVES THE BENEFIT OF APPLICABLE LAWS OF ANY JURISDICTION WHICH LIMIT OR PREVENT ARTIST FROM RELEASING UNKNOWN OR UNSUSPECTED CLAIMS. ARTIST UNDERSTANDS THE FOREGOING WAIVER AND ITS SIGNIFICANCE AND CONSEQUENCES, INCLUDING, WITHOUT LIMITATION, ITS SIGNIFICANCE AND CONSEQUENCES FOR THE RELEASES ARTIST HAS MADE HEREIN.

10. REMEDIES

Producer shall be entitled to injunctive relief, specific performance, and other equitable relief to preserve its rights and interest in and to such rights and services as are set forth herein. This provision shall not, however, be construed as a waiver of any rights Producer may have for damages or otherwise arising from any breach of this Agreement. Artist agrees that Artist's sole remedy in the event of any default or breach of the Agreement by Producer (including, but not limited to, the failure to pay any sums which may be due Artist, and/or to comply with any credit provisions hereunder) shall be an action at law against Producer to recover monetary damages actually suffered, if any (but no special, consequential or punitive damages). Specifically, Artist agrees that Artist shall have no right to enjoin the distribution or exhibition of the Series, any other motion picture or other work based upon the Series or the Results and Proceeds, or to terminate or rescind any of the rights, releases or privileges granted hereunder to Producer, or to obtain any other form of equitable or injunctive relief, any right to which Artist irrevocably waives. At all times, Producer shall have all rights and remedies which it has at law or in equity pursuant hereto or otherwise, all of which rights and remedies shall be construed as cumulative.

11. "PLUGOLA", "PAYOLA" AND LOGOS

Artist represents that Artist has not and will not give or agree to give anyone directly and/or indirectly associated with the Series anything of value in exchange for Artist's engagement in the Series. Artist represents that Artist has not and will not accept any money, services, or other valuable consideration, other than Artist's compensation hereunder, for the inclusion of any matter in the Series or for the endorsement of any company, product, or service in the Series. Further, Artist shall not visibly wear any product name or logo during the provision of Artist's services hereunder, without Producer's prior written consent. If Producer approves the inclusion in the Series of any logo or trademark, which logo or trademark is proprietary to Artist, then Artist hereby grants Producer the right to include such

logo or trademark in the exhibition, promotion, advertising, merchandising and other exploitation of the Series.

## 12. MORALS

If Artist should commit or, if based upon a credible allegation supported by a reasonable investigation by Producer or Hulu, is alleged to have committed, an act or an offense under federal, state or local laws or which, in Producer's sole and reasonable discretion, brings Artist into public disrepute, scandal, contempt or ridicule or reflects unfavorably upon Artist, Hulu or Producer (or their assigns or licensees), or the Series, or otherwise degrades Hulu or Producer or the Series or injures or would injure the success of the Series, each as determined by Hulu in its sole and absolute discretion, Producer (or its assigns or licensees) shall have the right, in addition to and without prejudice to any other remedy of Producer of any kind or nature set forth herein, to (a) treat such act as a material breach and/or Default under the applicable provisions of this Agreement and/or suspend or terminate this Agreement with immediate effect, (b) cease exploiting the Series (or not proceed with producing or exploiting the Series as the case may be), and (c) delete the credit provided for in the Agreement from any exhibition or other uses of all or part of the Series, including without limitation in connection with the advertising and promotion thereof. In the event Producer elects to terminate this Agreement pursuant to this provision, the payment of the compensation which has accrued under Paragraph 3 of the Deal Terms as of the date of termination shall constitute the full payment by Producer for all services rendered and rights granted to Producer hereunder, subject to Producer's right hereunder in law and in equity. Producer's rights hereunder shall be subject to the relevant provision of any applicable guild agreement for Artist's services.

