**DYNAMIS LLP**
ERIC S. ROSEN (*pro hac vice*)
erosen@dynamisllp.com
(617) 802-9157
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

JAMIE H. SOLANO (*pro hac vice*)
jsolano@dynamisllp.com
(973) 295-5495
200 Connell Drive
Berkeley Heights, New Jersey 07922

BROOKE WATSON (*pro hac vice*)
bwatson@dynamisllp.com
(305) 306-6593
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

YUSEF AL-JARANI (*pro hac vice*)
yaljarani@dynamisllp.com
(213) 283-0685
1100 Glendon Avenue, 17th Floor
Los Angeles, California 90024

CAROLINE McHUGH (*pro hac vice*)
cmchugh@dynamisllp.com
11 Park Place, 3rd Floor
New York, New York 10007

**Parkinson | Benson | Potter**
D. Loren Washburn
loren@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

*Attorneys for Plaintiff Marciano Brunette*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| MARCIANO BRUNETTE, <br><br> *Plaintiff*, <br><br> v. <br><br> DEMI ENGEMANN and JEFF JENKINS PRODUCTIONS, LLC, <br><br> *Defendants*. | **OPPOSITION TO PLAINTIFF DEMI ENGEMANN'S MOTION TO DISMISS** <br><br><br> No. 2:25-cv-01102-DAO <br><br> Judge Tena Campbell <br> Magistrate Judge Daphne A. Oberg |

**PLAINTIFF MARCIANO BRUNETTE'S OPPOSITION TO DEFENDANT DEMI ENGEMANN'S MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD......................................................................................................... 2

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT...................................................................................................................... 9

   I.   UTAH'S ANTI-SLAPP STATUTE DOES NOT APPLY TO FEDERAL ACTIONS. ...... 9

   II.  THE PERFORMER AGREEMENT DOES NOT BAR PLAINTIFF'S CLAIMS............ 12

   III. PLAINTIFF ALLEGES ACTIONABLE CLAIMS OF DEFAMATION, DEFAMATION *PER SE*, DEFAMATION-BY-IMPLICATION, FALSE LIGHT, AND BUSINESS DISPARAGEMENT.................................................................................................... 15

       A.   The Complaint alleges that the statements were made with actual malice............... 16

       B.   Engemann's defamatory statements are actionable false statements of fact, not opinion. ..................................................................................................................... 19

           *i. Engemann's statements are not opinions.* .......................................................... 19

           *ii. The technical definition of sexual assault is irrelevant to the court's analysis.* 22

           *iii. Reasonable inferences drawn from Engemann's statements are actionable as defamation-by-implication .* ................................................................................ 23

       C.   "Invitation" or "implicit consent" are not defenses under Utah law......................... 23

   IV. PLAINTIFF ADEQUATELY PLEADS TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS................................................................................................ 24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
421 U.S. 240 (1975) ............................................................................................ 11

*Amann v. Off. of Utah Att'y Gen.,*
No. 2:18-CV-00341-JNP-DAO, 2021 WL 3931390 (D. Utah Sept. 2, 2021) ......................... 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................. 2

*Berk v. Choy,*
146 S. Ct. 546 (2026)......................................................................................... 2, 9, 10

*Brehany v. Nordstrom, Inc.,*
812 P.2d 49 (Utah 1991)........................................................................................ 17

*C.R. England v. Swift Transp. Co.,*
2019 UT 8.................................................................................................... 24, 25

*Cox v. Hatch,*
761 P.2d 556 (Utah 1988)..................................................................................... 22, 24

*Cuervo v. Sorenson,*
112 F.4th 1307 (10th Cir. 2024) ................................................................................ 12

*Fields Enterprises Inc. v Bristol Harbour Vil. Assn., Inc.,*
191 N.Y.S. 3d 856 (4th Dept. 2023)............................................................................. 12

*Great N. Assocs., Inc. v. Cont'l Cas. Co.,*
596 N.Y.S. 2d 938, (3d Dept. 1993).............................................................................. 14

*Moore v. Cohen,*
548 F. Supp. 3d 330 (S.D.N.Y. 2021) ........................................................................... 14

*In2 Networks, Inc. v. Honeywell Int'l,*
No. 2:11-CV-6-TC, 2011 WL 4842557 (D. Utah Oct. 12, 2011) ................................................ 16

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n,*
655 F.3d 136 (2d Cir. 2011) .................................................................................... 14

*Jacob v. Bezzant,*
2009 UT 37.................................................................................................... 15

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*,
  175 F.3d 848 (10th Cir. 1999) ........................................................................... 20

*Kalisch-Jarcho, Inc. v. City of New York*,
  58 N.Y.2d 377 (1983) .................................................................................. 13, 14

*Kaveh v. Starbucks Corp.*,
  No. 2:24-CV-00291, 2025 WL 308256 (D. Utah Jan. 3, 2025) ................................. 19

*Keisel v. Westbrook*,
  2023 UT App 163 ............................................................................................ 15

*Lichfield v. Kubler*,
  No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468 (D. Utah Sept. 29, 2025) ........................ 19

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*,
  885 F.3d 659 (10th Cir. 2018) ........................................................................ 2, 11

*Mackey v. Krause*,
  2025 UT 37 ................................................................................................ 10, 11

*Mathews v. McCown*,
  2025 UT 34 ............................................................................................... Passim

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ........................................................................................ 20, 21

*Miller v. Glanz*,
  948 F.2d 1562 (10th Cir. 1991) ............................................................................ 2

*Nelson v. Pehrson*,
  No. 2:24-CV-568 TS, 2025 WL 2675804 (D. Utah Sept. 18, 2025) ............................ *passim*

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................................... 17

*Nunes v. Rushton*,
  299 F. Supp. 3d 1216 (D. Utah 2018) .................................................................... 15

*Overstock.com, Inc. v. SmartBargains, Inc.*,
  2008 UT 55 ...................................................................................................... 25

*Porter v. Staples the Off. Superstore, LLC*,
  521 F. Supp. 3d 1154 (D. Utah 2021) .................................................................... 15

iv

*Rowe v. DPI Specialty Foods, Inc.*,
No. 2:13-CV-708-DN, 2016 WL 4186959 (D. Utah Aug. 8, 2016) ........................................ 17

*Safeway Inc. v. Abbott Lab'ys*,
761 F. Supp. 2d 874 (N.D. Cal. 2011)................................................................................... 14

*Searle v. Johnson*,
646 P.2d 682 (Utah 1982)..................................................................................................... 25

*Sec. Sys., Inc v. Alder Holdings, LLC*,
421 F. Supp. 3d 1186 (D. Utah 2019) ................................................................................... 16

*Shanley v. Hutchings*,
716 F. Supp. 3d 1179 (D. Utah 2024) ........................................................................... *passim*

*Sommer v. Fed. Signal Corp.*,
79 N.Y.2d 540 (1992)........................................................................................................... 14

*West v. Thomson Newspapers*,
872 P.2d 999 (Utah 1994)........................................................................................... 15, 19, 23

## Statutes

28 U.S.C. § 1927................................................................................................................... 10

Utah Code § 78B-25 ...................................................................................................... *passim*

## Rules

Fed. R. Civ. P. 12...................................................................................................... *passim*

Fed. R. Civ. P. 8................................................................................................................ 2, 10

## Other Authorities

Restatement (Second) of Torts § 580A.................................................................................. 14

Plaintiff Marciano Brunette ("Plaintiff" or "Brunette") respectfully submits this Memorandum of Law in opposition to Defendant Demi Engemann's ("Engemann") Motion to Dismiss ("Motion"), Doc. 30, the Complaint ("Complaint"), Doc. 1, alleging claims of defamation, defamation *per se*, defamation-by-implication, false light, business disparagement, and intentional interference with economic relations.  Brunette's claims are adequately alleged, and the motion to dismiss should be denied.

