**DYNAMIS LLP**
ERIC S. ROSEN (*pro hac vice*)
BROOKE WATSON (*pro hac vice*)
erosen@dynamisllp.com
bwatson@dynamisllp.com
(617) 802-9157
175 Federal Street, Suite 1200
Boston, Massachusetts 02110

JAMIE H. SOLANO (*pro hac vice*)
CAROLINE McHUGH (*pro hac vice*)
jsolano@dynamisllp.com
cmchugh@dynamisllp.com
(973) 295-5495
233 Broadway, Suite 1750
New York, NY 10279

YUSEF AL-JARANI (*pro hac vice*)
yaljarani@dynamisllp.com
(213) 283-0685
1100 Glendon Avenue, 17th Floor
Los Angeles, California 90024

**Parkinson | Benson | Potter**
D. Loren Washburn
Cliff Parkinson
loren@pbp.law
cliff@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

*Attorneys for Plaintiff Marciano Brunette*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| MARCIANO BRUNETTE,<br><br>     *Plaintiff*,<br><br>v.<br><br>DEMI ENGEMANN and JEFF JENKINS PRODUCTIONS, LLC,<br><br>     *Defendants*. | No. 2:25-cv-01102-TC-DAO |

**PLAINTIFF MARCIANO BRUNETTE'S OPPOSITION TO
DEFENDANT JEFF JENKINS PRODUCTIONS' MOTION FOR SUMMARY
JUDGMENT, MOTION FOR JUDGMENT ON THE PLEADINGS, AND FEE MOTION**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

JJP'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED ...................................................................................................................2

   I.   LEGAL STANDARD.......................................................................................... 2

   II.   STATEMENT OF FACTS .................................................................................. 3

   III. ARGUMENT ................................................................................................. 10

JJP'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ...........25

   I.   ADDITIONAL BACKGROUND ..................................................................... 25

   II.   BRUNETTE'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS (DKT. 33 AT 4–6) ................................................................................. 26

   III. STATEMENT OF ADDITIONAL MATERIAL FACTS.................................. 27

   IV. LEGAL STANDARD OF REVIEW ................................................................ 32

   V.   ARGUMENT .................................................................................................. 32

JJP'S MOTION FOR FEES UNDER STATE LAW SHOULD BE DENIED.......47

   I.   ARGUMENT .................................................................................................. 47

CONCLUSION ...........................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*1-800 Contacts, Inc. v. Weigner*,
  2005 UT App 523, 127 P.3d 1241 ................................................................................. 40

*112 W. 34th St. Assocs., LLC v. 112–1400 Trade Props. LLC*,
  95 A.D.3d 529 (1st Dep't 2012) ................................................................................... 42

*Abbas v. Foreign Policy Grp., LLC*,
  783 F.3d 1328 (D.C. Cir. 2015) .................................................................................... 47

*Am. Fam. Life Assurance Co. of New York v. Baker*,
  778 F. App'x 24 (2d Cir. 2019) .................................................................................... 46

*Aquagen Int'l, Inc. v. Calrae Tr.*,
  972 P.2d 411 (Utah 1998) ............................................................................................. 39

*Arndt v. Koby*,
  309 F.3d 1247 (10th Cir. 2002) .................................................................................... 49

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 2

*AT & T Corp. v. Beehive Tel. Co.*,
  No. 2:08CV941, 2010 WL 376668 (D. Utah Jan. 26, 2010) .............................. 43, 44

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*,
  226 F.3d 1138 (10th Cir. 2000) ..................................................................................... 2

*Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*,
  956 F.3d 1228 (10th Cir. 2020) ................................................................................... 48

*Beaird v. Seagate Tech., Inc.*,
  145 F.3d 1159 (10th Cir. 1998) ................................................................................... 32

*Belote v. Maritrans Operating Partners, L.P.*,
  No. 97–3993, 1998 WL 136523 (E.D. Pa. Mar. 20, 1998) ...................................... 38

*Berk v. Choy*,
  146 S. Ct. 546 (2026) ...................................................................................................... 2

*Bihag v. A&E Television Networks, LLC,*
  669 F. App'x 17 (2d Cir. 2016) ................................................................................. 34

*Billy v. Edge Homes,*
  No. 219CV00058JNPEJF, 2020 WL 2572522 (D. Utah May 21, 2020) .................................. 19

*Birch v. Polaris Indus., Inc.,*
  812 F.3d 1238 (10th Cir. 2015) ................................................................................. 32

*Boulder Falcon, LLC v. Brown,*
  720 F. Supp. 3d 1175 (D. Utah 2024) ......................................................................... 35

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................ 32

*Chapin v. Knight-Ridder, Inc.,*
  993 F.2d 1087 (4th Cir. 1993) .............................................................................. 16, 17

*Church of Scientology Int'l v. Behar,*
  238 F.3d 168 (2d Cir. 2001) ..................................................................................... 24

*Clinton v. Sec. Benefit Life Ins. Co.,*
  63 F.4th 1264 (10th Cir. 2023) ................................................................................. 19

*Consol. Edison, Inc. v. Northeast Utilities,*
  332 F. Supp. 2d 639 (S.D.N.Y. 2004) ........................................................................ 44

*Cook v. Dava Mktg., LLC,*
  No. 2:23-CV-00632-DBB-DBP, 2025 WL 1684438 (D. Utah June 16, 2025) ...................... 18

*Coomer v. Lindell,*
  No. 22-CV-01129-NYW-SKC, 2023 WL 2528624 (D. Colo. Mar. 15, 2023) .................. 20, 22

*Coomer v. Make Your Life Epic LLC,*
  98 F.4th 1320 (10th Cir. 2024) ................................................................................. 47

*Cooper v. Crestani,*
  No. 2:18-CV-970-TS-PMW, 2019 WL 4752076 (D. Utah Sept. 30, 2019) ........................ 22

*Cox v. Hatch,*
  761 P.2d 556 (Utah 1988) ....................................................................................... 11

*David v. City & Cnty. of Denver,*
  101 F.3d 1344 (10th Cir. 1996) ................................................................................ 48

*DeMentas v. Est. of Tallas, By & Through First Sec. Bank*,
764 P.2d 628 (Utah Ct. App. 1988) .................................................................. 38, 39, 40

*Dias* v. *City & Cnty. of Denver*,
567 F.3d 1169 (10th Cir. 2009) ...................................................................................... 19

*Dodds v. Am. Broad. Co.*,
145 F.3d 1053 (9th Cir. 1998) ........................................................................................ 17

*Dosso v. Knights Collision Experts*,
No. 20-CV-0461-EK-CLP, 2021 WL 9038372 (E.D.N.Y. Sept. 15, 2021) .............................. 37

*Ellis v. Salt Lake City Corp.*,
147 F.4th 1206 (10th Cir. 2025) ...................................................................................... 32

*Featherstone v. Schaerrer*,
2001 UT 86, 34 P.3d 194 ........................................................................ 26, 36, 37, 38

*Fernandez v. Clean House, LLC*,
883 F.3d 1296 (10th Cir. 2018) ................................................................................ 18, 19

*Finman v. ClearCellular, Inc.*,
No. 222CV00272JNPJCB, 2023 WL 2742720 (D. Utah Mar. 31, 2023) ................................. 19

*Frost v. Budget Car & Truck Rental*,
15 A.D.3d 963, 788 N.Y.S.2d 904 (2005) ......................................................................... 43

*Garner v. The Cincinnati Ins. Co.*,
No. 2:24-CV-00378-TC-DAO, 2026 WL 776291 (D. Utah Mar. 19, 2026) ...................... 31, 32

*George v. Urban Settlement Servs.*,
833 F.3d 1242 (10th Cir. 2016) ...................................................................................... 23

*Gopher Media LLC v. Melone*,
154 F.4th 696 (9th Cir. 2025) ......................................................................................... 47

*Great N. Assocs., Inc. v. Cont'l Cas. Co.*,
596 N.Y.S. 2d 938, (3d Dep't 1993) ............................................................................... 33

*Green v. Cosby*,
138 F. Supp. 3d 114 (D. Mass. 2015) .............................................................................. 12

*Hogan v. Winder*,
762 F.3d 1096 (10th Cir. 2014) ...................................................................................... 12

*Hogan v. Winder*,
   No. 2:12-CV-123 TS, 2012 WL 4356326 (D. Utah Sept. 24, 2012)....................................15, 16

*Holdren v. Gen. Motors Corp.*,
   13 F. Supp. 2d 1192 (D. Kan. 1998)........................................................................37, 38

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) ........................................................................................24

*In re Actrade Fin. Techs., Ltd.*,
   424 B.R. 59 (Bankr. S.D.N.Y. 2009)........................................................................43, 44

*In re Clinton St. Food Corp.*,
   254 B.R. 523 (Bankr. S.D.N.Y. 2000)........................................................................43

*In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*,
   835 F.3d 1195 (10th Cir. 2016) ............................................................................39, 40

*Jacob v. Bezzant*,
   2009 UT 37, 212 P.3d 535........................................................................................25

*Jacques v. Bank of Am.*,
   No. CV F 12-0821 LJO DLB, 2013 WL 129328 (E.D. Cal. Jan. 9, 2013) ..............................22

*Judge v. Saltz Plastic Surgery, P.C.*,
   2016 UT 7, 367 P.3d 1006........................................................................................49

*Kalisch-Jarcho, Inc. v. City of New York*,
   58 N.Y.2d 377 (1983)........................................................................................33

*Kaveh v. Starbucks Corp.*,
   No. 2:24-CV-00291, 2025 WL 308256 (D. Utah Jan. 3, 2025) ..............................................11

*Keisel v. Westbrook*,
   2023 UT App 163, 542 P.3d 536 ..................................................................................14

*King v. Fox*,
   7 N.Y.3d 181 (2006)........................................................................................45

*Kingsley v. Amazon.com Servs. LLC*,
   No. 2:25-CV-00385-TC-CMR, 2025 WL 2480720 (D. Utah Aug. 28, 2025)..........................10

*Klocke v. Watson*,
   936 F.3d 240 (5th Cir. 2019) ....................................................................................47

*Lawrence v. Moss*,
  639 F.2d 634 (10th Cir. 1981) ................................................................. 24

*Lichfield v. Kubler*,
  No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468 (D. Utah Sept. 29, 2025) ....................... 14

*Lubrication & Maint., Inc. v. Union Res. Co.*,
  522 F. Supp. 1078 (S.D.N.Y. 1981) .......................................................... 44

*Lucent Technologies, Inc.*,
  470 F. Supp. 2d 1195 (S.D. Cal. 2007) ...................................................... 42

*Mathews v. McCown*,
  2025 UT 34, 575 P.3d 1114 ................................................................... 11

*Mile High Contracting, Inc. v. Deseret News Publ'g Co.*,
  2018 WL 7374786 (Utah 3d Dist. Ct. Mar. 16, 2018) ......................................... 17

*Miller v. Glanz*,
  948 F.2d 1562 (10th Cir. 1991) ............................................................... 2

*Mireles v. Waco*,
  502 U.S. 9 (1991) ........................................................................... 24

*Mitchell v. Wells Fargo Bank*,
  355 F. Supp. 3d 1136 (D. Utah 2018) ........................................................ 23

*Moore v. Cohen*,
  548 F. Supp. 3d 330 (S.D.N.Y. 2021) ........................................................ 34

*Nelson v. Pehrson*,
  No. 2:24-CV-568-TS, 2025 WL 2675804 (D. Utah Sept. 18, 2025) ........................... 2, 11

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ......................................................................... 19

*Nunes v. Rushton*,
  299 F. Supp. 3d 1216 (D. Utah 2018) ........................................................ 25

*O'Hara v. Hall*,
  628 P.2d 1289 (Utah 1981) ................................................................... 40

*Phelps v. Wichita Eagle-Beacon*,
  886 F.2d 1262 (10th Cir. 1989) .............................................................. 18

*Popkin v. Sec. Mut. Ins. Co. of New York*,
  367 N.Y.S.2d 492 (1975)....................................................................................... 42

*Psenicska v. Twentieth Century Fox Film Corp.*,
  No. 07 CIV. 10972(LAP), 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008) ................................. 34

*Quintana v. Santa Fe Cnty. Bd. of Comm'rs*,
  973 F.3d 1022 (10th Cir. 2020) ............................................................................. 19

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*,
  706 P.2d 1028 (Utah 1985)................................................................................... 39

*Rivera v. Peri & Sons Farms, Inc.*,
  735 F.3d 892 (9th Cir. 2013) ................................................................................ 18

*Roberts v. Associated Wholesale Grocers, Inc.*,
  No. 93-3327, 1994 WL 556887 (10th Cir. Oct. 12, 1994) ........................................... 32

*Rossi v. University of Utah*,
  2021 UT 43, 496 P.3d 105..................................................................................... 38

*Safeway Inc. v. Abbott Lab'ys,*
  761 F. Supp. 2d 874 (N.D. Cal. 2011)..................................................................... 34

*Sanders v. Mountain Am. Fed. Credit Union*,
  689 F.3d 1138 (10th Cir. 2012) ............................................................................. 22

*Santa Fe Alliance for Pub. Health & Safety v. City of Santa Fe*,
  993 F.3d 802 (10th Cir. 2021) ............................................................................... 10

*SCO Grp., Inc. v. Novell, Inc.*,
  377 F. Supp. 2d 1145 (D. Utah 2005) ............................................................... 18, 24

*Shanley v. Hutchings*,
  716 F. Supp. 3d 1179 (D. Utah 2024) ......................................................... 11, 48, 49

*Shapiro v. NFGTV, Inc.*,
  No. 16 CIV. 9152 (PGG), 2018 WL 2127806 (S.D.N.Y. Feb. 9, 2018)................................. 34