## 13. INSURANCE

Subject to the exclusions and limitations set forth in such policies, Artist shall be covered under Producer's errors and omissions insurance and general liability insurance for the Project; provided, however, that the coverage of Artist under such policies will not relieve Artist in any way whatsoever from Artist's representations, warranties and indemnities contained herein and no such policy will cover any claims or demands to which Artist's indemnification of Producer applies. Producer may (in Producer's sole discretion) secure in Producer's own name or otherwise at Producer's own expense, life, accident, health, cast, pre-production, and other insurance covering Artist independently or together with others, and Artist shall not have any right, title, or interest in and to such insurance. It is acknowledged and agreed that Artist's insurability pursuant to customary cast insurance subject to a customary deductible with no material exclusion shall be a condition to Producer's obligations hereunder. Artist shall assist Producer in procuring such insurance by timely submitting to the usual and customary medical examinations and by signing such applications and other instruments in writing as may be required by the insurance company involved. Artist may have Artist's own physician or other person present at any examination or test required pursuant to this paragraph at Artist's own expense. If Producer is unable to obtain such insurance on Artist at ordinary rates, with not more than normal deductions, subject only to the usual exclusions and without requirement of compliance with extraordinary conditions, Producer shall have the right to terminate this Agreement without liability by giving Artist written notice of termination.

## 14. ASSIGNMENT

Artist may not assign this Agreement or any rights hereunder, in whole or in part, except with Producer's and/or Hulu's prior written consent. Any such purported assignment shall be null and void and of no force and effect. Producer may freely transfer or assign this Agreement and any of its rights and obligations hereunder in whole or in part to any person or entity and this Agreement shall inure to the benefit of Producer and its successor and assigns; provided, however, Producer shall remain secondarily liable hereunder unless such assignment is to a financially responsible party who assumes in writing the performance and obligations of Producer under this Agreement to be performed from and after such assignment, in which case Producer shall be released of its duties, obligations.

## 15. WAIVER

No failure or delay in exercising on the part of either party, and no course of dealing with respect to any right, power, or privilege under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other exercise thereof or the exercise of any other right, power or privilege.

## 16. FURTHER DOCUMENTS

Upon request by Producer, Artist shall execute such further documents and instruments consistent herewith and do any acts or deeds reasonably required by Producer or its successors, licensees or assignees may reasonably request in order to evidence, effectuate, or enforce the terms, intents and purposes of this Agreement and any of Producer's and Hulu's rights hereunder (subject to Artist's reasonable opportunity to review and comment); and if Artist fails to do so within five (5) business days from receipt of Producer's request to do so, unless a shorter time is required by Producer, Artist irrevocably appoints Producer as Artist's attorney-in-fact with the full power and authority to do so, which power is coupled with an interest. If requested, Producer will provide Artist with a copy of any documents so executed; provided, however, any casual inadvertent failure by Producer to provide such copies shall not be deemed a breach by Producer of this Agreement.

10

## 17. IDENTIFICATION; WORK PERMITS; VISAS

Artist represents and warrants that Artist has provided to Producer all identification documentation and/or other information or documentation requested or required by Producer in connection with Producer's statutory record-keeping and identification verification obligations and that all such information and documentation is valid, true, and accurate as of the date provided to Producer by Artist. Artist further represents and warrants that Artist has obtained and will maintain at all times during which this Agreement is in effect, any and all passports, visas, work permits, immigration clearances and all other clearances and permits necessary to enable Artist to perform Artist's duties hereunder in the jurisdictions in which services are contemplated (collectively, "**Clearances**"). Such Clearances shall be valid and effective during the period of production of the Series in all such jurisdictions, and Artist's obtaining and maintaining such Clearances shall be a condition to Producer's obligations hereunder.

## 18. UNION/GUILD JURISDICTION

Artist acknowledges and agrees that: (a) any appearance by Artist in or in connection with the Series or Artist's services shall be an appearance as Artist's self; (b) Artist's services are not subject to any guild, union, or other collective bargaining agreement; and (c) no consideration of any kind is or shall be owed or payable to Artist, except as otherwise expressly set forth in this Agreement. If any of Artist's services become covered under any collective bargaining agreement to which Producer is or becomes a party ("**Union Agreement**"), to the maximum extent permitted by the applicable Union Agreement, if the compensation payable to Artist hereunder exceeds the applicable minimum compensation specified in the applicable Union Agreement, Producer shall have the right to apply such excess against any and all monetary obligations of Producer arising hereunder or under such Union Agreement.