## INTRODUCTION

Engemann, a reality television personality, falsely accused Brunette of sexual assault and predation on social media. Over the course of months, on television, in podcasts, in press interviews, Engemann repeated her claims as her story escalated from an admission of harmless flirtation, to a story of "two ass grabs," groping, sexual assault, and to claims that Brunette "grabbed" her "privates." Engemann knew her claims were false, yet repeated them anyway to gain visibility at Brunette's expense.

The Complaint adequately alleges every element of every claim. Brunette and Engemann met during filming of *Vanderpump Villa* in August 2024. They kissed. Engemann told Brunette she loved him. For the next seven months, she maintained close, voluntary contact with him: sharing her phone location with Brunette and exchanging phone calls, FaceTime calls, hundreds of pages of text messages, and invitations to visit. When footage of the pair's flirtation was set to air, Engemann got cold feet and instead constructed a false narrative of sexual assault to insulate herself from reputational damage.  Brunette seeks redress for his harms.

Engemann advances five arguments for dismissal. None work. *First*, Utah's anti-SLAPP statute does not apply in federal court. The Supreme Court decided this question on January 20, 2026, holding in *Berk v. Choy* that state laws demanding more at the pleading stage than what is

1

required under Federal Rules of Civil Procedure (the "Federal Rules") Rule 8 cannot apply in federal proceedings. *Berk v. Choy*, 146 S. Ct. 546 (2026). The Tenth Circuit reached the same conclusion in *Los Lobos Renewable Power, LLC v. Americulture, Inc*., 885 F.3d 659 (10th Cir. 2018). *Second*, a "Performer Agreement" not referenced in the Complaint cannot be used to dismiss the case on a Rule 12(b)(6) motion.  Moreover, Engemann, who is neither a signatory nor third-party beneficiary of the Performer Agreement, does not have standing to invoke the release and, even if she did, the release is not enforceable under New York law. *Third*, the Complaint pleads actual malice in detail—Engemann was well-aware that she was never sexually assaulted by Plaintiff, but she persisted in repeatedly telling the public otherwise. *Fourth*, Engemann's statements are not protected opinion. Statements such as "I either was sexually assaulted or I wasn't, and the answer is that I was" are statements of fact. *Fifth*, implied consent is not a defense to defamation under Utah law. The Motion must be denied.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is permitted only if, accepting "all well-pleaded factual allegations . . . as true and viewed in the light most favorable to Plaintiff as the nonmoving party," Plaintiff has "failed to state a claim upon which relief can be granted." *Nelson v. Pehrson*, No. 2:24-CV-568 TS, 2025 WL 2675804, at *1 (D. Utah Sept. 18, 2025). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Id.* (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). So long as the "complaint [] states a *plausible* claim for relief," it will "survive[] a motion to dismiss." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[1]

---

[1] Engemann asserts that the Complaint should be dismissed under Utah's anti-SLAPP statute. *See* Mot. 4-18. For the reasons explained below, Utah's anti-SLAPP does not apply to federal

## STATEMENT OF FACTS

### *The Parties and the Shows*

Brunette starred in Seasons One and Two of the reality television show *Vanderpump Villa* on Hulu TV ("Hulu"). Compl. ¶ 8. *Vanderpump Villa*, hosted and produced by Lisa Vanderpump, focuses on the personal lives of the villa staff as they host various guests in Italy. *Id.* ¶ 22. As a reality television personality, Brunette's professional opportunities to contract with brands, attend events, and participate in shows depend on his personal reputation. *Id.* ¶ 25. Before the defamatory statements at issue, Brunette had a positive, albeit Casanova-esque, public image. *Id.* ¶ 27. Sexual assault allegations are uniquely damaging in this industry as commercial sponsors routinely avoid working with individuals accused of such crimes . *Id.* ¶ 28.

Engemann is a social media influencer and a resident of Utah with approximately 1.2 million TikTok followers and over 725,000 Instagram followers. *Id.* ¶ 9. She starred in *The Secret Lives of Mormon Wives* ("*Mormon Wives*"), a reality television series on Hulu that follows a group of Mormon social media influencers. *Id.* ¶¶ 9, 18. Season One of *Mormon Wives* was released on Hulu on September 6, 2024, Season Two was released on May 15, 2025, and Season Three on November 13, 2025. *Id.* ¶ 21. Season Four was released on March 12, 2026.

### *Brunette and Engemann form a close bond in Italy*

In August 2024, Hulu filmed a "cross-over" episode of *Vanderpump Villa* where cast members of *Mormon Wives* visited the Italian villa as guests. *Id*. ¶ 23, 29. Upon information and belief, the entire villa and its surrounding grounds, except for the bathrooms, were covered by

---

actions.  Even if it did, the grounds on which Engemann moves for dismissal under anti-SLAPP are the same as those that would warrant dismissal under Fed. R. Civ. P. 12(b)(6) – "fail[ure] to state a cause of action upon which relief can be granted." *See* Utah Code § 78B-25-107; *see also* Mot. at 8 ("[I]f Brunette's Complaint fails to state a cause of action upon which relief can be granted as to any claim, that claim must be dismissed."). As such, the proper legal standard of review is that which applies to a 12(b)(6) motion to dismiss.

recording devices to capture cast members' interactions. *Id.* ¶ 30. Everything that happened at the villa, including the alleged assault, would have been captured on film. *See id.* ¶¶ 107, 115.

At the villa, Engemann and Brunette spent extensive time together flirting and sharing conversations about their personal lives, including Engemann's marital problems. *Id.* ¶¶ 31, 32, 64. In an unaired encounter, the pair kissed and Engemann told Brunette: "I love you." *Id.* ¶ 32. Brunette responded: "I love you too." *Id.* Engemann never told Brunette that his touching or communication was unwanted. *Id.* ¶ 34. Brunette left the encounter under the impression that Engemann was a friend who likely intended to leave her husband, possibly to pursue a relationship with him. *Id.* ¶ 35.

### *For Months After Italy, Engemann Maintained Close Contact with Brunette*

After filming, Engemann maintained close, voluntary contact with Brunette through multiple channels, including by phone, FaceTime, and text message. Compl. ¶¶ 41–51. Engemann introduced Brunette to her young daughter on FaceTime, sent photos of her daughter sleeping, and even shared her phone location with Brunette until March 2025. *Id.* ¶¶ 43, 51, 105.