*Shuler v. Liberty Consulting Servs., Ltd.*,
  No. 20-CV-5779-KAM-CLP, 2022 WL 1552039 (E.D.N.Y. Apr. 4, 2022)............................. 37

*Simar Holding Corp. v. GSC*,
  87 A.D.3d 688 (2011)........................................................................................... 45

*Sommer v. Fed. Signal Corp.*,
   79 N.Y.2d 540 (1992) ................................................................................................ 33

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ................................................................................................... 20

*State of New York v. Wolowitz*,
   96 A.D.2d 47 (1983) ................................................................................................... 45

*Sugarhouse Fin. Co. v. Anderson*,
   610 P.2d 1369 (Utah 1980) ......................................................................................... 39

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
   330 F.3d 1110 (9th Cir. 2003) .................................................................................... 21

*Talley v. Time, Inc.*,
   923 F.3d 878 (10th Cir. 2019) ....................................................................... 19, 20, 21

*Tarantola v. Williams*,
   48 A.D.2d 552, 371 N.Y.S.2d 136 (1975) .................................................................. 44

*Terry v. Bacon*,
   2011 UT App 432, 269 P.3d 188 .................................................................................. 40

*Trans-W. Petroleum, Inc. v. United States Gypsum Co.*,
   830 F.3d 1171 (10th Cir. 2016) ............................................................................. 39, 40

*UHS of Provo Canyon, Inc. v. Bliss*,
   No. 2:24-CV-163-DAK-CMR, 2024 WL 4279243 (D. Utah Sept. 24, 2024) ............ 49

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
   895 F.3d 730 (10th Cir. 2018) ...................................................................... 18, 19, 23

*US Dominion, Inc. v. Powell*,
   554 F. Supp. 3d 42 (D.D.C. 2021) ............................................................................. 22

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*,
   97 F.3d 29 (2d Cir. 1996) ........................................................................................... 44

*Watson v. EnableUtah*,
   787 F. Supp. 3d 1245 (D. Utah 2025) .................................................................. 38, 39

*Weil v. Johnson*,
   No. 119431/02, 2002 WL 31972157 (N.Y. Sup. Ct. Sept. 27, 2002) ........................ 34

ix

*West v. Thomson Newspapers*,
    872 P.2d 999 (Utah 1994)..................................................................... 11, 13, 14, 16

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ......................................................................... 17

*Williams v. Duke Energy Int'l, Inc.*,
    681 F.3d 788 (6th Cir. 2012) .......................................................................... 23

*Woodward v. City of Worland*,
    977 F.2d 1392 (10th Cir. 1992) ...................................................................... 48

*XPO Logistics, Inc. v. Peterson*,
    No. 2:15-CV-703-CW, 2025 WL 1114392 (D. Utah Apr. 15, 2025) ................................. 23, 24

*Zacharius v. Kensington Pub. Corp.*,
    No. 652460/2012, 2014 WL 52892 (N.Y. Sup. Jan. 6, 2014) .................................... 42

## Statutes

Utah Code § 78B-25-110 .................................................................................... 48

## Rules

DUCivR 56-1(c)(4)............................................................................................ 27

Fed. R. Civ. P. 8(c) ......................................................................................... 44

Fed. R. Civ. P. 9(b) ................................................................................ 18, 19, 23

Fed. R. Civ. P. 12(b)(6)...................................................................................... 2

Fed. R. Civ. P. 12(c) ................................................................................... 2, 10

Fed. R. Civ. P. 56(a) ....................................................................................... 31

Utah R. Prof'l Conduct 4.2(a) ......................................................................... 26, 35

Utah R. Prof'l Conduct 4.2(e)(2)................................................................... 26, 35, 36

Utah R. Prof'l Conduct 5.3(c) ........................................................................ 26, 36

Utah R. Prof'l Conduct 8.4............................................................................ 26, 36, 37

x

## Other Authorities

1 A. Corbin, Corbin on Contracts § 210 (1963) ............................................................... 42

10 N.Y. Jur., Contracts § 217............................................................................................ 42

Restatement (Second) of Contracts § 77............................................................................ 39

Restatement (Second) of Torts § 580A.............................................................................. 34

Plaintiff, Marciano Brunette ("Plaintiff" or "Brunette"), respectfully submits this Memorandum of Law in Opposition to Defendant Jeff Jenkins Productions's ("JJP") Motion for Summary Judgment, Motion for Judgment on the Pleadings, and Motion Seeking Fees Under State Law ("Motion").

## INTRODUCTION

JJP produced and broadcast a television series built on a lie: that Marciano Brunette sexually assaulted Demi Engemann. The accusation was false. JJP knew it was false (or, at minimum, recklessly disregarded overwhelming evidence that it was false) and published it anyway because a fabricated sexual assault storyline generates ratings (and profits). Now, rather than defend its conduct on the merits, JJP asks this Court to terminate the case at the threshold through three procedural vehicles. Each one fails.

JJP's motion for judgment on the pleadings fares no better than its merits position. Publishing accusations that someone is a "sexual predator" who committed "sexual assault" is defamatory *per se*. The Complaint pleads defamation by implication with specificity, detailing how JJP's *Mormon Wives* episodes portrayed Brunette as akin to a violent rapist. And the Complaint is replete with allegations of actual malice, including that castmates told JJP that Engemann was lying, that the executive producer of *Vanderpump Villa* publicly confirmed the footage contradicted Engemann's account, and that JJP chose to publish the lies anyway for a ratings boost. JJP's demand that the Court disregard these allegations (at the pleading stage no less) underscores the weakness of its position.

JJP's motion for summary judgment relies on two documents, both governed by New York law, neither of which entitles JJP to relief. The first, a Performer Agreement, cannot release intentional tort liability as a matter of New York public policy. The second—a document prepared

1

by JJP's in-house lawyer and sent directly to Brunette *after* this lawsuit was filed without the knowledge or consent of his attorneys—was procured in apparent violation of the rules of professional conduct. JJP has refused to produce a single communication surrounding that document. Even setting aside how it was obtained, the document lacks consideration, reflects no meeting of the minds, and its terms do not encompass settling this lawsuit. At best, it is ambiguous, which means it must be construed against JJP.

Finally, JJP seeks fees under Utah's anti-SLAPP statute. The Supreme Court's recent decision in *Berk v. Choy*, 146 S. Ct. 546 (2026), forecloses that request: state anti-SLAPP statutes do not apply in federal court. JJP's Motion should be denied in its entirety.

## JJP'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED

### I.     LEGAL STANDARD

Rule 12(c) is available "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). The standard for a motion under Rule 12(c) is the same standard as a motion to dismiss under Rule 12(b)(6). *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). Dismissal is only appropriate if, after viewing "all well-pleaded factual allegations … as true and viewed in the light most favorable to Plaintiff," the Complaint has "fail[ed] to state a claim upon which relief can be granted." *Nelson v. Pehrson*, No. 2:24-CV-568-TS, 2025 WL 2675804, at *1 (D. Utah Sept. 18, 2025). The Court's role is "not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint is legally sufficient to state a claim for which relief may be granted." *Id.* (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)). If the "complaint states a *plausible* claim for relief," the motion should be denied. *Id.* (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

2

## II.    STATEMENT OF FACTS

### A.    The Parties and the Shows

Brunette is a castmate on *Vanderpump Villa*, a reality television show that focuses on the personal lives of the villa staff (like Brunette) as they host various guests in Italy. Compl. ¶¶ 8, 22. Engemann is a married social media influencer with approximately 1.2 million TikTok followers who was a castmate on the reality television show called *The Secret Lives of Mormon Wives* ("*Mormon Wives*"). *Id.* ¶¶ 9, 18. *Mormon Wives* follows a group of Utah-based social media influencers dubbed "MomTok" and various storylines about their lives. *Id.* ¶ 18. JJP produced the *Mormon Wives* series, which was distributed on Hulu TV. *Id.* ¶ 19.

### B.    Brunette and Engemann Form a Close Bond in Italy that They Maintain After Filming

In August 2024, Vanderpump Villa filmed a crossover episode in Italy where cast members of *Mormon Wives* visited the villa as guests. *Id.* ¶¶ 23, 29. The entire villa and its surrounding grounds, except for the bathrooms, were covered by recording devices. *Id.* ¶ 30.

At the villa, Engemann and Brunette spent extensive time together, flirting and sharing conversations about their personal lives, including Engemann's marital problems. *Id.* ¶¶ 31–32, 64. Engemann told Brunette she had thought about divorcing her husband approximately 27 times. *Id.* ¶ 64. In an unaired encounter, the pair kissed on the lips and Engemann told Brunette: "I love you." *Id.* ¶ 32. Brunette responded: "I love you too." *Id.* Engemann never told or otherwise expressed to Brunette that his touching or communication was unwanted. *Id.* ¶ 34. Brunette left the encounter under the impression that Engemann was his friend who likely intended to leave her husband, possibly to pursue a relationship with him. *Id.* ¶ 35.

After filming, Engemann maintained close contact with Brunette for months. They spoke on the phone repeatedly—on September 7, 2024 alone, three separate calls lasting 11, 21, and 31

3

minutes; and in March 2025, they spoke multiple times a day, including a 40-minute call starting at 10:15 at night. *Id.* ¶ 42. They FaceTimed regularly; Engemann introduced Brunette to her young daughter on FaceTime and sent him photographs of her daughter sleeping. *Id.* ¶¶ 43, 105. They exchanged hundreds of pages of text messages that were flirtatious and intimate. *Id.* ¶¶ 44–51. Engemann invited Brunette to her show's premiere in Los Angeles and then in Utah. *Id.* ¶¶ 48–49. She confronted him jealously about a rumor that he had kissed another woman. *Id.* ¶ 50. She shared her phone location with Brunette until March 2025. *Id.* ¶ 51. None of the messages suggested any non-consensual encounter, sexual or otherwise. *Id.* ¶ 44.

### C.     Engemann Makes Escalating and Contradictory Accusations of Sexual Assault

In April 2025, Hulu hosted an event that included cast members from *Vanderpump Villa* and *Mormon Wives*. *Id.* ¶ 57. The event provided valuable networking opportunities for those in attendance. Brunette's invitation to the event was rescinded, upon information and belief, because of Engemann. *Id.*

On April 21, 2025, Brunette posted a TikTok video stating he had been "uninvited to the function cus a 30yo mormon wife's scared I'll tell her husband the truth." *Id.* ¶ 58. In response, Engemann commented on social media: "[H]e got uninvited by @hulu because he's a s3ual pr3dator that can't keep his hands to himself, not because I'm hiding anything from my husband. He's a lying clout chaser." *Id.* ¶ 59. "Sexual predator" implied that Brunette committed heinous and repetitive criminal sexual acts. *Id.* ¶ 61. He did not.

The next day, Engemann repeated her claims, suggesting that other women would "come forward" against Brunette: "I know without a doubt I'm not the first." *Id.* ¶ 62. Engemann lacked any factual basis to make such a factual assertion, and since her post, no additional women have

4

come forward accusing Brunette of sexual assault. *Id.* ¶ 39. Engemann also posted on Instagram: "unwanted physical touch = assault. PERIOD the end." *Id.* ¶ 63.

The timing of Engemann's change of heart was not a coincidence. The Hulu event occurred just days before Season Two of *Vanderpump Villa*, which aired Engemann and Brunette's flirtation in Italy, was released. *Id.* ¶¶ 58–59, 64. Concerned that her reputation as a faithful wife was at risk, she reframed her consensual encounter as sexual misconduct to shift the narrative away from her infidelity and toward Brunette's alleged depravity. *Id.* ¶¶ 4, 36–40, 67.

Gradually, Engemann's story increased in severity over time. Although she initially claimed there were "two ass grabs," her story swiftly shifted to one of unwanted touching akin to violent sexual abuse and to Brunette grabbing her "privates." *Id.* ¶¶ 2, 36–37.

***The Viall Files*** **podcast (May 15, 2025)**: Engemann stated: "I [] opened up to all of the girls after *Vanderpump Villa* that I had been groped, sexually assaulted." *Id.* ¶ 69.

**Season Three, Episode 6 ("The Book of Confrontation") (November 13, 2025)**: Engemann claimed "there was two ass grabs." *Id.* ¶ 85. Engemann then compared Brunette's alleged conduct to the violent rape and childhood abuse suffered by castmates Mayci Neeley and Mikayla Matthews. *Id.* ¶ 88.

**Season Three, Episode 8 ("The Book of Awakening") (November 13, 2025)**: Engemann declared: "I either was sexually assaulted or I wasn't and the answer is that I was." *Id.* ¶ 91. When a castmate expressed skepticism, Engemann compared her situation to "someone who got beat 75 times by their husband," giving the false implication that she had been violently assaulted and manipulated by Brunette. *Id.* ¶¶ 92–94.

**Season Three, Episode 9 ("The Book of Judgment") (November 13, 2025)**: Engemann, crying, stated: "why am I having to defend myself against men's behavior to a group of women?" *Id.* ¶ 95.

**Season Three, Episode 10 ("The Book of Enlightenment") (November 13, 2025)**: Engemann stated unequivocally: "Marciano did sexually assault me." *Id.* ¶ 96.