## 19. USE OF DATA

Artist hereby acknowledges that for purposes connected with the Agreement, including compliance with this Agreement and Producer's legal and regulatory obligations, Producer may collect, use, and otherwise process certain individually identifiable information about Artist, their relatives and associates (in the event such individuals are designated as emergency contacts or beneficiaries, for example) provided by Artist, including without limitation personal data such as name, address, email address, government ID, banking and insurance information and sensitive personal data such as race or ethnic origin, health conditions and health insurance, criminal convictions and history, and trade union information (collectively "**Personal Data**"). Artist further acknowledges that the processing of Personal Data may involve transfer or disclosure to Producer's affiliated companies, Producer's employees and agents, and to third parties, including without limitation, third party service providers, external advisors, government agencies, regulators and authorities, courts and other tribunals and other persons connected with Producer and/or the Series and that such transfer may be to countries that may not provide a level of protection to Personal Data equivalent to that provided by Artist's home country, but in such instances Producer shall use reasonable endeavors to have in place adequate measures to ensure the security of the Personal Data. To ensure that the Personal Data remains as accurate as possible, Artist hereby agrees to inform Producer as soon as reasonably practicable of any changes thereto. Artist also represents and warrants that Artist is authorized to disclose Personal Data to Producer. Producer hereby informs Artist that Artist may have certain rights in respect of Personal Data (such as access, rectification, and portability) and that further information about these rights and Producer's processing of personal data generally can be obtained upon request from Producer.

## 20. CONTROLLING LAW & DISPUTE RESOLUTION

The Agreement was fully negotiated and entered into and shall be governed by and construed and enforced in accordance with the laws of the State of New York (United States of America) without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law. The Parties agree to submit disputes to binding, confidential arbitration in New York, New York in accordance with the following procedure: either (a) the parties shall mutually select a neutral arbitrator; or (b) if the Parties cannot agree on such arbitrator, each Party shall select one (1) neutral arbitrator, and those two (2) arbitrators shall then select a third neutral arbitrator to solely preside over the proceedings. Unless the Parties agree otherwise, the neutral arbitrator will be a former or retired judge or justice of any New York state or federal court with substantial experience in matters involving the entertainment industry. All arbitration proceedings shall be conducted under Judicial Arbitration and Mediation Services ("**JAMS**") who will adhere to the procedure established by JAMS (either the 'Comprehensive Arbitration Rules' for claims over Two Hundred Fifty Thousand Dollars [$250,000], or the 'Streamlined Arbitration Rules' for claims under Two Hundred Fifty Thousand Dollars [$250,000]). The arbitrator shall apply New York law, without reference to rules of conflicts of law or rules of statutory interpretation, to the resolution of any dispute. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The Parties are to share costs and the arbitrator's costs equally. Each Party shall remain responsible for its own attorneys' fees. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award. If either Party refuses to perform any or all of its obligations under the final arbitration award within thirty (30) days of such award being rendered, then the other party may confirm or enforce the final award in any court of competent jurisdiction in New York. The Parties hereto agree that any arbitration proceedings, testimony, or discovery, along with any documents filed or otherwise submitted in the course of any such proceedings (and including the fact that the arbitration is even being conducted) shall be confidential and shall not be disclosed to any third party except to the arbitrator and their staff, the Parties' attorneys and their staff and any experts retained by the parties, or as required by law. Notwithstanding the foregoing, a Party may disclose limited information if required in any judicial proceeding brought to enforce these arbitration provisions or any award rendered hereunder.

## 21. NOTICES

All notices required or permitted hereunder must be given in writing and delivered in person or via certified mail, email or delivered by an internationally recognized courier service, properly addressed, and stamped with required postage (if applicable) to the addresses set forth below. The date of personal delivery, the date the email is sent, and the date three (3) business days after mailing, will be deemed the date of service. The address of either party may be changed upon ten (10) days prior written notice to the other party. All notices required hereunder will be in writing.

To Artist:               c/o

To Producer:            Ludwig Productions, LLC
                        15301 Ventura Blvd., Building B, Suite 260
                        Sherman Oaks, CA 91403
                        Attn: Business & Legal Affairs

## 22. MISCELLANEOUS

This Agreement (including without limitation the Standard Terms and Conditions), constitutes the entire agreement between the parties and supersedes all prior and contemporaneous written or oral agreements pertaining thereto. This Agreement cannot be amended, modified, rescinded, or terminated except by written instrument executed by all Parties. No representations or warranties have been made other than those expressly provided herein. Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within legal requirements. The parties may execute this Agreement in counterparts, each of which shall constitute an original for all purposes, including any copies of same, and all duplicate counterparts will be construed together and constitute one Agreement. The Parties will be bound by signatures on this document which are transmitted by mail, hand delivery, facsimile and/or email to the other Party. Such signature will have the same binding effect as any original signature.