The hundreds of pages of text messages exchanged between the pair are flirtatious and intimate, suggesting that a close personal relationship had developed. *Id.* ¶ 44. For example, on August 20, 2024, just days after the alleged "assault," Engemann invited Brunette to Utah to "do ketamine." *Id.* ¶ 45. The following evening Engemann sent Brunette a heart emoji. *Id.* ¶ 46. Engemann also invited Brunette to an event in Los Angeles, *id,* ¶ 48, and to Utah for the season premiere of the show, *id.* ¶ 49. When Brunette was unable to attend, Engemann texted Brunette "missed you!" *Id.* Engemann was even jealous when Brunette kissed other women. *Id.* ¶ 50.

4

### *The Defamation Was Instigated By Rumors About the Pair*

In April 2025, Hulu hosted an event that included cast members from *Vanderpump Villa* and *Mormon Wives*. Compl. ¶ 57. The event provided valuable networking opportunities for those in attendance. Brunette's invitation to the event was rescinded, upon information and belief, because of Engemann. *Id.*

On April 21, 2025, Brunette posted a TikTok video stating he had been "uninvited to the function cus a 30yo mormon wife's scared I'll tell her husband the truth." *Id.* ¶ 58. In response, Engemann commented on social media: "[H]e got uninvited by @hulu because he's a s3ual pr3dator that can't keep his hands to himself, not because I'm hiding anything from my husband. He's a lying clout chaser." *Id.* ¶ 59. "Sexual predator" implied that Brunette committed heinous and repetitive criminal sexual acts. *Id.* ¶ 61. He did not.

The next day, Engemann repeated her claims, suggesting that other women would "come forward" against Brunette: "I know without a doubt I'm not the first." *Id.* ¶ 62. Engemann lacked any factual basis to make such a factual assertion, and, since her post in *April 2025*, no additional women have come forward accusing Brunette of sexual assault. *Id.* ¶ 39. Engemann also posted on Instagram: "unwanted physical touch = assault. PERIOD the end." *Id.* ¶ 63.

The timing of Engemann's change of heart was not a coincidence. The Hulu event occurred just days before Season Two of *Vanderpump Villa*, which aired Engemann and Brunette's flirtation in Italy, was set to release. *Id.* ¶¶ 58–59, 64. Concerned that her reputation as a faithful wife was at risk, she reframed her consensual encounter as sexual misconduct to shift the narrative away from her infidelity and toward Brunette's alleged depravity. *Id.* ¶¶ 4, 36–40, 67.

### *Engemann Initially Denied Any Misconduct*

Shortly after making her initial claims, Engemann changed her tune. In May 2025, Engemann told a reporter that "nothing happened with Marciano" while she was in Italy. *Id.* ¶ 68. She stated: "[T]here wasn't even a remote attraction to him. It sucks that women can't be kind and friendly and even playful with men in this world without it being taken as, like, you're open." *Id.* These statements are irreconcilable with her accusations of sexual assault.

### *The Accusations Escalated in Severity Over Time*

Engemann's recantation was short-lived. Noting how much traction her fabrication was gaining, Engemann's accusations grew progressively more severe. Though she initially claimed there were only "two ass grabs," her story swiftly shifted to one of unwanted touching akin to violent sexual abuse and to Brunette grabbing her "privates." Compl. ¶¶ 2, 36–37.

**May 15, 2025, The Viall Files podcast**: Engemann stated: "I [] opened up to all of the girls after *Vanderpump Villa* that I had been groped, sexually assaulted." *Id.* ¶ 69.

**Season Three, Episode 6 ("The Book of Confrontation"):** Engemann claimed "there was two ass grabs." *Id*. ¶ 85. Engemann then compared Brunette's alleged conduct to the violent rape and childhood abuse suffered by castmates Mayci Neeley and Mikayla Matthews. *Id*. ¶ 88.

**Season Three, Episode 8 ("The Book of Awakening"):** Engemann declared: "I either was sexually assaulted or I wasn't and the answer is that I was." *Id.* ¶ 91. When a castmate expressed skepticism, Engemann compared her situation to "someone who got beat 75 times by their husband," giving the false implication that she had been violently assaulted and manipulated by Brunette. *Id*. ¶¶ 92–94.

**Season Three, Episode 9 ("The Book of Judgment")**: Engemann, crying, stated: "why am I having to defend myself against men's behavior to a group of women?" *Id.* ¶ 95.

6

**Season Three, Episode 10 ("The Book of Enlightenment"):** Engemann stated unequivocally: "Marciano did sexually assault me." *Id.* ¶ 96.

**Season Three Reunion (December 4, 2025)**. Engemann opined: "[Y]ou can be sexually assaulted and then also continue a relationship. . . I think [it] honestly just boils down to a trauma response." *Id.* ¶ 98. She then cried in response to a discussion of Matthews' childhood sexual abuse, saying it reminded her of "everything she has been through," *id.* ¶ 99, and confronted Neeley: "how uncomfortable would it be if you got [] raped by your abuser or you got slapped or [w]hatever, and then afterwards you're like, 'I love you.'" *Id.* ¶ 100. By comparing Brunette's conduct to rape, domestic battery and childhood assault, Engemann conveyed the defamatory implication that Brunette had committed violent and depraved sexual violence. *Id.* ¶¶ 94, 100.

**November 24, 2025**: Engemann accused Brunette of having "grabbed" her "privates" without permission, a new and more severe accusation. *Id.* ¶¶ 118–19.

**November 25, 2025**: Engemann posted on Instagram that she had a "recorded phone call" that would prove her account, adding: "I like to play with my food a little before I eat it." *Id.* ¶ 120. Upon information and belief, there is no recording. *See id*. In an Entertainment Tonight interview, Engemann stated "unequivocally" she "was sexually assaulted and inappropriately touched without [her] consent." *Id.* ¶ 122. She then called Brunette a liar: "He is lying. Not only lying about what actually happened at *Vanderpump Villa*, but lying about [our] relationship." *Id.*

### *Engemann's Own Castmates and the Executive Producer of Vanderpump Villa Contradicted Her Account*

None of the people closest to the alleged assault believe that it occurred. Compl. ¶ 104. One cast member told Engemann: "You're lying and it's obvious that you're lying." *Id*. Another castmate found it odd that Engemann permitted her daughter to FaceTime with Brunette and sent Brunette photographs of her daughter sleeping. *Id.* ¶¶ 69, 105. The castmates who were at the

7

villa noted that Engemann contemporaneously told them she felt guilty about her flirtation with Brunette, and that she was "not a victim." *Id.* In an Access Hollywood interview published on or about November 23, 2025, Lisa Vanderpump, host and producer of *Vanderpump Villa*, stated: "I categorically know what happened because we have cameras everywhere and I have seen every ounce of the footage." *Id*. ¶¶ 30, 115–16. The women who doubted Engemann, Vanderpump noted, "had very good reason." *Id*.