**Instagram post (November 25, 2025)**: Engemann posted on Instagram that she had a "recorded phone call" that would prove her account, adding: "I like to play with my food a little before I eat it." *Id.* ¶ 120. Upon information and belief, there is no recording. *See id.*

**Season Three Reunion (December 4, 2025)**: Engemann opined: "[Y]ou can be sexually assaulted and then also continue a relationship. . . I think [it] honestly just boils down to a trauma response." *Id.* ¶ 98. She cried in response to a discussion of Matthews's childhood sexual abuse, saying it reminded her of "everything she has been through," *id.* ¶ 99, and confronted Neeley: "how uncomfortable would it be if you got [] raped by your abuser or you got slapped or [w]hatever, and then afterwards you're like, 'I love you.'" *Id.* ¶ 100. By comparing Brunette's conduct to rape, domestic battery, and childhood assault, Engemann conveyed the defamatory implication that Brunette had committed violent and depraved sexual violence. *Id.* ¶¶ 94, 100.

***Entertainment Tonight* interview (December 4, 2025)**: Engemann stated "unequivocally" she "was sexually assaulted and inappropriately touched without [her] consent." *Id.* ¶ 122. She then called Brunette a liar: "He is lying. Not only lying about what actually happened at Vanderpump Villa, but lying about the relationship that we had." *Id.*

### D.    JJP Knew or Had Reason to Know Engemann's Accusations Were False

JJP knew, or at best recklessly disregarded, that Brunette did not sexually assault Engemann and was not a sexual predator. But JJP needed to create a show that was salacious. As Engemann later publicized, JJP encouraged its castmates to come up with a big "cliffhanger." *Id.* ¶ 79. Before JJP chose to publish Engemann's accusations as a centerpiece of Season 3, it had access to at least seven categories of information contradicting her story.

6

*First*, after Season 1, JJP told its castmates the show was "boring" and asked for ideas for a "big cliffhanger." *Id.* Engemann herself suggested that JJP film her sitting and talking with another male castmate in a relationship to make it "seem like something was going on" between them—a fabricated storyline. *Id.* Engemann knew JJP was hungry for salacious content.

*Second*, during filming for Season 2, JJP watched as Engemann accused a man of "putting his hands on her" and "shoving" her at a Halloween party. JJP's own footage showed that no aggressive action occurred. *Id.* ¶¶ 54, 106. Several castmates said in front of JJP's cameras that Engemann had not been shoved. *Id.* ¶ 106. This demonstrated Engemann's willingness to repeat easily refutable lies.

*Third*, during filming for the Season 2 Reunion Episode (April 2025), several castmates suggested that Engemann had not truthfully characterized the nature of her interactions with Brunette. *Id.* ¶ 66. The Season 2 Reunion did not air until July 1, 2025, but JJP possessed this information before Season 3 was filmed. *Id.* ¶ 67.

*Fourth*, during filming for Season 3 (February–May 2025), Brunette's ex-girlfriend confronted Engemann in view of JJP's cameras and told her to retract the "sexual predator" accusation. *Id.* ¶ 103. Other castmates made clear to JJP that Engemann was lying. One stated, in front of cameras: "You're lying and it's obvious that you're lying." *Id.* ¶ 104. Another pointed out that Engemann had been FaceTiming Brunette with her children and sending him photographs of her children—conduct inconsistent with the behavior of a sexual assault victim. *Id.* ¶ 105. Several castmates stated that Engemann had earlier told them she was *not* a victim. *Id.* ¶ 72.

*Fifth*, JJP knew Engemann's public story was delayed and had shifted over time. Her accusations did not surface until over eight months after the interaction and on the eve of her

7

conduct being publicized. Her account escalated in severity—a pattern inconsistent with truthful reporting. *Id.* ¶ 108.

*Sixth*, JJP knew or could have learned with minimal diligence of Engemann's months-long voluntary contact with Brunette after filming—phone calls, FaceTime, texts, location sharing. *Id.* ¶ 109. That conduct was fundamentally inconsistent with the portrayal of Brunette as a "sexual predator" who had just committed a violent sexual act.

*Seventh*, JJP had access to on-camera footage, audio recordings, and production materials from *Vanderpump Villa*. *Id.* ¶ 107. JJP in fact obtained and aired *Vanderpump Villa* footage in *Mormon Wives*. *Id.* This footage would have refuted Engemann's narrative and depicted behavior inconsistent with her claims. *Id.* Lisa Vanderpump, the executive producer of *Vanderpump Villa*, publicly declared: "I categorically know what happened because we have cameras everywhere and I have seen every ounce of the footage," and that the women who doubted Engemann "had very good reason." *Id.* ¶ 116.

Despite all of this, JJP purposefully chose not to investigate Engemann's accusations. *Id.* ¶ 107. JJP did not ask Brunette for his account. *Id.* ¶ 110. JJP chose instead to build a profitable storyline around the accusations. *Id.*

### E.      **JJP Intentionally or Recklessly Publishes and Amplifies Engemann's Lies For Ratings**

Because falsely accusing someone of sexual assault creates an exceptional type of reality-television drama that boosts ratings, JJP published Engemann's lies as one of the primary storylines for Season 3 of *Mormon Wives*. *Id.* ¶ 77. In November 2025, JJP released Season Three of *Mormon Wives*. The Season published and amplified many of Engemann's defamatory statements of sexual assault. Specifically, in Episodes 6, 7, 8, 9, 10, and the Season 3 Reunion Episode (which was released later *after* Ms. Vanderpump made clear that she "categorically knew"

8

from the footage that there was "good reason to doubt" Engemann), JJP exploited Engemann's lies, painting Brunette to be a sexual predator who sexually assaulted Engemann. These lies were false and unequivocally defamatory.

JJP never asked Brunette for his side of the story, perhaps to insulate themselves and preserve what they try to argue now—that they "did not *really* know" that it was false. Following Engemann's false accusations, JJP stopped filming with Brunette and did not include *any* disclaimer or message in Season Three that Brunette vehemently denied Engemann's false claims. JJP did not conduct an investigation into the claims that one of its cast members had been sexually assaulted while filming a cross-over show. JJP instead produced side-by-side Engemann's accusations with clips from other cast members relaying horrific accounts of true experiences of actual sexual assault and extreme violence (that have nothing to do with Brunette) to amplify Engemann's accusations. JJP also chose to strategically air Engemann discussing the problem of "women not believing women" when a cast member expressed skepticism or disbelief of her false claims. *Id.* ¶ 89. It presented Engemann's lies as part of a broader narrative of predatory sexual behavior while, simultaneously, withholding context and facts that undermined the truth of the accusations. *Id.* ¶ 112. As a result of JJP's conduct, Brunette has suffered and continues to suffer significant damages.

### F.   Brunette Has Suffered Concrete Damages

Engemann's false accusations—amplified by JJP—have caused irreparable harm to Brunette's career and personal life. *Id.* ¶¶ 123–32. Prior to Engemann's accusations, Brunette had been under contract negotiations to appear on a popular reality dating competition show. Following Season Three, the dating show company informed him it was declining to fulfill the contract. *Id.* ¶ 125. Brunette lost a lucrative opportunity to guest DJ at a renowned nightclub in Las Vegas, which, along with Engemann's accusations, has prevented him from launching his DJ career. *Id.*

9

¶ 126. Brunette was excluded from the Season Three Reunion of *Mormon Wives*, an event for which he would have been paid, because Engemann did not want him there. *Id.* ¶ 127. For Brunette, whose career depends on appearances in the reality television ecosystem, exclusion from a major reunion episode was itself an economic injury and a form of professional exile.

The public has bought into Engemann's narrative. On social media, viewers group Brunette with men credibly accused of domestic violence, including James Kennedy (arrested for domestic violence in December 2024) and Jax Taylor (credibly accused of domestic abuse by his estranged wife). *Id.* ¶¶ 131–32. Other viewers have called Brunette a "creep" and ranked him among "the worst m[e]n on reality tv ever." *Id.* In person, at least one individual recognized Brunette and screamed at him: "I know what you did, get away from me!" *Id.* ¶ 130. In short, the false accusations of sexual assault and the branding of Brunette as a "sexual predator" have severely tarnished his personal and professional reputations, making it nearly impossible to find meaningful employment in the entertainment industry. *Id.* ¶ 141.

## III.    ARGUMENT

As an initial matter, JJP's Motion seeking relief under Rule 12(c) should be denied as premature because the pleadings are not closed—Defendant Engemann has not answered the Complaint. *See* Fed. R. Civ. P. 12(c). As this Court recently recognized, when a case has multiple defendants and not all defendants have answered, the Tenth Circuit has made clear that a Rule 12(c) motion would be premature. *See Kingsley v. Amazon.com Servs. LLC*, No. 2:25-CV-00385-TC-CMR, 2025 WL 2480720, at *3 (D. Utah Aug. 28, 2025) (Campbell, J.) (denying Rule 12(c) motion as premature where only moving defendant had filed answer) (citing *Santa Fe Alliance for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 809 n.3 (10th Cir. 2021)).

A.    **Falsely Labeling Someone A Sexual Predator Who Sexually Assaulted A Woman Conveys A Defamatory Meaning As A Matter Of Law.**

On a motion to dismiss, the sole issue is whether a reasonable person "*could* find that a statement conveys a defamatory meaning." *Mathews v. McCown,* 2025 UT 34, ¶ 45, 575 P.3d 1114 (emphasis added); *id.* ¶ 97 n.18 ("the question of whether the statement is defamatory belongs to the trier of fact").

Defamatory statements are those that "impeach a plaintiff's honesty, integrity, virtue, or reputation." *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1194 (D. Utah 2024) (false statements involving rape, child sexual abuse, adultery, sexual coercion, blackmail, and plagiarism conveyed a defamatory meaning as a matter of law) (internal quotation marks omitted). "[W]hat may be considered defamatory" is "rather broad." *Kaveh v. Starbucks Corp.*, No. 2:24-CV-00291, 2025 WL 308256, at *9 (D. Utah Jan. 3, 2025) (Oberg, M.J.), *report and recommendation adopted*, No. 2:24-CV-00291-AMA-DAO, 2025 WL 306041 (D. Utah Jan. 27, 2025) (quoting *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994)).

Statements that charge "sexual misconduct" are *per se* defamatory. *Shanley*, 716 F. Supp. 3d at 1197; *see also Mathews*, 2025 UT 34, ¶ 90 ("false statements alleging criminal conduct on the part of the plaintiff are defamatory per se"); *Nelson*, 2025 WL 2675804, at *2; *Cox v. Hatch*, 761 P.2d 556, 562 n.5 (Utah 1988) (noting "that an *imputation* of criminality is defamatory; as slander, it is slanderous per se") (emphasis added). The law is clear that accusing someone of "heinous crimes" such as sexual assault are statements that are "capable of sustaining a defamatory meaning as a matter of law." *Shanley*, 716 F. Supp. 3d at 1194.

JJP does not explain how falsely accusing someone repeatedly of sexual assault and being a sexual predator is not the type of criminal conduct that is, *at minimum*, capable of conveying a defamatory meaning. Instead, JJP urges the Court to become the factfinder and weigh whether

11

something that is defamatory *per se* could nonetheless be viewed through a different lens. That is not the *Mathews* standard. The Complaint overwhelmingly pleads numerous statements that, if not *per se* defamatory, are certainly "capable" of defamatory meaning.

JJP's citation to *Hogan v. Winder* for the proposition that the Complaint here alleges some sort of "back and forth" debate not capable of defamatory meaning is misplaced. Mot. 26 (citing *Hogan v. Winder*, 762 F.3d 1096, 1107 (10th Cir. 2014)). The cited portion of that opinion determined that an allegation that the plaintiff had engaged in "erratic behavior" was too vague and subjective and not capable of defamatory meaning in the context of an article defending the defendant's decision to terminate the plaintiff. That is not at all like the repeated lies here, where JJP repeatedly published false accusations that Brunette engaged in sexual assault and was a sexual predator, that Engemann's experience was akin to someone who had suffered violent abuse and rape, and that Engemann's actions to the contrary were the result of a "trauma response" or the result of women not being believed or supported when they came forward with "their" truth. JJP's decision to cease further filming with Brunette made sure that his side was not presented. JJP chose to republish salacious lies because the storyline was profitable. That is sufficient at this stage. Whether JJP can convince a jury that the statements did not defame Plaintiff is an argument for a later date. *See, e.g.*, *Green v. Cosby*, 138 F. Supp. 3d 114, 135 (D. Mass. 2015) ("A jury must ultimately decide whether the statement asserted or implied this actual fact or merely opined that the allegations sounded far-fetched, without actually asserting or implying the [defamatory fact]").

**B.      The Complaint Adequately Alleges Defamation By Implication.**

JJP does not dispute that the implications alleged here—that Brunette assaulted and manipulated Engemann—are defamatory. Nor could it. Instead, JJP argues only that "no reasonable viewer would find that the Series creates the implications Plaintiff alleges." Mot. 27. JJP asks the right question but reaches the wrong conclusion.

12

Again, "[i]n the context of an allegedly defamatory implication," the question for the Court is: "*could* a reasonable fact finder conclude that the underlying statement conveys the allegedly defamatory implication?" *West*, 872 P.2d at 1019 (emphasis added). Once "the court determines that the statement is *capable* of sustaining [] a [defamatory] meaning ..., the trier of fact must then determine whether the statement was in fact so understood by its audience." *Id.* at 1008–09 (emphasis added). In other words, the Court's role is limited to determining whether a reasonable viewer *could* draw the alleged inference—not whether viewers did. JJP's motion does not show that the Series is *incapable* of conveying the alleged implications; it merely offers a competing interpretation of selected excerpts and asks the Court to adopt it. That is not the standard for dismissal.

       1.    <u>The Series Reasonably "Could" Convey that Brunette Assaulted Engemann.</u>

JJP's argument is not that the Series fails to convey an implication of sexual assault, but rather that it does not convey a "serious[] assault." Mot. 26–27. But even if the Series only reasonably conveyed that Brunette "merely" assaulted Engemann, rather than "seriously" assaulted her, the motion fails. Assault is assault. Whether the Series conveyed that Brunette "only" touched Engemann without her consent as opposed to forcibly raping her makes no difference for purposes of this argument. Both implications are defamatory.