**EXHIBIT B**

**EMERGENCY MEDICAL RELEASE**

**IN CASE OF EMERGENCY**, I, by signing below, authorize Ludwig Productions, LLC, each of their respective subsidiary corporations or affiliates, and any of their employees, representatives, and contractors to arrange for or provide such medical and/or psychological assistance to me as they determine to be necessary.

I also authorize any licensed physician, psychologist, therapist and/or medical facility to provide any medical/surgical care and/or hospitalization to me, including anesthetics, which they determine necessary or advisable, pending receipt of a specific consent from me. I authorize any reasonably necessary care by the paramedics.

DATE: 03/06/2025          SIGNED: Marciano Brunette (Mar 6, 2025 17:14 PST)

Print Name: Marciano Brunette

Emergency Contact Name: Tammy Ragosta

Relationship: Mother

Their address: ████████████████

City: Las Vegas    State: Nevada    Zip Code: 89147

Phone: Daytime: (████)    ████████    Evening: (███)    ███████
                 Area Code

13

**EXHIBIT C—COMPANY POLICIES**

**RESPECT IN THE WORKPLACE POLICY**

Ludwig Productions, LLC ("**Producer**") is committed to providing a professional and respectful work environment where everyone is treated fairly and with dignity. In support of this commitment, Producer prohibits discrimination, harassment, bullying and retaliation in the workplace or work-related settings.

**SCOPE OF POLICY**

This policy applies to Producer's applicants and employees (co-workers, supervisors, and managers). As used in this policy, the term "employee" includes contractors and volunteers in the workplace. In addition, this policy applies to conduct at work and in work-related settings whether on Producer premises or off-site, and whether during or outside of regular work hours. This includes during work-related travel, on production locations, during social events with colleagues (including vendors or other business partners), and on social media sites.

**EQUAL EMPLOYMENT OPPORTUNITY**

Producer is committed to making employment decisions – such as hiring, promotions, compensation, work assignments, training opportunities, and corrective action or discipline, based on merit, qualifications, business needs, and other job related criteria, without regard to race, color, religion, creed, ethnicity, national origin or ancestry, citizenship or immigration status, sex (including pregnancy), sexual orientation, gender and gender identity or expression (including transgender status for those who are transitioning or have transitioned), marital status, age, mental or physical disability, genetic information, military or veteran status, or any other characteristic applicable law protects ("**protected characteristic**"). Producer prohibits discrimination against applicants and employees based on any of these protected characteristics. Similarly, discrimination based on the perception that an applicant or employee has a protected characteristic or associates with someone who has or is perceived to have a protected characteristic violates this policy.

**REASONABLE ACCOMODATIONS**

Producer is committed to equal employment opportunities for qualified individuals with a known disability and provides reasonable accommodations in employment to any qualified individual with a disability. Producer provides and is ready and willing to discuss reasonable accommodations for any such individuals to allow for the performance of the essential functions of their jobs. What constitutes a reasonable accommodation may depend on many factors including, but not limited to, the nature of the individual's disability and the essential functions of the position.

Producer respects the religious beliefs and practices of all employees. Producer provides and is ready and willing to discuss reasonable accommodations for employees who's sincerely held religious beliefs conflict with a Producer policy, procedure, or other employment requirement, unless such an accommodation would create an undue hardship.

**HARASSMENT PROHIBITED**

Harassment is a type of discrimination. It includes conduct that creates a disrespectful, intimidating, hostile, degrading, or offensive work environment for another individual based on one or more protected characteristic. Harassment can be verbal (such as slurs, jokes, insults, epithets, gestures, or teasing), visual (such as the posting or distribution of offensive posters, symbols, cartoons, drawings, computer displays, or emails), physical conduct (such as physically threatening another person, blocking someone's way, making physical contact in an unwelcome manner, etc.), or environmental (such as excluding others or making them feel unwelcome).