### *Engemann Has a Pattern of Behavior of Making False Accusations*

This is not the first time Engemann has lied in pursuit of fame. Engemann admitted in a social media post that she told Production to stage an affair between her and a castmate's partner in order to make the show less "boring." Compl. ¶¶ 78–79. Production declined. At a Halloween party in Season Two of *Mormon Wives*, a party-goer lightly touched Engemann to get her attention. *Id.* ¶¶ 54, 55. Engemann claimed that the party-goer had "put his hands on her," causing her husband to start a fight that ended with police intervention. Engemann intimated, and later expressly claimed, that the contact was a "shove." *Id.* When confronted by castmates, Engemann refused to admit her exaggeration and falsely insisted she had been shoved. *Id.* ¶ 106. Engemann understood Productions' appetite for salacious content and was happy to fabricate storylines to satisfy it. *Id.* ¶ 80.

### *Damage to Brunette has Been Concrete and Severe*

Engemann's false accusations have caused irreparable harm to Brunette's career and personal life. Compl. ¶¶ 123–32. Prior to Engemann's accusations, Brunette had been under contract negotiations to appear on a popular reality dating show. Following Season Three, the dating show company declined to fulfill the contract. *Id.* ¶ 125. Brunette lost a lucrative opportunity to guest DJ at a renowned nightclub in Las Vegas, which, along with Engemann's

accusations, has prevented him from launching his DJ career. *Id.* ¶ 126. Brunette was excluded from the Season Three Reunion of *Mormon Wives*, an event for which he would have been paid, because Engemann did not want him there. *Id.* ¶ 127. For Brunette, whose career depends on appearances in the reality television ecosystem, exclusion from a major reunion episode was itself an economic injury and a form of professional exile.

The public have bought into Engemann's narrative. On social media, viewers group Brunette with men credibly accused of domestic violence, including James Kennedy (arrested for domestic violence in December 2024) and Jax Taylor (credibly accused of domestic abuse by his estranged wife). *Id.* ¶¶ 131–32. Other viewers have called Brunette a "creep" and ranked him among "the worst m[e]n on reality tv ever." *Id.* In person, at least one individual recognized Brunette and screamed at him: "I know what you did, get away from me!" *Id.* ¶ 130. In short, the false accusations of sexual assault and the branding of Brunette as a "sexual predator" have severely tarnished his personal and professional reputations, making it nearly impossible to find meaningful employment in the entertainment industry. *Id.* ¶ 141.

## ARGUMENT

### I. UTAH'S ANTI-SLAPP STATUTE DOES NOT APPLY TO FEDERAL ACTIONS.

The recent Supreme Court case of *Berk v. Choy*, 146 S. Ct. 546, 552-554 (2026) renders Utah's anti-SLAPP statute inapplicable in federal courts. In *Berk*, the Court held that a state-law requirement imposing obligations on federal plaintiffs beyond what the Federal Rules require cannot apply in federal court. *Id*. When a Federal Rule "answers the same question" as state procedure, the Federal Rule governs. *Id.* at 560 (J. Jackson, concurring in judgment). Here, Utah's anti-SLAPP statute conflicts with Federal Rules 8, 12 and 56 in at least four independent ways. *See* Utah Code §§ 78B-25-101-115.

9

*First*, the anti-SLAPP statute allows litigants to present evidence *prior to discovery* and move the court for a decision *on the merits* and *with prejudice* on an expedited basis. *Mackey v. Krause*, 2025 UT 37, ¶ 35; *see also* Utah Code §§ 78B-25-101 to -115. At this early stage, evidentiary proof is *not* required, and in fact *may not be considered*, by federal courts. *See Berk v. Choy*, 146 S. Ct at 553 (denying dismissal premised on "matters outside the pleadings"). Moreover, such procedure conflicts with Rule 12(d), which bars extrinsic evidence on a Rule 12(b)(6) motion. If extrinsic evidence is considered, the motion should be treated as one for summary judgment under Rule 56.

*Second*, the anti-SLAPP statute shifts the burden of persuasion from the *defendant* to the *plaintiff*, requiring *plaintiff* to prove a prima facie case, without the benefit of discovery, long before the Federal Rules require plaintiffs to do so. *See* Utah Code § 78B-25-107(1)(c)(i) (dismissal required if "[plaintiff] fails to establish a prima facie case as to each essential element of the cause of action"); *see also id.* § 78B-25-104(4) (permitting "limited discovery" only "if a party shows that specific information is necessary"). This burden shifting directly contradicts Rule 8 (requiring only a short and plain statement) and Rule 12 (dismissal on affirmative defense granted only where elements are "obvious on the face of the complaint"). *Amann v. Off. of Utah Att'y Gen.*, No. 2:18-CV-00341-JNP-DAO, 2021 WL 3931390, at *14 (D. Utah Sept. 2, 2021) (noting Rule 8's "liberal pleading requirements"); *Nelson v. Pehrson*, No. 2:24-CV-568 TS, 2025 WL 2675804, at *2 (D. Utah Sept. 18, 2025) (dismissal must be based on the "well-pleaded allegations of the Complaint").

*Third*, Utah's anti-SLAPP mandatory discovery stay, *see* Utah Code § 78B-25-104, conflicts with Rules 16 and 26, which permits discovery to begin as early as practicable. *Fourth*, Utah's mandatory fee-shifting conflicts with the Federal Rules. Under § 78B-25-110(1) if the

10

court grants the special motion to dismiss, it must award the defendant their court costs, attorney's fees, and litigation expenses. The Federal Rules, however, allow fee-shifting only in narrow, discretionary circumstances: Rule 11 (frivolous filings), and 28 U.S.C. § 1927 (vexatious litigation). Fee-shifting is the exception, not the rule. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).

The *Berk* ruling reinforces and confirms existing Tenth Circuit law. In a 2018 challenge to New Mexico's anti-SLAPP statute, the Tenth Circuit held that the additional requirements imposed by the statute did not apply to claims brought in federal courts. *Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 669 (10th Cir. 2018). As the Tenth Circuit explained, "[t]he plain language of the New Mexico anti-SLAPP statute reveals the law is nothing more than a *procedural* mechanism designed to expedite the disposal of frivolous lawsuits." *Id.* at 668-69 (emphasis in original). As anti-SLAPP procedures directly conflict with the Federal Rules, the New Mexico statute could not apply in federal courts. *Id.* at 673 (the statute "is not designed to influence the *outcome* of an alleged SLAPP suit but only the *timing* of that outcome") (emphasis in original).

Utah's anti-SLAPP statute fails for the same reasons. *See* Utah Code § 78B-25-107; *see also Mackey*, 2025 UT at ¶ 38 (noting that "[t]he second step [of Utah's anti-SLAPP statute] places the burden on the plaintiff to demonstrate that there is a prima facie case"). Utah's anti-SLAPP merely serves as an "expedited" process by which defendants may dismiss unmeritorious claims. *Mackey*, 2025 UT at ¶ 36. As such, Utah's anti-SLAPP statute does not apply to cases in federal court. Engemann's motion under the Act should be denied on that ground alone.[2]

---

[2] Even if Utah's anti-SLAPP statute was applicable to her claims, Engemann's motion still fails. As explained below, the Complaint alleges actionable claims of defamation, defamation *per se*, defamation-by-implication, false light, business disparagement, and intentional interference with

## II.   THE PERFORMER AGREEMENT DOES NOT BAR PLAINTIFF'S CLAIMS.

Engemann relies on a document not cited to or referenced in the Complaint—a 2025 "Performer Agreement" (Dkt. 31-7)—to argue that Plaintiff's claims against her are barred. Engemann is incorrect.