JJP's argument rests almost entirely on two sparse exchanges in which it was suggested that Engemann's experience was "different" from another participant's experience with abuse. Mot. 26–27. But that other participant described being "choked, hit, pushed, ... raped." JJP App'x, Ex. D (Season 3, Ep. 6) 00:12:46. Suggesting Engemann's experience was less severe than the most vicious forms of physical and sexual abuse does not come close to negating the implication of assault. To the contrary, the comparison only makes sense if Engemann's allegations are

understood to involve some form of sexual assault, which, again, JJP does not dispute is defamatory.

In any event, JJP's reliance on those isolated "different" statements ignores both the governing standard and the substance of what the Series actually conveys. Courts "cannot … view[] individual words in isolation," but must "carefully examine the context in which the statement was made." *West*, 872 P.2d at 1009. Here, the Complaint alleges that the Series repeatedly presents Engemann's accusations that Brunette engaged in non-consensual physical contact—including allegations of unwanted touching and "grabb[ing]"—and then escalates those accusations into explicit claims of "sexual assault," while reinforcing them through analogies to battered spouses and abusive relationships used to explain her continued contact. Compl. ¶¶ 85–86, 91–96, 98, 153–55. Those depictions convey not merely isolated conduct, but a broader narrative that JJP repeatedly curated of non-consensual and abusive behavior.

This case therefore bears no resemblance to the authorities JJP relies on. In *Lichfield v. Kubler*, the alleged implication arose from a fleeting image embedded in a "jumble" of unrelated materials, not a sustained narrative repeatedly reinforcing a single accusation across multiple episodes. No. 2:24-CV-00458-JNP-CMR, 2025 WL 2772468, at *7 (D. Utah Sept. 29, 2025). Likewise, in *Keisel v. Westbrook*, the challenged statements arose from a single, discrete post-game interview in which NBA player Russell Westbrook repeatedly framed his comments as protected opinions—"for me," "to me," "I think it's racial." 2023 UT App 163, ¶¶ 37 and 42, 542 P.3d 536. The court further emphasized that Westbrook was speaking generally about fan behavior, not making a concrete factual accusation about the plaintiff. *Id.* at ¶ 48. Here, JJP presented as one of its main plots a specific accusation against Brunette personally—sexual assault—across multiple episodes, including through repetition and contextual framing. Last,

14

*Hogan v. Winder* involved a single article whose context made clear that references to "extortion" arose from "heated civil litigation" and constituted "rhetorical hyperbole," such that reasonable readers would not understand them as factual accusations of criminal conduct. By contrast, Plaintiff alleges that the Series presents Engemann's accusations as literal, factual claims of sexual assault, not attributed advocacy or hyperbole, making the defamatory implication readily capable of being understood. No. 2:12-CV-123 TS, 2012 WL 4356326, at *10 (D. Utah Sept. 24, 2012).

JJP's publication presents a narrative in which Engemann's allegations of non-consensual contact are repeated, escalated, and reinforced across episodes, including through comparisons to violent abuse and trauma-response framing. Compl. ¶¶ 85–100, 153–54. At minimum, a reasonable viewer ***could*** understand the Series to convey that Brunette committed sexual assault.

2.      The Series Reasonably "Could" Convey that Brunette Manipulated Engemann.

JJP likewise does not dispute that implying Brunette manipulated Engemann would be defamatory. Instead, it argues only that the Series does not reasonably convey that implication. Mot. 27. But as with assault, JJP's argument focuses on isolated expressions of skepticism while ignoring the broader narrative the Series constructs.

The Complaint alleges that the Series does not simply present Engemann's continued contact with Brunette as inconsistent with assault; it affirmatively explains that conduct through analogies to abusive relationships and trauma responses. Engemann compares her situation to that of a battered spouse who remains with her abuser despite repeated violence, and invokes those dynamics to justify why she continued communicating with Brunette after the alleged assault. Compl. ¶¶ 92–94, 98, 155. That framing does not negate the implication of manipulation; it supplies it. A reasonable viewer could understand those comparisons to suggest that Brunette exerted influence over Engemann or caused her to act in ways inconsistent with her own interests.

15

JJP's reliance on moments of doubt expressed by other participants does not eliminate that implication. As with the assault claim, courts must "carefully examine the context in which the statement was made," not isolated snippets. *West*, 872 P.2d at 1009. The Complaint alleges that, across episodes, the Series repeatedly presents and reinforces a narrative in which Engemann's continued contact is explained by reference to abusive dynamics rather than independent choice. Compl. ¶¶ 91–98, 153–55. A reasonable viewer ***could*** understand the Series to convey that Brunette manipulated Engemann. Whether viewers in fact drew that inference is a question for the jury, not the Court. *West*, 872 P.2d at 1008–09.

3.      JJP's "Intent" Argument Misstates the Law and Relies on Non-Binding Dicta.

JJP's remaining argument—that Plaintiff must plead that JJP intended to convey the alleged defamatory implications (Mot. 28)—fails as a matter of law. *Hogan*—the only in-circuit decision JJP relies on—acknowledged that the rule JJP advocates derives from a Fourth Circuit case, which is inapposite here. 2012 WL 4356326, at *8.[1] Regardless, *Hogan* does not adopt any such "intent to imply" requirement. To the contrary, the *Hogan* court acknowledged that "no Utah court has directly ruled on this issue" and stated only that it was "inclined to require" allegations of intent. *Id.* at *9. Critically, the court then ***declined*** to reach the issue, explaining that "because … Plaintiff has not alleged facts that meet the lower standard … the Court need not decide this issue." *Id.* That is not a holding; it's dictum. *Mile High Contracting, Inc. v. Deseret News Publ'g*

---

[1] In *Chapin v. Knight-Ridder, Inc.*, the Fourth Circuit held that "because the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing ***where the expressed facts are literally true***," and only then must the language "affirmatively suggest that the author intends or endorses the inference." 993 F.2d 1087, 1092–93 (4th Cir. 1993) (emphasis added). That limitation, which JJP omits, is critical: *Chapin* imposes an intent requirement only where the challenged statements are concededly true. Plaintiff, of course, denies that he assaulted or manipulated Engemann. The *Chapin* framework does not apply. That JJP must resort to selectively quoting and mischaracterizing case law betrays the weakness of its argument.

*Co.*, a Utah trial court decision, adds nothing. 2018 WL 7374786 (Utah 3d Dist. Ct. Mar. 16 2018). It simply repeats *Hogan*'s dictum as an "alternative" ground for dismissal. *Id.* at *9.[2]

In any event, even if such an "intent to imply" requirement existed (it does not), the Complaint plausibly alleges it. It alleges that JJP "developed, produced, edited and published" a series that "constructed and broadcast storylines" presenting Engemann's accusations as credible while omitting exculpatory context and limiting Plaintiff's response. Compl. ¶¶ 101–13. It further alleges that JJP repeatedly amplified those accusations across episodes and promotional content to maximize their impact. *Id.* And the Complaint expressly alleges that JJP acted with the requisite intent. *Id.* ¶ 156. Those allegations readily support a plausible inference that JJP intended to convey the defamatory implications at issue.

### C. The Complaint Adequately Alleges That JJP Acted With Malice Under Any Pleading Standard.

JJP's Motion rests on a pleading standard the Tenth Circuit does not recognize. Rule 9(b) expressly permits malice to be alleged generally, and the Tenth Circuit has repeatedly enforced that rule. JJP's contrary argument—requiring detailed facts and identification of specific employees prior to the opportunity to conduct discovery of the entity (Mot. 31–35)—depends entirely on out-of-circuit authority and should be rejected.

1. JJP's Argument Relies on a Pleading Standard the Tenth Circuit Rejects.

The Tenth Circuit has expressly rejected the kind of "exacting standard[] for plausibly pleading actual malice" JJP advances. Mot. 35. Even after the Supreme Court's plausibility

---

[2] The only other decision JJP cited is *Dodds v. Am. Broad. Co.*, an out-of-circuit opinion that likewise relied on *Chapin* and similar cases. 145 F.3d 1053, 1064 (9th Cir. 1998) (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (requiring a showing of intent only when "true facts are conveyed" by the alleged defamation)). More concerning, *Dodds* expressly rejected the "objective, 'reasonable viewer' standard" that the Utah Supreme Court adopted in *West* in favor of a subjective intent test. *Id. West*, of course, controls.

standard in *Twombly* and *Iqbal*, this Circuit has continued to emphasize Rule 9(b)'s allowance that "[m]alice … and other conditions of a person's mind may be alleged *generally*." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (emphasis in original) (quoting Fed. R. Civ. P. 9(b)). Indeed, the Circuit expressly stated that it was "follow[ing] the Ninth Circuit's lead" from *Rivera v. Peri & Sons Farms, Inc.*, which held that "[a]t the pleading stage, a plaintiff need not allege willfulness with specificity." 735 F.3d 892, 903 (9th Cir. 2013). Although this Circuit recognized that under *Iqbal*, "in some circumstances there must be more specific factual allegations to support willfulness," it nevertheless held that an "allegation of willfulness suffices"—even one merely alleging conduct was "deliberate, intentional, and willful"—where intent can be inferred. *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299–1300 (10th Cir. 2018). For example, even the simple allegation that a defendant company was "small" makes it "plausible" that it knew of labor-rights violations within the company. *Id.* at 1300.

Accordingly, "[i]n this Circuit, a party need not aver any specific facts in support of its general allegations of malice." *SCO Grp., Inc. v. Novell, Inc.*, 377 F. Supp. 2d 1145, 1153 (D. Utah 2005); *see also Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269–70 & n.5 (10th Cir. 1989) ("In evaluating the sufficiency of [a] plaintiff's allegations," courts "cannot ignore the plain language of Rule 9(b)," which "permit[s] a general averment of intent unaccompanied by supporting factual allegations."). Courts in this District dutifully apply that principle. *See, e.g.*, *Cook v. Dava Mktg., LLC*, No. 2:23-CV-00632-DBB-DBP, 2025 WL 1684438, at *5 (D. Utah June 16, 2025) (an "'allegation of willfulness suffices,' even one that merely states that the alleged violations were 'deliberate, intentional, and willful'") (quoting *Fernandez*, 883 F.3d at 1299–1300); *Finman v. ClearCellular, Inc.*, No. 222CV00272JNPJCB, 2023 WL 2742720, at *2 (D. Utah Mar. 31, 2023) ("alleging … that the defendants knew that the representations were false at

18

the time they were made … is all that is required by Rule 9(b)"); *Billy v. Edge Homes*, No. 219CV00058JNPEJF, 2020 WL 2572522, at *6 n.3 (D. Utah May 21, 2020) ("[T]he federal rules state that 'intent, knowledge, and other conditions of a person's mind may be alleged generally,' and the Tenth Circuit has held that willfulness in some contexts may be adequately alleged 'when the complaint merely stated that the alleged violations were deliberate, intentional, and willful.'") (first quoting Fed. R. Civ. P. 9(b); second quoting *Fernandez*, 883 F.3d at 1299–1300). Requiring more, including an identification of which particular individual within a company acted with malice, is contrary to Rule 9(b) and grounds for reversal. *Cf. Polukoff*, 895 F.3d at 745 (reversing dismissal of complaint for failure to allege "who knew what and when they knew it" within the company).

### 2. Plaintiff More than Plausibly Pleads Actual Malice.

Contrary to Defendants' suggestion, plausibility is a "low bar," and a complaint's allegations will clear it even if "actual proof of those facts is improbable, and [] a recovery is very remote and unlikely." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (first quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020); second quoting *Dias* v. *City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). Here, the Complaint alleges no less than **seven discrete facts** which individually and collectively raise a plausible inference of malice. Compl. ¶¶ 103–10. "[A] publication 'was made with actual malice' when the defendant published 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Talley v. Time, Inc.*, 923 F.3d 878, 895 (10th Cir. 2019) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Malice may be evidenced by, *inter alia*, (a) "situations 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports,'" or (b) "evidence … that a publisher knew it was publishing contested allegations but deliberately ignored sources or information that might reveal what actually

19

happened." *Id.* at 896–97 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). The Complaint's allegations clearly demonstrate that both factors were present.

*First*, the Complaint plausibly alleges that JJP had numerous, specific reasons to doubt Engemann's accusations before publishing them. During filming, in JJP's presence, Brunette's ex-girlfriend directly refuted the "sexual predator" claim, and multiple cast members told Engemann she was lying, including that it was "obvious" she was lying. Compl. ¶¶ 103–04. JJP also knew facts fundamentally inconsistent with the accusation, including Engemann's months-long voluntary and friendly contact with Brunette after the alleged incident and the absence of any contemporaneous complaint matching the later, escalated claims. *Id.* ¶¶ 108–09. It further knew Engemann had a pattern of making exaggerated or false accusations that had already been contradicted by video evidence during production, and that her story materially shifted over time. *Id.* ¶¶ 106, 108. Taken together, these allegations constitute precisely the kind of "obvious reasons to doubt" that support a plausible inference of reckless disregard. *Cf. Coomer v. Lindell*, No. 22-CV-01129-NYW-SKC, 2023 WL 2528624, at *7 (D. Colo. Mar. 15, 2023) (allegations "that the 'sole source' of Defendants' statements was Mr. Oltmann" and that they failed to investigate despite "'obvious reasons to doubt the veracity' of his claims" enough to plead malice) (quoting *Talley*, 923 F.3d at 896).