These types of behavior can violate this policy even if done in a joking manner and even if no intention to offend exists. Similarly, being under the influence of alcohol or other substances does not excuse behavior that violates this policy. Producer expects its supervisors and managers to set an example for others and therefore they should be aware of their heightened responsibilities to behave appropriately.

**Sexual Harassment:**

Sexual harassment is harassment based on sex or conduct of a sexual nature, and includes harassment based on sex (including pregnancy, childbirth, breastfeeding, or related medical conditions), gender, gender identity or gender expression. It may include all the actions described above as harassment, as well as other unwelcome sex-based conduct. Sexually harassing conduct can occur regardless of the gender or sexual orientation of the individuals involved and between members of the same or opposite sex, and it does not necessarily have to be motivated by sexual or romantic desire, and may include situations that began as reciprocal relationships, but that later cease to be reciprocal. An individual can be a victim of sexual harassment even if he or she is not personally a target of the harassing behavior. Sexual harassment is generally categorized into two types:

1. Quid Pro Quo Harassment ("this for that")
   - Submission to sexual conduct is made explicitly or implicitly a term or condition of an individual's employment.
   - Submission to or rejection of the conduct by an employee is used as the basis for employment decisions affecting the employee.
2. Hostile Work Environment Harassment

14

Conduct that has the purpose or effect of unreasonably interfering with an employee's work performance or of creating an intimidating, hostile, or offensive working environment due to or based on gender. Examples include:

- Unwelcome sexual advances, flirtation, teasing, sexually suggestive or obscene letters, invitations, notes, emails, voicemails, or gifts.
- Sex, gender, or sexual orientation-related comments, slurs, jokes, remarks, or epithets.
- Comments about an individual's body or appearance.
- Leering, obscene, or vulgar gestures, or making sexual gestures.
- Displaying or distributing sexually suggestive or derogatory objects, pictures, cartoons, or posters or any such items.
- Impeding or blocking movement or assaulting others.
- Unnecessary or unwelcome physical contact, such as touching, massaging, or kissing.
- Any sexual advances that are unwelcome as well as reprisals or threats after a negative response to sexual advances.
- Conduct or comments consistently targeted at one gender, even if the content is not sexual.

Other types of conduct may constitute sexual harassment under this policy or applicable law.

## Workplace Relationships

Producer recognizes that consensual romantic or sexual relationships may exist or develop between employees and does not prohibit them. However, perceived, or actual conflicts can arise both during the relationship and after it comes to an end. This risk is greater when the relationship involves a supervisor and a subordinate, no matter how many levels separate them, or when one of the employees can influence or determine the other's working conditions, regardless of whether they work in the same department. In these situations, the employee with greater authority or influence must report the relationship when it begins to Julie Hunt, SVP Business & Legal Affairs (t:424-236-7542; e: jhunt@3bmg.com), and the other employee is encouraged to report the relationship as well.

Employees in romantic or sexual relationships that do not involve a disparity in authority or influence are encouraged to tell Julie Hunt, SVP Business & Legal Affairs (t:424-236-7542; e: jhunt@3bmg.com), when such a relationship develops, particularly if they work together. While Producer respects the privacy of its employees, knowing about the relationship allows it to assist in navigating any potential workplace issues that may arise.

Once a relationship is brought to Producer's attention, it will work with the employees to address any potential issues, including any actual or perceived conflict of interest. In these circumstances, Producer may change reporting relationships, transfer one or both of the employees to another position, or take other steps designed to address the situation.

## Bullying

Bullying undermines the respectful work environment that Producer values. Bullying occurs when an individual behaves in an intimidating, hostile, or abusive manner toward another, regardless of whether it is based on that person's membership in a protected category. While bullying generally involves a pattern of behavior, a single act that is sufficiently severe may still violate this policy. Like harassment, bullying may be verbal, physical, or environmental. It is important to distinguish bullying from workplace supervision -- such as giving performance feedback, setting, and adhering to business or other performance objectives, or counseling for poor performance -- which, when conducted in an appropriate manner, does not violate this policy.

## COMPLAINT PROCEDURE
### Raising a Concern
Any individual who believes he or she has observed, heard of, or been the subject of a violation of this policy should report his or her concern to Producer as soon as possible.