*First*, Engemann cannot rely on a document outside of the Complaint for dismissal under Rule 12(b)(6). *See Cuervo v. Sorenson*, 112 F.4th 1307, 1313 (10th Cir. 2024) (overturning a lower court's dismissal because it relied on a document that plaintiff "does not reference [], and [which] is not central to any claim in the [complaint]"); *see also* Fed. R. Civ. Pro. 12(d).

*Second*, Engemann is neither a signatory to nor an intended third-party beneficiary of the Performer Agreement, and therefore lacks standing to enforce its terms. *See Fields Enterprises Inc. v Bristol Harbour Vil. Assn., Inc.*, 191 N.Y.S. 3d 856, 860 (4th Dept. 2023) ("[A] third party may sue as a beneficiary on a contract made for [its] benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts").

*Third*, Engemann's belief that Plaintiff contractually "assumed the risk" of Engemann's lies is inaccurate. The Performer Agreement's "assumption of risk" provision states that show participants may "reveal and/or relate *information* about Artist of a personal, private, surprising, embarrassing and/or unfavorable nature." Dkt. 31-7 §7(a). "Information" is defined as "knowledge gained from investigation, study, or instruction." *Information*, Merriam-Webster,

---

economic relations. *See* Utah Code § 78B-25-107 (articulating the grounds for dismissal); *see also* Compl. ¶¶ 133-70. Engemann has failed to offer sufficient evidence to suggest, let alone *prove*, that Plaintiff's claims are frivolous. Utah Code § 78B-25-107; *see also* Mot. 8-16. Engemann published false and defamatory statements about Plaintiff, claiming that he was a sexual predator and had sexually assaulted her, without privilege and in a manner that harmed Plaintiff. *See generally* Compl. Engemann acted with malice and with the intent to harm Plaintiff's professional reputation in a manner that caused Plaintiff significant harm. *Id.* As such, even if Utah's anti-SLAPP statute was applicable, Engemann's motion still fails.

https://www.merriam-webster.com/dictionary/information (last visited Mar. 16, 2026). False claims that Plaintiff committed criminal sexual abuse is not "information," because information is, by definition, true.  Engemann's statements are false. The release does not protect against false statements.

*Fourth*, the Performer Agreement only bars claims "directly or indirectly caused by, arising out of, resulting from, or relating to, in any way, the Series" *Id.*  §8. The Performer Agreement defines "Series" as *Secret Lives*. The Agreement does not extend to additional shows such as *Vanderpump Villa*.  Moreover, a substantial portion of Engemann's defamatory conduct occurred outside the Series. Engemann's publicist issued a statement, attributed to Engemann, characterizing Brunette's conduct as sexual assault, and Engemann made similar statements in media interviews. *See* Compl. ¶¶ 88, 93, 100, 117. These statements were not footage, "activities" within the meaning of the Agreement, or attributable to the development, production, or publication of the Series. They were independent defamatory publications that are not covered by the release.

*Fifth*, the Performer Agreement is governed by New York law, and, critically, makes clear that claims are released only "to the maximum extent permitted by [New York] law." Dkt. 31-7 §§8, 20 (emphasis added). New York has a longstanding public policy that renders unenforceable contractual provisions purporting to limit liability for intentional or willful misconduct, or grossly negligent acts. *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983) (a general release "no matter how flat and unqualified its terms, *will not* exonerate a party from liability under all circumstances . . . [and] will not apply to exemption of willful or grossly negligent acts.") (emphasis added).  Put simply, "an exculpatory clause is unenforceable when … the misconduct for which it would grant immunity smacks of intentional wrongdoing." *Id.* at 385;

13

*see also id.* (release is unenforceable for actions that are "fraudulent, malicious, or prompted by the sinister intention of one acting in bad faith" or that "betoken[] a reckless indifference to the rights of others"); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S. 2d 938, 940, (3d Dept. 1993) (releases cannot "insulate the releasee from intentional, willful or grossly negligent acts"); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992) ("It is the public policy of this State[]that a party may not insulate itself from damages caused by grossly negligent conduct.") (collecting cases); *Safeway Inc. v. Abbott Lab'ys*, 761 F. Supp. 2d 874, 901 (N.D. Cal. 2011) (contractual provision is unenforceable due to New York's public policy). This is true even if the parties *intended* to release claims related to such conduct. *See Great N. Assocs.*, 596 N.Y.S. 2d at 940 (release that purportedly disposed of claims related to "fraud . . . and tortious interference with contractual relations" is unenforceable because "defendants … embarked upon a deliberate and calculated scheme to damage plaintiff's business") (citing *Kalisch–Jarcho* 58 N.Y.2d at 385).[3]

Defamation is, of course, an intentional tort. *See* Restatement (Second) of Torts § 580A. The Complaint does not allege that Engemann accidentally or negligently accused Brunette of sexual assault. Rather, the Complaint alleges a sustained, deliberate campaign of calculated and false statements made on television, in media interviews, through her publicist, and on social media. *See* Compl. ¶¶ 63, 88, 90, 93, 98, 100, 117, 122. That conduct falls squarely within the category of intentional wrongdoing against which New York courts refuse to permit immunization through a release.

---

[3] Engemann relies on two cases, neither of which address the application of New York's public policy. In *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 140 (2d Cir. 2011), the plaintiff brought breach of contract and tort claims and argued that the release was not enforceable because it was procured by economic duress. *Id. Moore v. Cohen*, 548 F. Supp. 3d 330 (S.D.N.Y. 2021) did not discuss or address New York's public policy on the unenforceability of releases involving intentional torts.

14

### III.   PLAINTIFF ALLEGES ACTIONABLE CLAIMS OF DEFAMATION, DEFAMATION *PER SE*, DEFAMATION-BY-IMPLICATION, FALSE LIGHT, AND BUSINESS DISPARAGEMENT.

Defamation, defamation *per se*, defamation-by-implication, false light, and business disparagement (together, the "Defamation Claims") are all different sides of the same coin. Defamation requires the plaintiff to show "(1) the defendant published the statements in print or orally; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *Nelson v. Pehrson*, No. 2:24-CV-568 TS, 2025 WL 2675804, at *2 (D. Utah Sept. 18, 2025); *see also Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1192 (D. Utah 2024). Defamation *per se* classifies any false accusations of sexual misconduct as defamatory as a matter of law, *Shanley*, 716 F. Supp. 3d at 1197; *see also Nelson*, 2025 WL 2675804, at *2, and defamation-by-implication permits recovery when a statement, while not defamatory on its face, implies defamatory facts, *West v. Thomson Newspapers*, 872 P.2d 999, 1011 (Utah 1994) ("the implication arising from the statement and the context in which it was made, not the statement itself, [] forms the basis of [the] claim"); *see also Keisel v. Westbrook*, 2023 UT App 163, ¶ 50 (recognizing defamation-by-implication).