*Second*, the Complaint alleges purposeful avoidance of the truth. This was not a "he said, she said"; this was a "she said, video evidence ***showed*** what she said was false." JJP had access to objective, readily available evidence—including comprehensive footage that would have confirmed or refuted the alleged assault—yet "purposely chose not to take appropriate steps to investigate" before broadcasting the accusations. Compl. ¶ 107. It likewise failed to conduct even minimal diligence despite the severity of the allegations and instead developed, edited, and

20

amplified a storyline repeating those accusations while withholding contrary facts and limiting Brunette's ability to respond. *Id.* ¶¶ 101–02, 110–13. These allegations go well beyond conclusory assertions and plausibly plead that JJP both entertained serious doubts as to the truth and deliberately avoided confirming it, which is sufficient to state actual malice at the pleading stage. *Cf. Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1138–39 (9th Cir. 2003) (denying summary judgment on malice issue where jury could conclude publisher of consumer safety report knew its safety tests were potentially biased yet failed to investigate its testing procedures because it knew that "doing so would disclose the falsity of its" safety rating). This is nothing like the *Talley* decision JJP relies on, where uncontroverted discovery showed the reporters conducted a "10-month investigation" involving "dozens of interviews," relied on independent sources whose accounts "corroborated one another," and "did not observe any basis to question [their] credibility" before publishing the alleged defamatory article. 923 F.3d at 883–84, 892.

JJP's suggestion (hidden in a footnote) that the Court should simply ignore the Complaint's allegation that it had access to "on-camera footage, audio recordings, and production materials" from *Vanderpump Villa* (Compl. ¶ 107) is meritless. Mot. 33 n.7. Even under JJP's out-of-circuit case law, Brunette is not required at this stage to prove the precise scope of JJP's access to *Vanderpump Villa* materials; he need only plead facts that make it plausible. The Complaint does exactly that by alleging JJP in fact obtained and used *Vanderpump Villa* footage in the Series—demonstrating that JJP had access to those materials—and that the production environment was comprehensively recorded. Compl. ¶ 107. From those facts, it is certainly plausible that additional footage and recordings were available to JJP through ordinary production channels. That is not speculation; it is a common-sense inference grounded in the realities of television production and

JJP's own use of the footage. Even if the precise extent of JJP's access is disputed, that would raise a factual issue inappropriate for resolution at this stage. *See Cooper v. Crestani*, No. 2:18-CV-970-TS-PMW, 2019 WL 4752076, at *1 (D. Utah Sept. 30, 2019) ("Judgment on the pleadings should be granted only if 'the moving party has clearly established that no material issue of fact remains to be resolved'" after "all well-pleaded factual allegations … are accepted as true and viewed in the light most favorable to the Plaintiff") (quoting *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012)).

Even if, as JJP argues, failure to investigate, a profit motive, and one-sided depictions each in themselves do not plausibly allege malice (Mot. 33–34)—and the Complaint alleges far more than that—the question is whether the Complaint *as a whole* does, not snippets of allegations. The Complaint's "allegations, taken together and assumed true, are sufficient to raise 'a reasonable expectation that discovery will reveal evidence of actual malice,' and are sufficient to plausibly allege actual malice." *Coomer*, 2023 WL 2528624, at *7 (citation omitted); *see, e.g.*, *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63–64 (D.D.C. 2021) ("[i]n totality," complaint plausibly alleged malice where defendant "recklessly disregarded the truth by relying on obviously problematic sources to support a preconceived narrative he had crafted for his own profit"); *Jacques v. Bank of Am.*, No. CV F 12-0821 LJO DLB, 2013 WL 129328, at *5 (E.D. Cal. Jan. 9, 2013) (even if "none of the individual" allegations "support malice," they do "when taken together").

### 3. There Is No Requirement to Plead Which Employees Acted with Malice.

JJP has not cited any case to support its argument that Brunette was required to identify in the Complaint the particular employee(s) responsible for acting with malice. (Mot. 31–32.) Even if he were required to do so (he was not), any such requirement would be excused as a matter of law because JJP exclusively controls the information necessary to identify them. "Rule 9(b) does

not require omniscience" for a reason: requiring as much would frequently cause "pleading deficiencies … from the plaintiff's inability to obtain information in the defendant's exclusive control," through no fault of the plaintiff. *Polukoff*, 895 F.3d at 745 (first quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012); second quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016)). For that reason, courts must "excuse deficiencies that result from the plaintiff's inability to obtain information within the defendant's exclusive control." *Id.* The Tenth Circuit has held that "information regarding who knew what and when they knew it" is precisely the sort of information exclusively within a company's control. *Id.*

Here, JJP, "no doubt, knows which employees" encountered the numerous red flags identified in the Complaint and therefore knew or recklessly disregarded the falsity of the defamatory statements. *Id.* Because that information is within JJP's exclusive control, Brunette could not have, and need not have, included that information in the Complaint. *Cf. Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1164 (D. Utah 2018) ("The court also rejects Defendants' argument that Plaintiffs must specifically identify each Wells Fargo employee who created the initial accounts because Wells Fargo possesses this information.").

The sole in-circuit case JJP cites on this point is not to the contrary. (Mot. 31–32.) There, the district court acknowledged that the Tenth Circuit had, in earlier appeals in that same case, focused on whether the ***corporation*** acted with scienter "in connection with" the defamatory publications at issue, rather than on the corporation's attorney who was "the actual publisher" of the defamatory statements. *XPO Logistics, Inc. v. Peterson*, No. 2:15-CV-703-CW, 2025 WL 1114392, at *13 (D. Utah Apr. 15, 2025). Because the claimant "recognize[d] that at some level it is [the attorney]'s conduct that primarily should be examined," the district court "assum[ed] that it is only [the attorney]'s conduct that should be reviewed in making a bad faith determination."

23

*Id.* Thus, far from supporting JJP's argument, the district court's opinion recognized that the Tenth Circuit analyzes malice at the entity level, and the district court only considered the agent's conduct because the claimant conceded that was the only conduct that was relevant. Brunette has made no such concession. Further, that ruling—and the only other (out-of-circuit) decision JJP cites for this argument—was issued at **summary judgment** after the claimant had an opportunity to conduct discovery. *Id.* at *4. Brunette has not yet had the opportunity to conduct discovery into which JJP agents knew what. Consequently, JJP's only in-circuit authority is inapposite.

4.  Whether JJP Acted with Malice Is a Fact Issue Requiring Discovery.

JJP's argument for dismissal fails for another reason: six of the seven decisions it stakes its argument on, including its only two in-circuit opinions, came after discovery at summary judgment or trial. (Mot. 33–34.) That JJP could not identify a single Tenth Circuit case dismissing a complaint for failure to plausibly allege malice is telling—and unsurprising. As the Supreme Court and Tenth Circuit have recognized, because "malice calls in question a defendant's state of mind," it "does not lend itself readily to summary judgment." *Lawrence v. Moss*, 639 F.2d 634, 639 (10th Cir. 1981) (reversing summary judgment on defamation claim); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) ("'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition"). If malice typically cannot be resolved before trial even after discovery, it certainly cannot be resolved before discovery on a Rule 12(c) motion. *See SCO Group*, 377 F. Supp. 2d at 1153 ("even on a claim of defamation [] 'resolution of the falsity and actual malice inquiries typically requires discovery'") (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001)); *see also Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("malice … ordinarily cannot be resolved without engaging in discovery and eventual trial").

### D.      The Complaint Adequately Alleges False Light.

For the same reasons outlined above, the Complaint properly pleads false light. False light occurs when: "(1) the defendant publicized a matter concerning the plaintiff that placed the plaintiff before the public in a false light, (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person, and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed." *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1234 (D. Utah 2018) (citing *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535). False light claims are often "predicated on publication of a defamatory statement," *id.* at 1235, and "the same considerations apply to each." *Id.* (quoting *Jacob*, 2009 UT 37, ¶ 21). Here, Brunette was placed in the public false light of being a sexual predator who engaged in criminal conduct. The request for dismissal should be denied.

## JJP'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

### I.      ADDITIONAL BACKGROUND

JJP seeks summary judgment in its favor not by championing evidence to show it should prevail on the merits of these claims, but instead relies on two documents which JJP claims immunize it from its misconduct.

*First*, JJP cites the release language contained in a 2025 Performer Agreement that, as a matter of New York public policy, cannot release claims for intentional or reckless misconduct. JJP puts forth no evidence tending to show that any of its conduct was anything but intentional and reckless as alleged. *See* JJP App'x, Ex. A (Hunt Decl.), ex. 1.

*Second*, JJP has filed a document drafted by its lawyer and sent to Plaintiff *after this lawsuit was filed*. *See id.* ex. 2. JJP now claims this is a settlement document through which Plaintiff—without the advice or assistance of counsel—released all his claims in exchange for no consideration. JJP electronically sent the document to Plaintiff after JJP filmed Plaintiff at a bar

with one of his friends for approximately an hour, with a representative of JJP telling Plaintiff that he "had to" sign it and suggesting that Plaintiff would be paid (he was not). The language in the document is written to suggest it pertains to the production efforts of a show that will be aired and distributed *in the future*, not past episodes (which are already the subject of Plaintiff's 2025 Performer Agreement). The document—which JJP concedes was not drafted for Brunette—was never intended to cover this lawsuit because it says nothing *about this lawsuit*. JJP's argument fails as a matter of law.

## II. BRUNETTE'S RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS (Dkt. 33 at 4–6)

Plaintiff disputes JJP's characterization that he "is a participant" in *Mormon Wives*. Plaintiff agreed to the terms in the 2025 Performer Agreement for prior seasons of the show.

Plaintiff contests Paragraph 3 and objects to the admission and consideration of the document attached as Exhibit 2 to Julie Hunt's Declaration (the "2026 Document"), which is referenced in Paragraphs 2, 5, 8, and 9. *See* JJP App'x, Ex. A (Hunt Decl.), ex. 2. As discussed further below, the 2026 Document is a document that Ms. Hunt—an attorney who manages JJP's Legal Department—drafted, which was communicated to Plaintiff outside the presence of his counsel, notwithstanding Utah Rules of Professional Conduct 4.2(a), 4.2(e)(2), 5.3, and 8.4. As discussed below, there are disputed issues of material fact regarding whether this document is admissible, *see Featherstone v. Schaerrer*, 2001 UT 86, 34 P.3d 194 (noting that evidence obtained in violation of the Rules may be suppressed), whether it can be considered a contract, whether it is enforceable, whether it can be construed as a settlement of these claims, and whether it is unconscionable.

Plaintiff contests Paragraphs 4 and 5 insofar as they suggest that Plaintiff assumed the risk of JJP's intentional and reckless tortious misconduct, or to the extent they suggest that Plaintiff

26

assumed the risk of JJP publishing lies about Plaintiff. As discussed *infra*, the plain reading of these provisions, which were drafted by JJP and thus must be construed against JJP, does not lend itself to that interpretation.

Plaintiff contests Paragraph 6 insofar as it suggests that Plaintiff released claims involving the intentional or reckless misconduct alleged in this lawsuit.[3] The provision states that it only applies to the "maximum extent permitted by law," and New York law governs the agreement. As discussed below, New York's strong public policy prohibits parties from releasing claims involving willful, intentional, or reckless misconduct.

## III.     STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to DUCivR 56-1(c)(4), Brunette provides the following statements of additional material facts:

1.     At no point did Marciano Brunette sexually assault Demi Engemann. They exchanged a consensual kiss, and he is not a sexual predator. He has never engaged in any sort of violent conduct with her. *See* Pl.'s App'x, Ex. 1 ¶ 4.

2.     Engemann made false statements publicly on several occasions that Brunette sexually assaulted her and was a sexual predator. *See* JJP App'x, Ex. D (Season 3, Ep. 6) 00:12:11–00:13:10; Ex. F (Season 3, Ep. 8) 00:26:49–00:27:11; Ex. G (Season 3, Ep. 9) 00: 17:29–00:17:36; Ex. H (Season 3, Ep. 10) 00:36:37; Ex. I (Season 3, Reunion Ep.) 00:22:22, 00:32:09, 00:37:12.[4]

---

[3] The parties dispute the facts surrounding JJP's misconduct. *Compare* Compl., *with* JJP Answer. Much of the additional evidence surrounding JJP's intent and knowledge is in the possession of JJP and third parties, and Plaintiff needs to be permitted to engage in discovery before fully responding to summary judgment on these issues.

[4] JJP submitted to the Court, in connection with its Motion, certain documents and episodes in the Series. *See* Dkt. 33-1 (JJP's Appendix). Rather than duplicate the docket, Plaintiff cites to this record evidence in further support of Plaintiff's Opposition to the Motion.

3.    Several individuals who saw Engemann interact with Brunette, or spoke with Engemann shortly after their interaction, or knew Brunette, made clear to JJP that Engemann's accusations were false. *See, e.g.*, JJP App'x, Ex. D (Season 3, Ep. 6) 00:12:00–00:12:15, 00:25:30–00:25:42; Ex. G (Season 3, Ep. 9) 00:05:30–00:06:32; Ex. H (Season 3, Ep. 10) 00:39:14–00:39:22.

4.    JJP had observed Engemann previously falsely claim that she had been "shoved" by another man when video footage that JJP possessed plainly showed that accusation was false. *See* JJP App'x, Ex. D (Season 3, Ep. 6) 00:11:39–00:12:04.

5.    JJP had previously encouraged Engemann along with the other cast members to come up with ideas to make *Mormon Wives* less boring, and Engemann had previously suggested that JJP portray her relationship with another male castmate in a false light to gain ratings. *See* Pl.'s App'x, Ex. 6 (November 24, 2025 Instagram Post).

6.    JJP did not ask Plaintiff whether Engemann's allegations were true. Had JJP asked, Plaintiff could have provided JJP with evidence that contradicted Engemann's lies even further and would have denied her false accusations. Pl.'s App'x, Ex. 1 ¶ 5.