You may contact any of the following:
- Your immediate supervisor
- Julie Hunt, SVP Business & Legal Affairs
  - Tel: 424-236-7542
  - jhunt@3bmg.com
- Scotty Eagleton, Director of Production & Operations
  - 424-236-7612
  - seagleton@3bmg.com
- Producer's Online Reporting Tool:
  - https://3bmg.allvoices.co
- Producer's Hotline:
  - 844-780-3068

Employees have the option to remain anonymous when reporting a complaint through the Producer's Online Reporting Tool and/or Producer's Hotline. An individual is not required or expected to raise a concern to the supervisor or other employee who has engaged in

the discriminatory, harassing, retaliatory, or bullying behavior.

Employees are encouraged to bring forward any concerns they may have about a potential violation of this policy in order to allow Producer to perform a prompt and thorough investigation and to promote its efforts to ensure that others have a respectful working environment. Supervisors or managers who learn of any potential violation of this policy are required to immediately report the matter to one of the channels listed above.

<u>Supervisor and Non-Supervisor Responsibilities</u>
Supervisors (individuals to whom at least one other employee reports) are expected to lead by example and to ensure that the individuals they manage comply with this policy. A supervisor who witnesses an interaction that may violate this policy, who otherwise suspects or becomes aware that the policy may have been violated, or who receives a concern about potential discrimination, harassment, bullying, or retaliation must report it as soon as possible through one of the channels listed above. This obligation exists even if no complaint is made, the conduct is not directly reported to the supervisor, or an individual, who raises a concern, requests, or insists that the matter not be reported.

Supervisors and managers will be subject to discipline for failing to report suspected harassment, discrimination, bullying or retaliation or otherwise knowingly allowing harassment, discrimination, bullying or retaliation to continue.
Producer encourages all non-supervisors to raise situations they see or hear about that may violate the policy, even if they are not directly involved or affected. Keep in mind that everyone can play a role in promoting a respectful working environment. Without receiving reports about potential concerns, Producer may be unable to take appropriate action.

**RETALIATION PROHIBITED**
Producer strictly prohibits retaliation against any individual who, in good faith, raises a concern (internally or to an appropriate government agency or tribunal) about, or otherwise opposes, discrimination, harassment, bullying, or retaliation, or other behavior this policy prohibits, even if the concern proves to be unfounded or the investigation is inconclusive. Producer will not tolerate retaliation against any individual who participates in good faith in the handling or investigation of a concern conducted by Producer or an appropriate government agency or tribunal. Producer also prohibits retaliation against an individual who requests an accommodation in good faith.

Prohibited retaliation under this policy includes demotion, suspension, threats of discharge, or other adverse employment action, or other harassment or intimidation as a result of reporting a concern or participating in an investigation as described above.

Any concern that an employee has experienced retaliation should be reported as described in the complaint procedure above. Producer takes all complaints of retaliation seriously and investigates them promptly and thoroughly. Any employee who engages in retaliatory conduct is subject to disciplinary action, up to and including termination of employment.

**INVESTIGATIONS OF POLICY VIOLATIONS**
Producer will promptly look into the facts and circumstances of any alleged violation, as appropriate. Even in the absence of a formal complaint, Producer may initiate an investigation where it has reason to believe that conduct that violates this policy has occurred. Moreover, even where a complainant conveys a request to withdraw their initial formal complaint, Producer may continue the investigation to ensure that the workplace is free from discrimination, harassment, bullying and retaliation. Anonymous complaints will also be investigated. The method will depend on the details provided in the anonymous complaint. All investigations will be fair, impartial, and timely.

To the extent possible, Producer will endeavor to keep the reporting of the applicant or employee's concerns confidential; however, complete confidentiality cannot be guaranteed when it interferes with Producer's ability to fulfill its obligations under this policy. All employees are required to cooperate fully with any investigation. This includes, but is not limited to, maintaining an appropriate level of discretion regarding the investigation, and disclosing any and all information that may be pertinent to the investigation.

Upon completion of the investigation, if misconduct is substantiated, Producer will take appropriate corrective and preventive action calculated to address and/or remedy the conduct. Examples of corrective actions that may be taken against offenders include training or coaching, counseling, financial consequences (such as reduced merit increases or lower bonus payments), verbal or written warnings, suspension, and termination of employment.