False light requires allegations that the defamation reached the *public* (as opposed to simply a non-privileged third party).[4] *See Porter v. Staples the Off. Superstore, LLC*, 521 F. Supp. 3d 1154, 1164 (D. Utah 2021) ("While [defamation] requires that the information only be shared with

---

[4] False light occurs when: "(1) the defendant publicized a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1234 (D. Utah 2018) (citing *Jacob v. Bezzant*, 2009 UT 37, ¶ 21). False light claims are often "predicated on publication of a defamatory statement," *id.* at 1235, and "the same considerations apply to each." *Id.* (quoting *Jacob*, 2009 UT at ¶ 21).

one third party, false light publicity means that the matter is made public, by communicating it to the public at large . . . .") (internal quotations omitted); *see also Shanley*, 716 F. Supp. 3d at 1200 ("[F]alse light and defamation may turn on the same operative facts."). And business disparagement is defamation pertaining to one's profession.[5] *Shanley*, 716 F. Supp. 3d at 1199 (D. Utah 2024) ("While injurious falsehood parallels defamation, it is distinct in that it protects separate and unrelated interests; it is a business tort, not a personal tort.") (internal quotations omitted). Where, as here, an individual's personal reputation *is their business*, both claims are proper. *See e.g.*, *Sec. Sys., Inc v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186, 1195 (D. Utah 2019) (injurious falsehood and slander may be "based on the same misstatements").

Engemann bundles her argument against the Defamation Claims together, asserting that Plaintiff fails to assert actionable claims because (1) the allegations do not plead actual malice, (2) the defamatory statements were opinions and not facts, and (3) Plaintiff invited and induced publication of the defamatory statements. Engemann's arguments fail as a matter of law.

### A. The Complaint alleges that the statements were made with actual malice.

Engemann's first argument, that Brunette did not plead "actual malice," Mot. at 12, fails because Engemann's brief simply recites the actual malice *legal* standard but does not address any of the *factual allegations* in the Complaint. *See* Mot. at 10-12. For this reason alone, Plaintiff's Defamation Claims survive.

Even if Engemann had argued her case, dismissal would not be warranted. Public figures, including limited-purpose ones like Brunette,[6] must prove that defamatory statements are made

---

[5] The elements of business disparagement are "(1) falsity of the statement made; (2) malice by the party making the statement; and (3) special damages." *In2 Networks, Inc. v. Honeywell Int'l*, No. 2:11-CV-6-TC, 2011 WL 4842557, at *3 (D. Utah Oct. 12, 2011).

[6] There is no debate that Brunette has made himself a limited-purpose public figure with respect to his actions on *Vanderpump Villa* and *Mormon Wives*.

with actual malice—"that is, with knowledge that the statement was false or with reckless disregard of whether it was false or not." *Mathews v. McCown*, 2025 UT 34, ¶ 162 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)) (internal quotation marks and brackets omitted). Because the "issue of malice is ordinarily a factual issue," dismissal cannot be granted under Rule 12(b)(6) unless there is *no set* of facts alleged from which a reasonable person could find that defendant acted with actual malice. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 59 (Utah 1991); *see also Mathews*, 2025 UT at ¶ 155. If the complaint alleges facts shedding "obvious doubt" on the supposed truth of the defamatory statements or on the speaker's veracity, the motion to dismiss should be denied. *Mathews*, 2025 UT at ¶ 166; *see also Rowe v. DPI Specialty Foods, Inc.*, No. 2:13-CV-708-DN, 2016 WL 4186959, at *11 (D. Utah Aug. 8, 2016), *aff'd*, 727 F. App'x 488 (10th Cir. 2018) (reckless disregard exists where "allegations are so *inherently improbable* that only a reckless man would have put them in circulation or [where] there are *obvious reasons to doubt* the veracity of the informant or the accuracy of his reports") (internal quotation marks omitted).

The Complaint is replete with facts establishing Engemann's knowledge of the falsity of her statements. *See e.g.* Compl. ¶¶ 3, 33-35, 41-51, 61, 66, 72, 85, 90, 103, 104, 110, 115-16, 118-20, 137, 148, 156, 161. Engemann knew she was not sexually assaulted because she did not experience sexual assault. Engemann admitted as much when she stated, in May 2025, that "nothing happened with Marciano" in Italy. *Id.* ¶ 68. Engemann's story shifted multiple times, becoming increasingly sensationalized with each new allegation—from "two ass grabs," to "sexual predator," "sexual assault," and "grabbing" her "privates." *Id.* Engemann has never reported any of the allegedly inappropriate behavior to a criminal authority. *Id.* ¶¶ 59, 110. Only when Engemann became concerned that her reputation as a devoted wife was at risk *eight months after*

17

*the incident*, did Engemann shift her story and invent a narrative of Plaintiff's alleged sexual misconduct. *Id.* ¶¶ 58-63, 67. That Engemann's story was fictitious is confirmed by Engemann's friends that were with her the night of the alleged sexual assault and Lisa Vanderpump, the producer of the show on which the sexual assault allegedly occurred. *See e.g. id.* ¶ 116 ("'I categorically know what happened because we have cameras everywhere and I have seen every ounce of the footage[.]' [T]he women who doubt[] Engemann 'ha[ve] very good reason.'"); *see also id.* ¶¶ 66, 72, 90, 92. Such allegations create obvious doubt as to the veracity of Engemann's statements, and amount to a sufficient pleading of actual malice.

Moreover, Engemann's discussions purporting to contextualize her "assault" further demonstrate actual malice. Rather than acknowledge the wide disparity in severity between what Engemann claimed Plaintiff did to her ("two ass grabs") and sexual predation/assault, Engemann repeatedly equated this conduct to violent rape, child sexual abuse, and "someone who got beat 75 times by their husband." *Id.* ¶¶ 88, 92-93, 99-100. These statements, part of Plaintiff's defamation-by-implication claim, confirm that Engemann knew that what she was saying was false.

Last, the arguments in Engemann's Motion bear little resemblance to the allegations set forth in the Complaint. Though Engemann's public statements have been unequivocal, *see* Compl. ¶ 59 ("he got uninvited by @hulu because he's a s3ual pr3dator that can't keep his hands to himself"); *id.* ¶ 69 ("I had been groped, sexually assaulted"); *id.* ¶ 91 ("I either was sexually assaulted or I wasn't and the answer is that I was."); *id.* ¶ 96 ("Marciano did sexually assault me."); *id.* ¶ 122 (stating "unequivocally" that she "was sexually assaulted and inappropriately touched without [her] consent"), in her Motion, Engemann now claims all of these authoritative statements are mere "opinions" of "what she believes the definition of sexual assault is," "subjective and generalized characterizations of certain conduct and behavior," and "not [] objective facts," Mot.