7.    Instead, JJP published Engemann's false accusations over the course of its show and published Engemann shaming individuals who expressed skepticism. *See* JJP App'x, Ex. D (Season 3, Ep. 6) 00:12:11–00:13:10; Ex. F (Season 3, Ep. 8) 00:26:49–00:27:11; Ex. G (Season 3, Ep. 9) 00: 17:29–00:17:36; Ex. H (Season 3, Ep. 10) 00:36:37; Ex. I (Season 3, Reunion Ep.) 00:22:22, 00:32:09, 00:37:12. JJP did not publish the truth: that Brunette did not sexually assault Engemann and denied her false accusations.

8.    Brunette and Engemann were both wearing microphones when they interacted, she said "I love you," and they kissed. Pl.'s App'x, Ex. 1 ¶ 6. The executive producer of *Vanderpump*

28

*Villa* publicly stated that she had all of the video and audio footage from Engemann's time on the show and there was reason to doubt Engemann. Pl.'s App'x, Ex. 6 (November 25, 2025 *Us Weekly* Article).

9.    JJP nonetheless has continued to publish Engemann's false statements. *See* JJP App'x, Ex. I (Season 3, Reunion Ep.) 00:22:22, 00:32:09, 00:37:12.

10.    JJP and its lawyers knew that Plaintiff was represented by counsel in connection with this lawsuit no later than December 16, 2025. *See* Pl.'s App'x, Ex. 2 (Solano Decl.) ¶¶ 2, 4.

11.    In January 2026, Brunette traveled to Salt Lake City, Utah to visit Chase McWhorter, one of the castmates of *Mormon Wives* and one of Brunette's friends. Pl.'s App'x, Ex. 1 ¶¶ 7–8.

12.    While on the way to visit Mr. McWhorter, Mr. McWhorter raised the issue of whether Brunette would be willing to appear on film with him. *Id.* ¶ 8. Brunette ultimately agreed with Mr. McWhorter that they could be filmed at a nearby bar in Utah. Brunette did not discuss the arrangement with JJP prior to being filmed, and JJP did not discuss a contract. *Id.* ¶ 9.

13.    On January 23, 2026, JJP filmed Brunette and Mr. McWhorter for approximately an hour at a bar in Park City, Utah. Brunette did not sign anything or agree to anything prior to filming, and no one from JJP relayed to Brunette how the footage would be used. *Id.* ¶¶ 10–11.

14.    After JJP was done filming, a female representative of JJP approached Brunette and told him that he needed to sign a release. She did not present him with a document. Brunette questioned whether he actually needed to sign it because he had signed those types of documents for JJP previously. Brunette also asked the JJP representative how he was going to be paid. Brunette's prior 2025 Performer Agreement laid out how much money JJP was supposed to pay him for show appearances. *Id.* ¶ 12.

29

15.     The JJP representative, in response to Brunette's questions, told Brunette that he had to sign the release and that they had his bank account information. *Id.* ¶¶ 13–14. She made no mention that the release would address anything other than the filming that had just transpired. *Id.* The JJP representative then presented Brunette with a "QR code," which Brunette scanned using his phone. *Id.*

16.     The "QR code" sent him a document that was drafted by Julie Hunt, JJP's in-house lawyer (the "2026 Document"), which was appended to Ms. Hunt's Declaration. JJP App'x, Ex. A (Hunt Decl.), ex. 2. The document displayed in small print on his phone, which Brunette signed. Pl.'s App'x, Ex. 1 ¶ 14.

17.     Brunette did not think that the 2026 Document had anything to do with this lawsuit and did not intend to release any of his claims against JJP or Engemann. *Id.* ¶¶ 15–16.

18.     JJP has not paid Brunette anything for the hour of filming in Utah or for purportedly settling the claims in this lawsuit. *Id.* ¶ 17.

19.     The 2026 Document makes no mention of this lawsuit and does not obligate Brunette to dismiss his claims against JJP. JJP App'x, Ex. A (Hunt Decl.), ex. 2. It is not signed by anyone other than Brunette. *Id.* It does not contain a provision requiring JJP to provide any consideration to Brunette in exchange for his agreement to the terms contained therein. *Id.*

20.     The 2026 Document states that it was entered into "in connection with a production currently referred to as '*Secret Lives of Mormon Wives*' (the 'Program') *intended for initial exhibition* on one or more platforms operated by Hulu LLC[.]" *Id.* at 1 (emphasis added).

21.     The 2026 Document states that Plaintiff will not be paid consideration for either appearing on the Program or agreeing to anything in the 2026 Document. *Id.* at 2. The 2026 Document claims that "a significant element of the consideration I am receiving under this Release

30

is the opportunity for publicity that I will receive if Producer includes my Participation in the Program." *Id.* Nothing in the 2026 Document obligates Producer to include footage of Plaintiff. *Id.*

22.    Brunette's 2025 Performer Agreement already contained several provisions addressing JJP's ability to use Brunette's likeness, which would have provided the same "opportunity for publicity." JJP App'x, Ex. A (Hunt Decl.), ex. 1 ¶¶ 3, 5(b).

23.    The 2026 Document purports to release all claims "which I or the Releasing Parties ever had, now has, or in the future may have against the Released Parties," and then provides examples of such released claims, all of which relate to the earlier defined "Program." JJP App'x, Ex. A (Hunt Decl.), ex. 2 at 3.

24.    The 2026 Document states that if the parties cannot resolve any dispute related to the Agreement with direct discussion, the parties will first resolve the issue through mediation, and then through arbitration. *Id.* at 5. JJP has not attempted to bring this case to a mediator or demand arbitration. Pl.'s App'x, Ex. 2 (Solano Decl.) ¶ 7.

25.    According to JJP's outside counsel, the 2026 Document is a form document that was not drafted for Brunette. Pl.'s App'x, Ex. 4 (February 25, 2026 Letter from JJP's Counsel).

26.    At no time from January 23, 2026 to February 17, 2026 did JJP inform Plaintiff's Counsel or the Court that JJP had sent a legal document that settled these claims to Brunette and obtained his signature, nor did JJP request that Plaintiff's Counsel file a notice with the Court that the claims against JJP had been settled. Pl.'s App'x, Ex. 2 (Solano Decl.) ¶ 5.

27.    JJP did not raise release as an affirmative defense in its Answer and did not counterclaim to enforce the 2026 Document as a contract. *See* Dkt. 32 (JJP's Answer).

31

IV.     **LEGAL STANDARD OF REVIEW**

A movant for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they "might affect the outcome of the case." *Garner v. The Cincinnati Ins. Co.*, No. 2:24-CV-00378-TC-DAO, 2026 WL 776291, at *2 (D. Utah Mar. 19, 2026) (Campbell, J.) (citing *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015)). Summary judgment should be denied if there are material facts "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Roberts v. Associated Wholesale Grocers, Inc.*, No. 93-3327, 1994 WL 556887, at *1 (10th Cir. Oct. 12, 1994)). The Court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Ellis v. Salt Lake City Corp.*, 147 F.4th 1206, 1219 (10th Cir. 2025)). The movant "has the burden of 'pointing out to the district court ... [the] absence of evidence to support the nonmoving party's case.'" *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1168 (10th Cir. 1998) (alterations in original) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).

V.      **ARGUMENT**

A.      **JJP Fails To Show That The 2025 Performer Agreement Entitles It To Summary Judgment As A Matter Of Law.**

JJP is not entitled to a judgment in its favor as a matter of law based on the provisions contained in the 2025 Performer Agreement.

*First*, JJP's assertion that Plaintiff "assumed the risk" of Engemann's lies is inaccurate. The Performer Agreement's "assumption of risk" provision states that show participants may "reveal and/or relate *information* about Artist of a personal, private, surprising, embarrassing and/or unfavorable nature." JJP App'x, Ex. A (Hunt Decl.), ex. 1 ¶ 7(a) (emphasis added). "Information" is defined as "knowledge gained from investigation, study, or instruction."

32

*Information*, Merriam-Webster, https://www.merriam-webster.com/dictionary/information (last visited Mar. 16, 2026). False claims that Plaintiff committed criminal sexual abuse is not "information," because information is, by definition, true. Engemann's statements are false. The release does not protect against false statements.

*Second*, the 2025 Performer Agreement is governed by New York law, and, critically, makes clear that claims are released only "to the maximum extent permitted by [New York] law." JJP App'x, Ex. A (Hunt Decl.), ex. 1 ¶ 8. New York has a longstanding public policy that renders unenforceable contractual provisions purporting to limit liability for intentional or willful misconduct, or grossly negligent acts. *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983) (a general release "no matter how flat and unqualified its terms, *will not* exonerate a party from liability under all circumstances … [and] will not apply to exemption of willful or grossly negligent acts.") (emphasis added). Put simply, "an exculpatory clause is unenforceable when … the misconduct for which it would grant immunity smacks of intentional wrongdoing." *Id.* at 385; *see also id.* (release is unenforceable for actions that are "fraudulent, malicious, or prompted by the sinister intention of one acting in bad faith" or that "betoken[] a reckless indifference to the rights of others"); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S. 2d 938, 940, (3d Dep't 1993) (releases cannot "insulate the releasee from intentional, willful or grossly negligent acts"); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992) ("It is the public policy of this State[]that a party may not insulate itself from damages caused by grossly negligent conduct.") (collecting cases). This is true even if the parties contemplated releasing such claims related to such conduct. *See Great N. Assocs.*, 596 N.Y.S. 2d at 940 (release that purportedly disposed of claims related to "fraud … and tortious interference with contractual relations" is

33

unenforceable because "defendants … embarked upon a deliberate and calculated scheme to damage plaintiff's business") (citing *Kalisch–Jarcho* 58 N.Y.2d at 385).

New York's public policy forbidding the release of intentional or reckless misconduct applies not only to causes of action, but also to circumstances where the conduct at issue was intentionally wrong or reckless. Courts applying New York law have recognized this and have refused to grant summary judgment where, as here, such conduct would render the provision unenforceable. *See, e.g.*, *Safeway Inc. v. Abbott Lab'ys*, 761 F. Supp. 2d 874, 901 (N.D. Cal. 2011) (summary judgment denied because release unenforceable under New York's public policy and finding that "GSK may recover … if it proves that Abbott acted with reckless indifference").

The claims against JJP in the Complaint are intentional torts. *See* Restatement (Second) of Torts § 580A (defamation). The underlying allegations in the Complaint make clear that JJP engaged in intentional misconduct or, at minimum, reckless acts. *See* Compl. ¶¶ 36–38, 54, 66, 104–06, 108, 110–13. Plaintiff has set forth evidence that JJP was told that Engemann was lying, knew that the executive producer of *Vanderpump Villa* had access to the footage and said that the women had reason to doubt Engemann, and that JJP encouraged the castmates to fabricate storylines to make the show not "boring." *See* Pl.'s App'x, Ex. 5 (November 25, 2025 *Us Weekly* Article); Ex. 6 (November 24, 2025 Instagram Post); *see also* JJP App'x, Ex. D (Season 3, Ep. 6) 00:12:00–00:12:15, 00:25:30–00:25:42; Ex. G (Season 3, Ep. 9) 00:05:30–00:06:32; Ex. H (Season 3, Ep. 10) 00:39:14–00:39:22.

Notably, JJP has not put forth any evidence to suggest that it thought Engemann was telling the truth or that its conduct publishing Engemann's lies was anything other than the calculated scheme designed to boost ratings that is alleged in the Complaint. Publishing lies about sexual assault for profit at the expense of Plaintiff is precisely the type of intentional wrongdoing that

34

New York law refuses to immunize, regardless of the contract's language or even the parties' intent. But instead of attempting to offer evidence that it did not engage in intentional or reckless misconduct, JJP attempts to fill the gap in its argument by citing to several cases that did *not* raise or otherwise address New York's public policy.[5] JJP's reliance on these cases is improper.

**B.**      **JJP Fails To Establish That The 2026 Document Entitles JJP To Summary Judgment As A Matter Of Law Without Further Discovery.**

JJP has failed to show that it is entitled to judgment as a matter of law by reference to a document that JJP convinced Brunette to sign without his lawyers after this lawsuit commenced (the "2026 Document"). For the reasons below, it is not, for several reasons.[6]

---

[5] For example, *Bihag v. A&E Television*, *LLC* did not involve an intentional tort claim, and the Second Circuit evaluated only the release's effectiveness to release a breach-of-contract claim. 669 Fed. App'x 17, 18 (2d Cir. 2016) ("we consider only Bihag's claim for breach of contract"). The remainder of cases cited by Defendant do not address New York's public policy. *Moore v. Cohen*, 548 F. Supp. 3d 330 (S.D.N.Y. 2021) (no discussion of unenforceability of intentional torts as a matter of public policy); *Shapiro v. NFGTV, Inc.*, No. 16 CIV. 9152 (PGG), 2018 WL 2127806, at *1 (S.D.N.Y. Feb. 9, 2018) (same); *Psenicska v. Twentieth Century Fox Film Corp.*, No. 07 CIV. 10972(LAP), 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008), *aff'd*, 409 F. App'x 368 (2d Cir. 2009) (same); *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157, at *1 (N.Y. Sup. Ct. Sept. 27, 2002) (same).

[6] The 2026 Document was signed while both Brunette and a JJP representative were in Utah and addressed filming that JJP had just finished at a bar in Utah. Thus, Utah law should apply to the question of whether a contract was formed and whether Professional Rules of Responsibility render it void and/or inadmissible. The 2026 Document contains a New York choice-of-law provision, and thus, New York law governs questions regarding the interpretation of a formed contract. *See, e.g.*, *Boulder Falcon, LLC v. Brown*, 720 F. Supp. 3d 1175, 1186–87 (D. Utah 2024) (noting that "choice-of-law provisions in a contract do not control the preliminary question of contract formation, which necessarily demands an independent inquiry as to the applicable law").