**ADDITIONAL INFORMATION ON CALIFORNIA PRODUCTIONS**
You also should be aware that the Federal Equal Employment Opportunity Commission and the California Department of Fair Employment and Housing investigate and prosecute complaints of prohibited harassment, discrimination, and retaliation in employment. If you think you have been harassed or discriminated against or that you have been retaliated against for resisting, complaining, or participating in an investigation, you may file a complaint with the appropriate agency. The nearest office can be found by visiting the agency websites at www.dfeh.ca.gov and www.eeoc.gov. The California Department of Fair Employment and Housing Communication Center telephone number is 1-800-884-1684. The Southern California Office is located at 320 West 4th Street, 10th Floor, Los Angeles, CA 90013. The Northern California Office is located at 39141 Civic Center Drive, Suite 250, Fremont, CA 94538. If the Department

finds evidence of a violation of law, the Department may file a formal accusation. The accusation will lead either to a public hearing before the Fair Employment and Housing Commission or a lawsuit filed on the complainant's behalf by the Department. If the Commission finds that harassment occurred, it can order monetary remedies, such as back pay, fines or damages, and other remedies such as reinstatement, promotion, or changes in policies and practices. Whether or not the Department finds probable merit in a complaint, the charging party may file a lawsuit in court upon receipt of a right-to-sue letter from the Department.

**ACKNOWLEDGMENT**

I have received my copy of Producer's Respect in the Workplace Policy. I understand and agree that it is my responsibility to read and familiarize myself with this policy.

I understand that Producer is committed to providing a work environment that is free from harassment, discrimination, and retaliation. My signature certifies that I understand that I must conform to and abide by the rules and requirements described in this policy.

Employee's Signature: Marciano Brunette (Mar 6, 2025 17:14 PST)

Employee's Printed Name: Marciano Brunette

Date: 03/06/2025

**Company Policy Prohibiting Conflicts Of Interest**

Business decisions and actions must be based on the best interests of the Company and must not be motivated by personal considerations or relationships. You must avoid situations which, in the sole judgment of the Company, may create an actual or potential conflict between your personal interests and the interests of the Company.

Personal Relationships with Vendors

An actual or potential conflict of interest exists when an employee has a "close personal relationship" with a vendor. Close personal relationships include, without limitation, relatives (including relatives by marriage), someone who lives with the employee, or someone closely connected with the employee on a personal basis such as a dating relationship. Such close personal relationships between an employee and a vendor may impair the employee's ability to exercise best judgment on behalf of the Company.

If you are currently involved in, or become involved in, a close personal relationship with a vendor, you must disclose that fact immediately to the EVP of Production of Company. Following such notification, the Company will take such remedial action as it deems appropriate under the circumstances.

Personal Relationships between Supervisors and Subordinates

An actual or potential conflict of interest also exists when two employees are in a close personal relationship, and one of them supervises or makes employment decisions about the other. If you are currently involved in, or become involved in, such a close personal relationship, you must disclose that fact immediately to an executive of the Company. Following such notification, the Company will take such remedial action as it deems appropriate under the circumstances.

Gifts and Gratuities

Only if all the following conditions are satisfied my gifts be provided to or accepted from people doing business or seeking to do business with the Company: (a) the gift is of nominal value; (b) the gift arises out of the lawful and normal course of business; and (c) the gift does not obligate, or appear to obligate, the recipient in any manner. This policy applies to a gift of any type including, without limitation, all the following: cash, gift certificates, merchandise, meals, tickets or other entertainment; the provision of labor or payment of expenses; any type of tip or gratuity; any interest in any business venture or property; any rebate, refund, finder's fee, promotional fee or marketing fee; and any type of gift or payment that could reasonably be viewed as an inducement, or a bribe or kickback, no matter how it is characterized. If you have any question as to whether a particular gift complies with this policy, you must notify an executive of the Company of the situation without delay.

**Company Policy Governing Acceptable Use of Technology**

Company provides technology for use to support and enable the business. Your use of such technology, including but not limited to Company's computers, laptops, mobile devices, internet, software, systems, e-mail, telephones, voicemail, and related equipment (collectively, "**Company Technology**"), is subject to the following rules.

1.    Ownership and Monitoring. All data created, sent, received or stored using Company Technology is the property of Company. Employees have no reasonable expectation of privacy with respect to their use of Company Technology, and subject to applicable laws, Company reserves the right to and may from time to time inspect, access, audit, monitor and/or record employees' use of and access to Company Technology and all information accessed, created, modified, stored, sent, received, copied or otherwise handled in any way, by or through any Company Technology, at any time, in its sole discretion, without notice.