18

at 13, 14. Such characterization lacks credibility and further confirms that Engemann knew that what she said was untrue at the time she made these statements. A sexual assault survivor would not recharacterize their assault as an "opinion" eighteen months after it allegedly occurred. There was no assault.

**B. Engemann's defamatory statements are actionable false statements of fact, not opinion.**

Misstatements of fact are defamatory while pure opinions are not. "Whether a statement is one of fact or opinion is a question of law for the court to decide." *Lichfield v. Kubler*, No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468, at *5 (D. Utah Sept. 29, 2025) (citing *Mathews*, 2025 UT at ¶ 96). The Utah courts use the following factor test to distinguish between the two:

(i) the common usage or meaning of the words used;
(ii) whether the statement is capable of being objectively verified as true or false;
(iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and
(iv) the broader setting in which the statement appears.

*Kaveh v. Starbucks Corp.*, No. 2:24-CV-00291, 2025 WL 308256, at *10 (D. Utah Jan. 3, 2025), *report and recommendation adopted*, No. 2:24-CV-00291-AMA-DAO, 2025 WL 306041 (D. Utah Jan. 27, 2025) (quoting *West*, 872 P.2d at 1018). "The ultimate inquiry is whether the statement is 'sufficiently factual to be susceptible of being proven true or false.'" *Id.* (quoting *West*, 872 P.2d at 1019). Engemann's statements that Plaintiff sexually assaulted her, grabbed her privates, grabbed her "ass," and is a sexual predator are sufficiently factual as to be capable of being objectively verified as true or false. *See* Compl. ¶¶ 69, 85, 91, 96, 122. In Engemann's own words, "I either was sexually assaulted or I wasn't." *Id.* ¶ 91. She was not.

*i. Engemann's statements are not opinions.*

Engemann may not now reframe her declarative statements as "nondefamatory opinions," "concern[ing] abstract definitions about sexual assault, consent, and the conduct of victims" and

19

"generalized characterizations of certain conduct and behavior." Mot. at 14. *First*, there is nothing "abstract" or "generalized" about the statement "Marciano did sexually assault me." Compl. ¶ 96. The statements "he got uninvited by @hulu because he's a s3ual pr3dator that can't keep his hands to himself," "I had been groped, sexually assaulted," there were "two ass grabs," "I either was sexually assaulted or I wasn't and the answer is that I was," "unequivocally . . . I was sexually assaulted and inappropriately touched without my consent," and that Plaintiff "grabbed" her "privates" without permission are concrete, specific, and capable of being determined to be true or false. *Id.* ¶¶ 59, 69, 85, 91, 118, 122.

*Second*, "statements [made] as if they were settled facts" are treated as such. *Mathews*, 2025 UT at ¶ 101 (statement that plaintiff "egregiously defrauded the entire community with its gross double standards" is factual and capable of being defamatory). Opinions typically include "rhetorical hyperbole, exaggeration, and cautionary language," and indicate to "a reasonable reader[] that the statements should not be taken at face value." *Id.* ¶ 111. Where, as here, the speaker does not use "any cautionary language indicating that her statements were merely opinions," the statements are defamatory. *Id.* ¶ 101.

And even if Engemann had used the phrase "in my opinion" to describe the assault, the statements would still be actionable. There is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 852 (10th Cir. 1999) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990)). Even if "a speaker says, 'In my opinion, John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth…. Simply couching such statements in terms of opinion does not dispel these implications." *Id.* (citing *Milkovich*, 497 U.S. at 18-19).

A statement that begins with "in my opinion," "can cause as such damage to reputation as the statement, 'Jones is a liar.'" *Id.* (quoting *Milkovich*, 497 U.S. at 18-19).

Engemann's statements lack the exaggeration, hyperbole, and cautionary language that would indicate to a reasonable person that her statements were not to be believed. Her use of an "assertive tone," presentation of Plaintiff's "misdeeds as a settled fact," and citation of allegedly "factual basis for the statement[s]" indicate that her statements are facts. *Mathews*, 2025 UT at ¶ 113; *see also Shanley*, 716 F. Supp. 3d at 1193 ("[I]t is telling that [defendant] even asserted that her accusations were true."). Engemann herself repeatedly asserted the veracity of her statements, begging to be taken seriously by her friends and the media:

- "[I am] anxious to see how many other women come forward, I know without a doubt I'm not the first." Compl. ¶ 62.
- "To the people that were made aware of these events and watched me cry. and then proceed to use their platforms to victim shame, publicly called me a liar, and judge the way I handled it, from the bottom of my heart, shame on every last one of you." *Id.* ¶ 63.
- "I had opened up to all of the girls after *Vanderpump Villa* that I had been groped, sexually assaulted . . . I told [] the girls and I asked them not to tell anyone. . . . I was just like Guys, like I need you to allow me to handle this the way that I want to handle it. . . . Do not tell a soul." *Id.* ¶ 69.
- "I either was sexually assaulted or I wasn't and the answer is that I was." *Id.* ¶ 91.
- "[W]hy am I having to defend myself against men's behavior to a group of women?" *Id.* ¶ 95.
- "In response to a conversation about the sexual abuse experienced by Matthews, Engemann began crying and said that it reminded her of 'everything she has been through.'" *Id.* ¶ 99.
- "Eda Kalkay, Engemann's publicist, stated that: 'By definition, sexual assault is any nonconsensual sexual act or contact. As a woman, it distresses me that what happened to Demi is being minimized. You cannot believe the lies from a known liar.'" *Id.* ¶ 117.
- "[T]he recorded phone call I have say quite the opposite. [] the truth is coming." *Id.* ¶ 120.
- "I won't let a private act between my husband and I be a distraction from a serious act that I did not consent to." *Id.* ¶ 121.
- "[U]nequivocally [I] was sexually assaulted and inappropriately touched without [my] consent." *Id.* ¶ 122.

These are not opinions. They are stated as facts and as such, are defamatory.

21

*ii.   The technical definition of sexual assault is irrelevant to the court's analysis.*

Engemann suggests that her statements are not defamatory because "[w]hat amounts to consent or constitutes sexual assault, or how victims may behave, is subject to interpretation and depends on context." Mot. at 14. According to Engemann, "[w]here lines should be drawn regarding consent, appropriate physical contact, and what terminology properly describes various interactions is subject to debate and interpretation" — her "opinions" are simply "interpretations of what the term may encompass" and thus non-defamatory. *Id.* Not true.