1.     <u>Material Issues of Fact Surround Whether the 2026 Document Is Void and Inadmissible Because It Purports to Be a Settlement Document Prepared By an Attorney and Was Communicated to a Represented Party Without His Counsel's Permission or Knowledge.</u>

Material issues of fact exist regarding whether the 2026 Document is void or inadmissible because JJP is claiming it is a settlement document and it was communicated to a represented party without the permission or knowledge of that party's lawyers.

Utah's Rules of Professional Conduct, like nearly all Rules of Professional Conduct, make clear that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by a legal professional in the matter, unless the lawyer has the consent of the legal professional." Utah R. Prof'l Conduct 4.2(a). Subsection 4.2(e)(2) of Utah's rules goes even further and prohibits an attorney who is communicating with a represented party from "engag[ing] in negotiations of a plea agreement [or] settlement … unless such negotiations are permitted by law, rule or court order." Utah R. Prof'l Conduct 4.2(e)(2). The comments to the Rule make clear that subsection (e) is "intended to regulate a lawyer's communications with a represented person, which might otherwise be permitted under the Rule, by prohibiting any lawyer from taking unfair advantage of the absence of the represented person's legal professional." Utah R. Prof'l Conduct 4.2 cmt. 22. As recognized by the Utah Supreme Court, "the 'general thrust of the rule today is to prevent situations in which a represented party may be taken advantage of by adverse counsel.'" *Featherstone v. Schaerrer*, 2001 UT 86, ¶ 21, 34 P.3d 194.

Utah R. Prof'l Conduct 4.2 encompasses *all* communications (including emails of the type at issue here). And the Rule must also be read in conjunction with Utah Rules 5.3(c), which provides that, "[w]ith respect to a nonlawyer … retained by or associated with a lawyer," the "lawyer shall be responsible for conduct of such a person that would be a violation of the [Rules] if engaged in by a lawyer" and "the lawyer orders, or, with knowledge of the specific conduct,

36

ratifies the conduct involved." Utah R. Prof'l Conduct 5.3(c). Further, a lawyer may not "violate or attempt to violate the Rules of Professional Conduct, *knowingly assist or induce another to do so, or do so through the acts of another*[.]" Utah R. Prof'l Conduct 8.4 (emphasis added).[7]

Here, JJP's lawyers, of course, knew no later than December 16, 2025, that Plaintiff was represented in connection with this lawsuit. JJP's own lawyer drafted the 2026 Document, a purported settlement agreement, and sent it to Brunette *after* he was represented. The document was sent to him without his counsel's knowledge or permission and, presumably, without the permission of this Court. And now JJP's lawyers are arguing that he executed a legally binding settlement agreement for which JJP is not obligated to pay him one penny to resolve the claims in this lawsuit. Under these circumstances, JJP has not shown as a matter of law that this document can be enforced, as it appears that JJP's counsel "took unfair advantage by unethically dealing with [her] client's opponent before seeking—or receiving—permission from the opponent's counsel to do so." *Featherstone*, 2001 UT 86, ¶ 36. JJP's attempted resolution of this matter by making an end-run around Brunette's chosen attorneys and demanding he sign a "settlement" agreement for no consideration is precisely what Utah R. Prof'l Conduct 4.2 is designed to avoid.

Other courts that have considered similar circumstances—a lawyer drafting a settlement or legal document that is then sent to and signed by the represented party outside the presence of his counsel—have determined that such conduct violates similar ethics rules and renders the document void and unenforceable or, at minimum, inadmissible. *See, e.g.*, *Shuler v. Liberty Consulting*

---

[7] The American Bar Association has similar Model Rules of Professional Conduct. *See* Model Rules of Pro. Conduct r. 4.2 ("a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order"); Model Rules of Pro. Conduct r. 8.4 ("It is professional misconduct for a lawyer to … violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another").

*Servs., Ltd.*, No. 20-CV-5779-KAM-CLP, 2022 WL 1552039, at *12 (E.D.N.Y. Apr. 4, 2022), *report and recommendation adopted,* 2022 WL 1564109 (E.D.N.Y. May 2, 2022); *Dosso v. Knights Collision Experts*, No. 20-CV-0461-EK-CLP, 2021 WL 9038372 (E.D.N.Y. Sept. 15, 2021); *see also Holdren v. Gen. Motors Corp.*, 13 F. Supp. 2d 1192, 1197 (D. Kan. 1998) (finding a violation of similar versions of Rules 4.2 and 8.4 where affidavits that the client obtained from represented parties with the assistance of counsel, outside the presence of the represented parties' counsel, and deeming such evidence inadmissible).

JJP chose not to include in its motion for summary judgment any evidence surrounding how or why JJP obtained the 2026 Document it now claims has settled this case. When Plaintiff's counsel requested all communications surrounding this issue and demanded that JJP stop communicating with Plaintiff, JJP's counsel refused to provide any and instead responded that Ms. Hunt and her other attorneys did not directly speak with Plaintiff and that the document was not drafted specifically for him. *See* Pl.'s App'x, Ex. 2 (Solano Decl.) ¶¶ 8–10; Ex. 4 (February 25, 2026 Letter from JJP's Counsel). Neither of those things, obviously, means that the document was obtained in accordance with the Rules of Professional Conduct. *Featherstone* makes clear that excluding evidence—here, the document that was communicated to Brunette outside the presence of his attorneys—is within the Court's inherent authority in the event the document was obtained in violation of the Rules. *See Featherstone*, 2001 UT 86, ¶¶ 15–16; *see also Holdren v. Gen. Motors Corp.*, 13 F. Supp. 2d 1192, 1197 (D. Kan. 1998) ("If plaintiff has obtained evidence from 'parties' within the meaning of Rule 4.2, such evidence will be deemed inadmissible at trial."); *Belote v. Maritrans Operating Partners, L.P.*, No. 97–3993, 1998 WL 136523, at *7 (E.D. Pa. Mar. 20, 1998) (precluding plaintiff from using during trial any information obtained through investigator's *ex parte* contacts with "party" employee).

38

2.      The 2026 Document is Not an Enforceable Contract Because There Was No Adequate Consideration or Meeting of the Minds.

JJP has failed to show that the 2026 Document is a "contract" supported by adequate consideration rendering it enforceable. Under Utah law, "an enforceable contract is formed by 'mutual assent upon a bargained-for exchange"—that is, offer, acceptance, and adequate consideration.'" *Watson v. EnableUtah*, 787 F. Supp. 3d 1245, 1249 (D. Utah 2025) (quoting *Rossi v. University of Utah*, 2021 UT 43, ¶ 32, 496 P.3d 105). The "burden of proving consideration is on the party seeking to recover on the contract." *DeMentas v. Est. of Tallas, By & Through First Sec. Bank*, 764 P.2d 628, 631–32 (Utah Ct. App. 1988). If the party cannot prove consideration, the "contract will be held invalid by the court." *Id.* Further, "when evidence tending to prove lack of consideration is introduced, the issue of whether there was valid consideration becomes a question of fact for the trier of fact." *Id.* (quotation omitted).

"Consideration refers to a 'legal detriment' on the part of the promisor." *Watson*, 787 F. Supp. 3d at 1249 (quoting *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1372 (Utah 1980)). And "[c]onsideration sufficient to support the formation of a contract requires that a performance or a return promise must be bargained for." *Trans-W. Petroleum, Inc. v. United States Gypsum Co.,* 830 F.3d 1171, 1177 (10th Cir. 2016) (quoting *Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 413 (Utah 1998)). "Events which occur prior to the making of the promise and not with the purpose of inducing the promise in exchange are viewed as 'past consideration' and are the legal equivalent of 'no consideration.'" *DeMentas*, 764 P.2d at 633 (quoting 1 A. Corbin, Corbin On Contracts § 210 (1963)).

When "a statement [is] made in such vague or conditional terms that the person making it commits himself to nothing, the alleged 'promise' is said to be 'illusory'" and "cannot function as consideration." *Watson*, 787 F. Supp. 3d at 1250 (quoting *Res. Mgmt. Co. v. Weston Ranch &*

39

*Livestock Co.*, 706 P.2d 1028, 1036 (Utah 1985)). "Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.... Where the apparent assurance of performance is illusory, it is not consideration for a return promise." *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1211 (10th Cir. 2016) (quoting Restatement (Second) of Contracts § 77 cmt. a (Am. Law Inst. 1981)).

Here, JJP fails to identify adequate consideration justifying a settlement in this case. The document itself states that the Producer will not pay Brunette *anything* for his participation in the Series or for signing the 2026 Document. The 2026 Document was presented to Brunette after he agreed to be filmed by JJP, and after they were finished with said filming. Anything Brunette received by signing the release would be past consideration, which is no consideration. While the document states that Brunette's consideration is "the opportunity for publicity that I will receive if Producer includes my Participation in the Program or in the Advertisements," this is inadequate and illusory. The 2026 Document does not obligate JJP to use the film of Brunette in any way.[8] In other words, the 2026 Document plainly "makes [Producer's] performance entirely optional[.]" *In re Cox Enters., Inc.*, 835 F.3d at 1211. This is, if anything, a textbook example of a vague conditional term that is nothing more than an illusory promise that is insufficient consideration to form a contract. At minimum, it creates an issue of fact. *See DeMentas*, 764 P.2d at 631–32.

Likewise, "[b]efore forming an enforceable contract, there must be a meeting of the minds on the essential terms of the agreement." *Trans-W. Petroleum, Inc. v. United States Gypsum Co.*, 830 F.3d 1171, 1176 (10th Cir. 2016). "In determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and

---

[8] And Brunette already had the "opportunity for publicity" in the event JJP publicly disseminated his likeness, per the terms of the 2025 Performer Agreement.

40

interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on complete and definite terms." *1-800 Contacts, Inc. v. Weigner*, 2005 UT App 523, ¶ 4, 127 P.3d 1241. Whether there is a meeting of the minds depends on whether the parties actually intended to contract, "and the question of intent generally is one to be determined by the trier of fact." *Terry v. Bacon*, 2011 UT App 432, ¶ 21, 269 P.3d 188 (quoting *O'Hara v. Hall,* 628 P.2d 1289, 1291 (Utah 1981)) (internal quotation marks omitted).

Here, JJP chose to film Brunette prior to having any discussion on the terms of that filming or whether he would sign a document from his phone. JJP's representative suggested Plaintiff would be paid for his appearance. No one from JJP countersigned the document. No one from JJP suggested it covered his current lawsuit. JJP has failed to prove that the parties even intended to enter into what JJP now claims is a contract—did the representative from JJP intend to send the link to the QR code to the document Brunette signed, and, if so, why did she suggest that they had his banking information? Did she even understand the terms that she was relaying to Brunette? What did the JJP representative who told Plaintiff he "had to" sign the document think the parties were agreeing upon? According to JJP, the 2026 Document was not drafted for Brunette, making it impossible that the JJP representative thought it had anything to do with this lawsuit.[9] Under these circumstances, summary judgment is inappropriate.

---

[9] And, as discussed above, if JJP's lawyers thought that each time this document was being sent by QR code to a person they were presenting that person with settlement negotiations to resolve lawsuits unrelated to that filming, they were prohibited from doing so under Utah's ethics rules.

3.    The 2026 Document's Terms Do Not Encompass Settling or Dismissing Brunette's Lawsuit for JJP's Conduct in Season Three of *Mormon Wives*.

JJP's argument that the 2026 Document settles Brunette's claims for its intentional misconduct during Season Three of *Mormon Wives* misconstrues the language of the 2026 Document.

At the outset, the 2026 Document states that it relates to filming for a prospective series of what it thinks will be called *Mormon Wives*. The introductory paragraph of the 2026 Document states that the document is being entered into "in connection with a production currently referred to as '*Secret Lives of Mormon Wives*' (the 'Program') *intended for initial exhibition* on one or more platforms operated by Hulu LLC[.]" JJP App'x, Ex. A (Hunt Decl.), ex. 2 at 1 (emphasis added). The scope of the document refers prospectively to "a production" that *has not been released* on Hulu and is, instead, *intended* to be *initially* exhibited on Hulu. Within context, "Program" refers to footage for what they intend will be an upcoming episode not yet exhibited. It does not govern or address JJP's intentional misconduct from Season Three's past filming and past exhibition.

The section of the 2026 Document involving releases of claims also does not mention dismissing claims already filed. Nor does the document state that any lawsuit will be deemed settled by the execution of the 2026 Document. The examples provided within the scope of the release are plainly tied to prospectively framed "Program":

> [C]laims arising out of or related to the Program, my Participation, the Materials, the Advertisements, or the uses as described herein. The Claims shall also include but are not limited to: any and all claims arising from or relating to my participation in any of the activities and events associated with the Program, Producer or Network's production, promotion, exhibition, distribution and/or other exploitation of the Program[.]

*Id.* at 3.