2.    Message Content. Company Technology must not be used to send any message that does not comport with Company's ordinary standards of courtesy and professionalism. You are responsible for the content of all text, audio, or images that you place or send using Company Technology. Avoid posting statements, photographs, video, or audio that reasonably could be viewed as malicious, obscene, or threatening or intimidating; that disparage clients, or vendors; or that might constitute harassment or bullying. Examples of this conduct might include offensive posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by law and/or Company policy.

3.    Confidentiality. Never post or transmit confidential or proprietary information to anyone who does not have a right to, and need for, such information. Also, never access the files or communications of others unless you have a legitimate business purpose and authorization to do so.

4.    Compliance with Company Policies. Always comply with Company policies when using Company Technology. Any use that violates any of Company's policies, including those prohibiting discrimination and harassment, will not be tolerated.

5.    No Solicitations. Do not use Company Technology for religious, political, charitable, or personal solicitations, or for advertising any personal enterprise.

6.    Inappropriate Material. Do not use Company Technology to store, access, transfer, download, upload, communicate or create any material that is offensive or otherwise inappropriate for the workplace.

7.    Security. Use basic controls to prevent potential security breaches and leaks of Confidential Information or personal information. If you have reason to believe that any of your passwords have been compromised, change the applicable password immediately. If a request appears asking for your Company network login ID and/or password, do not comply, and notify Company's Director of Production and Operations immediately. Other basic controls include but are not limited to (i) ensuring that laptops and mobile devices are protected by lock screen passwords of at least 8 characters in length and that screens are set to lock within 10 minutes of inactivity; (ii) changing passwords regularly; (iii) keeping laptops and mobile devices appropriately secured; and not sharing laptops and/or mobile devices used to access Company Technology, or portable media containing Confidential Information or assets, with third parties (including family and friends). Also, you should exercise caution when opening attachment or selecting links from unknown sources as these may contain malicious software.

8.    Installation of Software and Downloading. Company intends to prevent computer viruses and unauthorized use of copyrighted materials belonging to entities other than Company. Never download and/or install any software using Company Technology without obtaining prior approval from an executive of Company. Also, never copy, transfer, rename, add, or delete information or programs belonging to other employees unless given express permission to do so by the owner.

9.    Copyright Infringement and Other Unlawful Activity. Use of Company Technology for any unlawful activity, including those laws relating to discrimination and harassment, privacy, financial disclosure, intellectual property and proprietary information, defamation, and criminal laws, is strictly prohibited. Never use Company Technology to convey material or information that is defamatory, libelous, slanderous, or that violates copyright or trademark laws or any licensing agreement.

10.    Be Aware of Company Representations. Only authorized employees may communicate on the Internet on behalf of the Company.

11.    <u>Violations</u>.  Violations of this policy may result in disciplinary action, up to and including immediate termination. If necessary, Company will advise appropriate legal officials of any illegal violations.

If you have any questions related to this policy, please speak with Company's Director of Production and Operation.

# SLOMW - Performer Agreement - Marciano Brunette (022725)(v2)

Final Audit Report                                          2025-03-07

| | |
|---|---|
| Created: | 2025-03-06 |
| By: | 3BMG Legal (Legal@3bmg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHHzucD3C0NnmxRzjPynNavSc1B8GSfSP |

## "SLOMW - Performer Agreement - Marciano Brunette (022725)(v2)" History

📄 Document created by 3BMG Legal (Legal@3bmg.com)
2025-03-06 - 3:33:13 AM GMT

📧 Document emailed to ███████████████████ for signature
2025-03-06 - 3:33:18 AM GMT

📄 Email viewed by ███████████████
2025-03-06 - 3:49:48 AM GMT

✍ Signer ████████████████ entered name at signing as Marciano Brunette
2025-03-07 - 1:13:58 AM GMT

✍ Document e-signed by Marciano Brunette (███████████████████)
Signature Date: 2025-03-07 - 1:14:00 AM GMT - Time Source: server

✅ Agreement completed.
2025-03-07 - 1:14:00 AM GMT

**Adobe Acrobat Sign**