Defamatory statements "impeach a plaintiff's honesty, integrity, virtue, or reputation." *Shanley*, 716 F. Supp. at 1194 (internal quotation marks omitted). Statements that charge "sexual misconduct" are *per se* defamatory. *Id.*, at 1197; *see also Nelson*, 2025 WL 2675804, at *2. There can be no serious debate that Engemann's statements—accusing Plaintiff of sexual assault, predation, and unwanted touching—charge him with sexual misconduct and are thus *per se* defamatory. *See also Shanley*, 716 F. Supp. 3d at 1198 (holding that statements "accusing [plaintiff] of 'cheating and husband stealing'" are *per se* defamatory because they "suggest[] sexual misconduct"). The actual definition of each specific phrase lodged against plaintiff (*i.e.* "consent") is irrelevant so long as the colloquial understanding of each statement is defamatory. *Mathews*, 2025 UT at ¶ 102-03 (acknowledging that "fraud" and "defraud" have both criminal and non-criminal meanings but, "regardless of whether [defendant] imputed criminal conduct to [plaintiff], a reasonable reader could perceive him to have declared that [plaintiff] committed ethically improper conduct.") (internal quotations omitted); *Cox v. Hatch*, 761 P.2d 556, 562 n.5 (Utah 1988) (noting "that an *imputation* of criminality is defamatory; as slander, it is slanderous *per se*") (emphasis added). Regardless of whatever "broader and more generalized discussion" Engemann intended to inspire by lobbing accusations at Plaintiff, the reality is that her statements

22

charged Plaintiff with sexual misconduct, impeached his integrity and reputation, and resulted in real damage to Plaintiff. Mot. at 14. Accordingly, the statements are defamatory *per se*.

> iii.    *Reasonable inferences drawn from Engemann's statements are actionable as defamation-by-implication.*

Engemann claims that her statements discussing "how victims respond to sexual assault," Mot. at 14, amount to "Engemann's subjective view on contested social concepts," and therefore are unactionable opinions. *See* Mot. 14-15. Engemann misses the point. These statements, in which Engemann claimed to be in the same boat as "someone who got beat 75 times by their husband," Compl. ¶ 93-94, wept about how Matthews' childhood sexual abuse reminded her of "everything she has been through," *id.* ¶ 99, and suggested that continuing a relationship with Plaintiff was akin to telling an abuser "I love you" after he "raped" and "slapped" her, *id.* ¶ 100, imply that Plaintiff is a violent and depraved sexual abuser. *See also id.* ¶¶ 94, 99-100, 121, 151-157. These implications are actionable as defamation-by-implication, an independent tort under Utah law, in which "the implication arising from the statement and the context in which it was made, not the statement itself, [] forms the basis of [the] claim." *West*, 872 P.2d at 1011. Plaintiff's claims are not grounded in Engemann's opinions about the acceptable behaviors of sexual assault survivors. The implication of these statements, *i.e.* that Plaintiff is a depraved criminal, is defamatory and actionable under Utah law.

## C. "Invitation" or "implicit consent" are not defenses under Utah law.

Engemann asserts that her defamatory statements are not actionable because Plaintiff "impliedly consented to the alleged actionable statements." Mot. at 15. Engemann is wrong.

Engemann relies exclusively on out-of-circuit cases to support her argument. *Id.* (citing cases from Texas, California, the Second Circuit and the Ninth Circuit). However, there is no analogue of "implied consent" under Utah law. The only readily-available case on the issue is *Cox*

23

*v. Hatch*, which notes that plaintiff's explicit consent to publish a specific photograph could be "an absolute defense" to defamation, but also acknowledges that, "[i]f consent has any place at all in such a context, it is indeed narrow." 761 P.2d at 561 n.4. This suggests that consent to publication of a specific statement may be a defense to defamation *for that specific statement*, but would not extend to protect *all* defamatory statements related to an issue. As such, even if this defense was available under Utah law (it is not), dismissal would be inappropriate. Brunette *did not consent to any of Engemann's statements* (let alone specific statements as contemplated in *Cox*), and there is nothing in the Complaint that alleges his consent. While Brunette certainly knew that situations may be staged by Production, he did *not* consent to Engemann's campaign of falsehoods. Appearing on a television show does not mean that someone consented to repeated false accusations of sexual assault.

Moreover, even if "implicit consent" was available under Utah law, it would be an affirmative defense that is unavailable at this stage of the litigation. *Mathews*, 2025 UT at ¶ 143 (on a motion to dismiss, "it is improper for a court to dismiss the claim based on an affirmative defense."); *see also Cox*, 761 P.2d at 561 n.4 ("[W]e forego ruling on [the] issue [of consent] because it raises a factual issue"). The court may not "consider[] more than the sufficiency of [the] complaint" on a motion to dismiss. *Mathews*, 2025 UT at ¶ 144. "[P]laintiff need not anticipate affirmative defenses that might be raised in a defendant's answer" and plead around them. *Id.* ¶ 128. Thus, even if implicit consent *was* a defense under Utah law (it is not), Engemann's motion cannot be granted on this ground.

## IV. PLAINTIFF ADEQUATELY PLEADS TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS.

Tortious interference with economic relations requires "improper means."  "Improper means" includes "defamation[] or disparaging falsehoods." *C.R. England v. Swift Transp. Co.*,

24

2019 UT 8, ¶ 43; *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18.[7] By defaming Plaintiff, Engemann intended to interfere with Plaintiff's existing or potential economic relations. It worked. Plaintiff was excised from the show, uninvited to an important networking event, excluded from the Reunion episode (for which he would have been paid), fired from a guest DJ opportunity, and ultimately rejected from the reality television world in which he had made his career, losing out on future paid opportunities to appear on popular shows.

Contrary to Engemann's claims, *see* Mot. at 17, Utah law does not require Plaintiff to prove that Engemann intended to interfere with a *particular* economic relation or contract, only to allege that defendant's "predominant purpose *was to injure the plaintiff*." *See Overstock*, 2008 UT at ¶ 18. The tort is an umbrella claim that "protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract." *C.R. England*, 2019 UT at ¶ 26. As such, Engemann's argument that she lacked knowledge of Plaintiff's specific business opportunities is not a defense to this tort.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied and this case set for a Rule 26(f) and case management schedule.

---

[7] Engemann relies on *Searle v. Johnson*, 646 P.2d 682, 683 (Utah 1982). This case predates recognition of tortious interference with economic relations by Utah courts, and simply recites, without adopting, the elements of the cause of action as articulated in a *law review article* summarizing nationwide jurisprudence on the issue. Under present-day Utah law, tortious interference with economic relations requires plaintiff to prove: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations (2) ... by improper means, (3) causing injury to the plaintiff." *C.R. England*, 2019 UT at 345. That "relations" is plural is sufficient to indicate that no specificity is required under Utah law.

Dated: March 17, 2026

Respectfully submitted,

**Parkinson | Benson | Potter**

*/s/ D. Loren Washburn*
D. Loren Washburn
loren@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

**DYNAMIS LLP**

*/s/ Eric S. Rosen*
Eric S. Rosen (*pro hac vice*)
Jamie H. Solano (*pro hac vice*)
Brooke Watson (*pro hac vice*)
Yusef Al-Jarani (*pro hac vice*)
Caroline McHugh (*pro hac vice*)

*Attorneys for Plaintiff Marciano Brunette*

## CERTIFICATE OF SERVICE

I certify that on March 17, 2026, I caused the foregoing brief to be served upon all Filing

Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.

*/s/ D. Loren Washburn*
D. Loren Washburn

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum of law is 25 pages or less and thus complies with the page limits in Local Rule 7.1(a).

*/s/ Eric Rosen*
Eric Rosen