42

Under New York law, which governs the 2026 Document, courts "giv[e] practical interpretation to the language employed [in contracts] and the parties' reasonable expectations." *Zacharius v. Kensington Pub. Corp.*, No. 652460/2012, 2014 WL 52892, at \*5 (N.Y. Sup. Jan. 6, 2014) (quoting *112 W. 34th St. Assocs., LLC v. 112–1400 Trade Props. LLC*, 95 A.D.3d 529, 531 (1st Dep't 2012)). "New York law considers the context as a key factor in interpreting a release. Where the release presents a specific context, the released claims are interpreted in this light." *Lucent Technologies, Inc*., 470 F. Supp. 2d 1195, 1199 (S.D. Cal. 2007). Further "[u]nder the canon of *ejusdem generis*, a series of specifics things or concepts is used to interpret a generic one in the same series." Zacharius, 2014 WL 52892, at \*5 (defining broader word that was followed by more narrower examples after "including, without limitation" in connection with the narrower examples); *see also Popkin v. Sec. Mut. Ins. Co. of New York*, 367 N.Y.S.2d 492, 495 (1975) ("Where comprehensive words in a contract are followed by an enumeration of specific things, under the rule of Ejusdem generis the things coming within the comprehensive words will be limited to those of a like nature to those enumerated") (quoting 10 N.Y. Jur., Contracts § 217).

Here, the description of what is to be released is tied by the specific examples related to the prospectively defined "Program," *i.e.*, footage that JJP was putting together for a project intended to be released in the future. The 2026 Document does not mention or otherwise encompass JJP's conduct vis-à-vis Brunette's participation prior to the series in production being filmed. It is not reasonable to have expected Brunette, an unsophisticated party who did not have the benefit of his counsel's advice, to have thought scribbling his signature on his phone and receiving no payment would have settled this federal lawsuit. At most, the contract is ambiguous, and any ambiguity must be read against JJP as the drafter. *See, e.g.*, *AT & T Corp. v. Beehive Tel. Co.*, No. 2:08CV941, 2010 WL 376668, at \*20 (D. Utah Jan. 26, 2010) (applying New York law

and observing that "ambiguity must be construed against the drafter") (citing *Frost v. Budget Car & Truck Rental,* 15 A.D.3d 963, 964, 788 N.Y.S.2d 904 (2005) ("it is well settled that any ambiguity should be resolved against the drafter of the release")).

> 4.  <u>New York Law Does Not Interpret Generally Worded Releases Broadly, Especially Where No Additional Consideration Is Bargained-For.</u>

Under New York law, "[e]ven the most broadly drawn general release cannot necessarily be taken at face value." *In re Clinton St. Food Corp.*, 254 B.R. 523, 534 (Bankr. S.D.N.Y. 2000). Instead, "a release, general on its face, will be limited to those claims within the contemplation of the parties at the time." *In re Actrade Fin. Techs.*, *Ltd.,* 424 B.R. 59, 69–70 (Bankr. S.D.N.Y. 2009) (collecting cases). "[T]he interpretation of a release and the limitations on parole evidence are often subject to special rules in light of the nature of releases. Thus, the meaning and coverage of a general release hinges on the controversy being settled and the purpose for which the release is actually given." *In re Clinton St. Food Corp.*, 254 B.R. at 534. New York courts have recognized that it is "not reasonable" to read a general release as covering a claim for which "[n]o part of the consideration for the release was related to the extinguishment of th[e] claim" and the claim "was neither bargained for nor discussed." *Tarantola v. Williams*, 48 A.D.2d 552, 554, 371 N.Y.S.2d 136, 140 (1975).

"Determination of the intent of the parties at the time they entered into the contract is not governed by their unexpressed subjective views, but rather by what they wrote, their acts, conduct and all surrounding circumstances." *Lubrication & Maint., Inc. v. Union Res. Co.*, 522 F. Supp. 1078, 1081 (S.D.N.Y. 1981). Further, "[d]elay in asserting the defense of settlement under a release may also be 'powerful evidence' that a party asserting a release defense merely 'contrived that theory long after the fact,' and that the release does not bar the claims at issue." *In re Actrade Fin. Techs., Ltd.,* 424 B.R. 59, 69–70 (Bankr. S.D.N.Y. 2009) (quoting *W. Alton Jones Found. v.*

*Chevron U.S.A., Inc.,* 97 F.3d 29, 34 (2d Cir. 1996)); *see also Consol. Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d 639, 650–51 (S.D.N.Y. 2004).

Here, nothing that transpired between JJP or Brunette suggest that the release language in the 2026 Document settles this lawsuit. JJP did not discuss or bargain-for this lawsuit when telling Brunette that he "had to" sign the document and, as noted, provided no consideration for this "settlement." JJP did not tell the Court that dismissal was forthcoming. It did not inform Plaintiff's counsel that the claims had been resolved and counsel should prepare a notice of dismissal. It did not seek mediation or arbitration to resolve this dispute. It did not counterclaim to enforce the "contract" or even plead a "release" as an affirmative defense in its answer. Under these circumstances, there are material facts in dispute and summary judgment is not appropriate.

Finally, that JJP did not raise release as an affirmative defense in its Answer further proves that the 2026 Document was never intended to release or settle Plaintiff's claims in this lawsuit. *See* Dkt. 32; Fed. R. Civ. P. 8(c); *Beehive Tel. Co.*, 2010 WL 376668, at *21 (collecting cases and finding affirmative defense of release waived when not pleaded in Answer).

     5.    <u>New York Law Renders Enforcement of the 2026 Document to Release Brunette's Intentional Tort Claims Unconscionable.</u>

Summary judgment is also inappropriate for JJP because the 2026 Document, to the extent it purports to settle this federal lawsuit, is unenforceable because it is unconscionable. An unconscionable contract is one that "is so grossly unreasonable as to be unenforceable because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" *Simar Holding Corp. v. GSC*, 87 A.D.3d 688, 689–90 (2011) (quoting *King v. Fox,* 7 N.Y.3d 181, 191 (2006)). Unconscionability has two components, procedural unconscionability and substantive unconscionability, both of which "operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less

imbalance in a contract's terms should be tolerated and vice versa" *Id.* (quoting *State of New York v. Wolowitz,* 96 A.D.2d 47, 68 (1983)). "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *Id.* (quoting *Wolowitz*, 96 A.D.2d at 67).

Examples of procedural unconscionability "include, but are certainly not limited to, high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties." *Id.* While examples of substantive unconscionability "are virtually limitless but include inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty." *Id.* (quoting *Wolowitz* at 67–68). Where the facts surrounding unconscionability are disputed, summary judgment is not appropriate. *See Simar* (reversing summary judgment on unconscionability issue); *see also Am. Fam. Life Assurance Co. of New York v. Baker*, 778 F. App'x 24, 28 (2d Cir. 2019) (remanding for further development on unconscionability).

Here, enforcing the 2026 Document against Plaintiff as a settlement agreement by which he is paid nothing for his claims is unconscionable. This "settlement agreement" was presented to him without his lawyers' knowledge or permission, after he had already agreed to be filmed, and after filming occurred. It was communicated to him by way of a QR code on his phone with vague instructions where he believed he "had to sign it." JJP also referenced that they had Plaintiff's banking information, suggesting that he would be paid—contrary to the language in the agreement itself. Nearly all the hallmarks of procedural unconscionability exist here: inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties, particularly when the contract was presented to an unsophisticated party by himself without the opportunity to present it to his own lawyer that he had already retained.

46

The 2026 Document is also substantively unconscionable because, if the 2026 Documents is read as settlement the claims in this lawsuit, Plaintiff would receive nothing in return for doing so. JJP escapes liability for its intentional misconduct which resulted in significant earnings at Plaintiff's expense. Under these circumstances, the 2026 Document is unconscionable as a matter of law, or, at a minimum, summary judgment should be denied.

## JJP'S MOTION FOR FEES UNDER STATE LAW SHOULD BE DENIED

I.   ARGUMENT

### A.   Utah's Anti-SLAPP Statute Does Not Apply To Federal Court Actions.

As an initial matter, Utah's anti-SLAPP law does not apply to this diversity action because it is a procedural statute and, to the extent it is substantive, conflicts with the Federal Rules. *See* Dkt. 51 (Pl.'s Opp. to Def.'s Mot. to Dismiss) at 9–11. Although the Tenth Circuit has not yet had occasion to rule on the issue, it did, *sua sponte*, "note that plaintiffs have prevailed on this ground [that state anti-SLAPP laws do not apply in federal court] elsewhere." *Coomer v. Make Your Life Epic LLC*, 98 F.4th 1320, 1324 n.5 (10th Cir. 2024) (collecting cases).

Further demonstrating that the Utah anti-SLAPP statute is inapplicable, JJP asks this Court to apply *only* those sections of Utah's anti-SLAPP law that let it recover fees, but not the discovery-stay, burden-shifting, expedited-hearing, or any other provisions that it knows conflict with the Federal Rules. (Mot. 37 & n.11.) JJP, however, cannot have it both ways. As Judge Bress recently explained when discussing California's anti-SLAPP statute (which Utah's is modeled after), "[t]he attorneys' fees provision in the anti-SLAPP statute is part of an integrated statutory scheme." *Gopher Media LLC v. Melone*, 154 F.4th 696, 717 (9th Cir. 2025) (Bress, J., concurring). It would be "wholly improper to apply a state attorneys' fees provision to a state law that [federal courts] have completely rewritten" and "that bears no resemblance to the statute enacted," because there

would be "in effect, no underlying statute to which the attorneys' fee provision could even apply." *Id.* at 716–17.

By conceding—as it must—that key features of Utah's anti-SLAPP law have no application in federal court, JJP admits that were it to prevail on its motion, it would "not [be] truly prevailing on that motion as the [Utah] legislature conceived it," but instead be "winning on some 'hybrid mess' of a motion." *Id.* at 717 (citation omitted). That is why, as then-Judge Kavanaugh explained, when an anti-SLAPP statute "does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6)," "attorney's fees under the Anti-SLAPP Act are not available." *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1337 n.5 (D.C. Cir. 2015) (Kavanaugh, J.); *see also Klocke v. Watson*, 936 F.3d 240, 247 n.6 (5th Cir. 2019) (fee-shifting provisions in anti-SLAPP laws "are not applicable apart from the burden-shifting early dismissal framework"). This Circuit found his opinion to be "persuasive." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1237 (10th Cir. 2020). Because Utah's anti-SLAPP law only allows fees "[o]n a motion under Section 78B-25-103" (Utah Code § 78B-25-110), ***not*** under Rules 12 or 56—whose standards JJP concedes govern this proceeding—there is no basis on which to award JJP fees even if it were to prevail.

**B.**     <u>**Accusing Someone Of Sexual Assault Is A Private Grievance, Not A Public Concern, Under Tenth Circuit Law.**</u>

Even if the anti-SLAPP law were to apply (it does not), JJP's argument would still fail at the outset. JJP tries to conveniently skate past the threshold requirement under Utah's anti-SLAPP law that the speech at issue involve a matter of public concern, without a single citation to any in-circuit authority—not even in its citation-heavy footnotes. (Mot. 36–37.) No wonder: it is longstanding Tenth Circuit law that accusing someone of sexual assault is a uniquely private concern, even if it takes place in a public forum.

48

The Tenth Circuit has consistently held that complaints of sexual harassment are private grievances, not matters of public concern, when "the thrust of the … speech was that [complainants] personally were being subjected to sexual harassment and they wanted it to stop." *Woodward v. City of Worland*, 977 F.2d 1392, 1403–04 (10th Cir. 1992). Such speech is "calculated to redress personal grievances" rather than to further "a broader public purpose." *Id.* at 1403. Thus, that a complainant "allege[s] that she has been personally subjected to sexual harassment" is not enough to elevate her speech to a matter of public concern. *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1356 & n.2 (10th Cir. 1996). On the contrary, "[w]hile *discussion* of the issues of rape, [and] [] sexual abuse … are undoubtedly matters of public concern," to "specifically *accuse*[] [someone] of rape and [] sexual abuse" is "not directed to matters of public concern." *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1191–92 (D. Utah 2024) (emphasis added).

That the accusations in this case were aired on television and posted on social media makes no difference. "[T]he form and context of" the accusations "do not render this private matter one of public concern—simply posting on publicly viewable social media cannot transform the content of speech into that of public import." *Id.* at 1192. Even where speech concerns a "subject of intense media interest, that alone will not convert speech … into speech of public concern." *Arndt v. Koby*, 309 F.3d 1247, 1254 (10th Cir. 2002). Likewise, that Brunette may be a limited-purpose public figure does not automatically render the allegations against him matters of public interest. *See Judge v. Saltz Plastic Surgery, P.C.*, 2016 UT 7, ¶ 17 n.5, 367 P.3d 1006 ("A logical nexus between information published and the matter of legitimate public interest is required not only in cases involving involuntary public figures but also in cases involving voluntary public figures."). As such, Engemann's false accusations of sexual assault are outside the protection of Utah's anti-

49

SLAPP statute. *See UHS of Provo Canyon, Inc. v. Bliss*, No. 2:24-CV-163-DAK-CMR, 2024 WL 4279243, at *5 (D. Utah Sept. 24, 2024).

## CONCLUSION

JJP published lies that Marciano Brunette is a sexual predator. It did so for profit. It now asks this Court to terminate the case before Brunette has had a single day of discovery—based on a release that cannot cover intentional torts, a document obtained behind his lawyers' backs, and an anti-SLAPP statute that does not apply in federal court. The Motion should be denied.

Dated: March 27, 2026

Respectfully submitted,

**Parkinson | Benson | Potter**

*/s/ D. Loren Washburn*
D. Loren Washburn
Cliff Parkinson
loren@pbp.law
cliff@pbp.law
801-643-1420
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098

**DYNAMIS LLP**

*/s/ Jamie Hoxie Solano*
Eric S. Rosen (*pro hac vice*)
Jamie H. Solano (*pro hac vice*)
Brooke Watson (*pro hac vice*)
Yusef Al-Jarani (*pro hac vice*)
Caroline McHugh (*pro hac vice*)

*Attorneys for Plaintiff Marciano Brunette*

50

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2026, I caused the foregoing brief to be served upon all Filing

Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.


*/s/ D. Loren Washburn*
D. Loren Washburn